## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No.  06-329 (CKK)** |
| | : | |
| **RANDALL CASSEDAY,** | : | |
| | : | |
| **Defendant.** | : | |

---

### SENTENCING MEMORANDUM

On November 20, 2006, with a modification accepted by this Court on December 21, 2006, Mr. Casseday plead guilty to counts two and three of a three count Information.  The Information charged Mr. Casseday with Count One - Enticing a Minor, in violation of 18 U.S.C. § 2422(b); Count Two - Possessing Material Constituting or Containing Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B),(b)(2); and Count Three - Enticing a Child, in violation of D.C. Omnibus Public Safety Congressional Review Emergency Act of 2006, Act 16-445, § 209(d).  He will appear before this Honorable Court for sentencing on February 15, 2007.  Mr. Casseday, through undersigned counsel, respectfully submits the following information for the Court's consideration in imposing a sentence and determining a period of supervised release.[1]

### BACKGROUND

On October 31, 2006, the above mentioned three-count Information was filed against Mr. Casseday.  He pled guilty to counts two and three of the information on November 20, 2006, pursuant to a written plea agreement in which the parties agreed to a sentence pursuant to Rule

---

[1]  Attached to this memorandum are sixteen letters written by various family members, friends, and co-workers all in support of Mr. Casseday.

11(c)(1)(c).  On December 21, 2006, the plea agreement was modified in which the parties again agreed to a sentence pursuant to Rule 11(c)(1)(c).

Pursuant to the plea agreement, the parties agreed to a sentence of sixty months incarceration on Count Two of the Information, and thirty months incarceration on Count Three of the Information, to be served consecutively.  Hence, a 90 month term of incarceration.  In addition, the parties agreed that at least ten years of supervised release must be imposed on Count Two, and three years of supervised release must be imposed on Count Three, to be run concurrently.  It should be noted that if Mr. Casseday's term of supervised release is revoked, he will be sanctioned by this Count pursuant to Count Two, and further sanctioned by the U.S. Parole Commission pursuant to Count Three.

## ARGUMENT

Notwithstanding the agreements stated in the plea agreement, it should be noted, however, that the Guidelines are not mandatory, but merely advisory.  The factors identified in 18 U.S.C. § 3553(a) support Mr. Casseday's and the government's request that he be sentenced to ninety months of incarceration.  In addition, Mr. Casseday requests that he be sentenced to a 10 year term of supervised release, consistent with the terms of the plea agreement.  The Court must consider the Guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).  United States v. Booker, 543 U.S. 220, 260  (2005).  These factors include:  "The nature and circumstances of the offense and the history and characteristics of the defendant; . . . the kinds of sentences available; . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and . . . the need to provide restitution to any victims of the offense."  18 U.S.C. 3553(a).  Pursuant to 18 U.S.C. § 3661,

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence.

After considering all of the factors set forth in § 3553(a), the Court must impose a sentence "that reflect[s] the seriousness of the offense, promote[s] respect for the law, provide[s] just punishment, afford[s] adequate deterrence, protect[s] the public, and effectively provide[s] the defendant with needed educational or vocational training and medical care." Id. at 765 (citing 18 U.S.C. § 3553(a)(2)). Section 3582 of Title 18 provides:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, **recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.** (Emphasis added).

With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph [(a)](2) [of § 3553]." 18 U.S.C. § 3553(a).

A review of all of the applicable factors set forth in § 3553(a) demonstrates that a sentence to a term of 90 months incarceration with a ten year term of supervised release would be warranted in this matter, and that a sentence of imprisonment outside of this guideline range would be greater than necessary to meet the sentencing purposes set forth in § 3553(a)(2). While Mr. Casseday has committed a very serious crime, he has expressed regret and remorse for his actions. With regard to the conduct that occurred on September 26, 2006, Mr. Casseday agreed to waive his right to a preliminary hearing, to file any pre-trial motions, and pled guilty in a timely fashion thereby saving scarce judicial resources.

It should be noted that Mr. Casseday is fifty-three years old.  Once he is released from his ninety month term of imprisonment, Mr. Casseday will be sixty years old.  As his plea agreement states, Mr. Casseday agrees to be subject to at least a ten year term of supervised release.  Therefore, he agrees to be supervised by a probation officer, with possible sanctions by the U.S. Parole Commission (for at least three years) and this Court (for at least ten years) if he violates any term of supervised release, until at least the age of seventy.  The government in its sentencing memorandum requests that this Court impose a term of 20 years supervised release, therefore subjecting Mr. Casseday to supervision until the age of eighty.  Monitoring Mr. Casseday from the age of seventy to eighty, is not a reasonable use of scarce judicial resources.  Further, it should be noted that pursuant to Section 115 of the Adam Walsh Act, Mr. Casseday is required to register as a sex offender for at least twenty-five years in any state or jurisdiction where he resides, is employed or is a student.  Therefore, Mr. Casseday is required to register as a sex offender until he is eighty-five years old.

Therefore, sentencing Mr. Casseday to a term of 90 months incarceration with ten years of supervised release is "sufficient, but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, or effectively provide Mr. Casseday with needed educational or vocational training and medical care."  See 18 U.S.C. § 3553(a).

<u>CONCLUSION</u>

For all of the foregoing reasons and such other reasons that may be discussed at the sentencing hearing in this matter, Mr. Casseday respectfully requests that the Court accept the plea agreement in this case and impose a sentence of 90 months incarceration with a ten year

term of supervised release which is adequate to promote the relevant sentencing objectives at

issue in this case.

_____Respectfully submitted,

\_\_/s/_____
Danielle C. Jahn
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Ste. 550
Washington, D.C.  20004
(202) 208-7500

February 11, 2007

Dear Judge Kollar-Kotelly,

My name is Namsook Casseday; I am Randy's wife and I feel that in order for you to understand my feelings about this entire situation, it is appropriate to explain to you our entire marriage and what our life was like because of the religion we joined.

Randy and I belonged to the Unification Church. We have been married legally for 27 years, but consummated our marriage in 1982. We became matched and engaged through pictures by Reverend Sun Myung Moon on October 31, 1978; however, we have not yet met by that day. Since the day of our engagement, we wrote to each other continuously until he came to Korea at the end of November in 1979. When Randy came to Korea, we spent that time preparing for my American Visa, as well as getting to know my family. He stayed there for about a month. Randy was so charming throughout the entire trip and made a great impression on my entire family. The first time I applied for my visa, I was rejected by the American Embassy because I belonged to the Unification Church. When that happened, Randy made great efforts to do everything he could for me; that was how Randy always was. Eventually I was granted a visa.

On October 5, 1980, I came to the United States for the first time in my life, which was exciting and intimidating at the same time. Randy picked me up and we stayed on the church property for three days and then met with Reverend Moon. They gave me a mission to go to Chicago, so in the three days that we were together, again, Randy spent his time helping and preparing me for my trip. I worked in Chicago for six months while Randy stayed in New York. He called every other day and wrote letters. At the end of the year, we were given permission to visit his parents out in Ohio. This was the first time he saw his family since he joined the Unification Church on January 6, 1974. You can tell by this, he wasn't exactly the closest person to his own family for his own reasons, but later that all changed.

In 1981, my mission was moved to New York. Until Randy and I officially consummated our marriage, we just dated as if we were not married yet because that was part of the Church's teachings. Ten months later, in 1982, I was moved once again on another mission to Texas. Traveling to different states was important for the Church in

order to spread their religion as far as possible. I then flew back to New York in July for the big official wedding in Madison Square Garden. About 2,100 couples were married that day. Yet, by order of the Church, we were not allowed to live together until September. We remained faithful to each other and we stayed pure until I moved in with him on the Church property in Tarrytown, New York. It is called Belvedere and we lived in a house they labeled East House. I worked as nurse aid at the time, and all the money I made went directly to the Church; in return they gave us one-hundred dollars as our spending money each month. You can see your Honor, we did not have an easy life. Randy worked as a gardener and worked so hard.

In March of 1983, we were given another mission called I.O.W.C. It involved preaching the Unification Church and traveling around the United States. It was not easy for me because I became with child before I left and also developed really bad sinus infections and allergies that made it hard for me to stay healthy. Again, your Honor, the life that we lived was painstaking, but we thought it was worth every second of our life to follow the Unification Church religion. Randy and I were separated constantly because of all of our missions that required us to travel to different states and places. I came back to New York in September and gave birth to my first born son in December. After the first hundred days of being born, I was offered a job of attending the Church's nursery, which required me to spend very little time with my new family. Two months later, I was promoted to work as the Reverend's grand-daughter's nanny and take care of her kids. I regret doing this, because this required even more time spent away from Randy and my son. I was very unhappy because all I wanted to do was see the two loves of my life.

The couples that were married in Madison Square Garden with us, also, had babies around the same time that we had our first child. It was kind of similar to the baby-boom after World War II. The couples that had babies and were living in Tarrytown were all required to leave their kids at the Unification Church's nursery, which was attended by Japanese women. However, they were not given proper care or attention which brought in social workers. Afterwards, they moved the babies to the New Yorker Hotel. Randy worked 16-18 hour days with no weekends free. He lived his life working for the Reverend, however, any free time he had, Randy would try his best to see our son. It was maniacal and ludicrous the way we lived our life. Not only could we not see each

other, we could not even spend time with our son because of this Reverend and his missions.

The New Yorker nursery for the Unification Church was soon shut down because of an incident involving a near drowning for a baby being given a bath. Afterwards, the children were sent back to live with their own parents, which was a relief for us even though I was still working as a nanny. No matter what happened, Randy did all he could to take care of me. We had a great marriage, even though we could not spend any real quality time together; our love was strong and we were always there for each other.

When I gave birth to my second child, I was required to work at the Church's staff nursery in Tarrytown. I was able to spend time with my children as well as more time with Randy, which led to the birth of my last child. Again, your Honor, I can't stress how much time and effort he would put in to giving my children and I love, even when he could only make an hour of time for us.

Seven years after my last child was born, we were given our final mission, which was to move out to Ohio, (Randy's hometown), and live near his parents. This hurt Randy's ego and morale because he devoted 21 years of his life to the Church, he felt like they were just throwing him to the curb. It affected him mentally, however, he still tried as much as he could to involve with himself with the Unification Church out there. For the first year or so, we still tried to attend as many Church meetings and services as we could every Sunday, however Randy's morale was so hurt, and we were so poor, it was hard to keep trying. Yet, no matter how awful our situation became, I never heard Randy complain about anything once. This was the beginning of his demise in his faith of our religion. There was a time in Ohio where I was so depressed, and had such a hard time finding a job that I made the decision to move back to New York, work, and just send over some money. I think that is where he started truly losing himself in a depression because I was not there, we were not making enough money, and he had no social life. Randy was stuck. I was gone for about ten months when we decided to move back to New York. I thought that would have made our situation a lot better, and it was for a little while.

We moved into a small town that is a tightly-knit community, and most people who see you walking down the street will greet you and know who you are. I thought our

life was going to be o.k. for the first time. Our kids made a lot of friends, we attended their games, and I know Randy made friends with a lot of our kid's friend's parents. There was not too many people who did not know us. He spent as much time as he could with the kids, driving them when ever they needed him, helping them out with homework, and fixing their cars up when needed. I can't say I know a lot of fathers who did as much as he did for their own children.

When we moved back to New York, Randy was hired by the Reverend's son, named Kook-Jin. Everyday, Randy would get poorly treated, taken granted for, and be used just so this man could make his precious money. Randy felt as if he was being stomped in the face. He worked for Kook-Jin for about five years, until he just could not take it anymore. Plus, Kook-Jin had hired a lawyer to do all the work that Randy has been doing for his years of work, and made him his own private assistant; he had Randy fetching this man's car for his wife and diminutive errands. It was driving me crazy, this man thought he owned Randy. Finally, we both had enough and decided it was time for Randy to get another job. Washington Times had been trying to reach him for a while, so he decided to take it on. It was hard for Randy to make such an important decision in commuting down south every week just so he can make a good living because he knew it meant separation from me and our family again. Randy is a family man and he needs us there for him, as we do him. It was the only way we could manage other wise I'm sure Kook-Jin would have driven Randy to his end.

As you may not know, The Washington Times is owned by the Unification Church, which meant that the people who he had been working for before, were also running the business in Washington D.C. It was not the same persons, however, your Honor, it was people from the same family. Randy did a lot for the Washington Times which earned him a lot of trust in the company, but also added on to the stress of his work. The president of the Washington Times, Hyun-Jin Moon, criticized Randy of not doing his job correctly which infuriated him and again started kicking down on his morale. There is only so much that a grown man can take before he snaps.

What you don't understand, Judge Kollar-Kotelly, is that although Randy and I love each other, there is a huge gap between us in communication. Because I have such a hard time with my English, and because I grew up in a different country, some of our

beliefs and ideas clash which created a barrier between us. I know he loves me, but that is why I think he started chatting on-line. Randy can make friends anywhere he goes, but he does not spend too much time with his friends. I always ignored the fact that he would spend time chatting on the internet because I thought that is what he needed, people to talk to since I could not. I partly blame myself for this because I could not give to him what an American wife could.

I know that his arrest and incarceration and woken him up from his troubles and snapped him into reality. Randy was driven to escape into a world of no judgment, and his own fantasies where people would accept him for who he was because they did not know him. All it took was reality and religion to slap him in the face and bring him right back down to earth. I still love Randy and I have so much faith in him in never committing this act of sin ever again. My family knows what he has been through and why he was driven to such insane acts of sin, yet those underlying problems won't ever be there again. Randy is a good person, he loves his family more than anything, and will do anything and everything he can for us. He realized that not only did he hurt himself, but he hurt me, my family, his friends, and everyone he knows. Randy wanted to escape this pain through just ending it all, but this reality also opened up his eyes to a purpose in life. He wants to make up for all his wrong doings, and show everyone that he is a much better person. Randy is a changed and much stronger person now and I know he will never do this again. I hope what you have just learned about us will help you understand our and his situation. I love my husband, and I will always be there for him, especially when he earns his freedom again. Thank you so much for your time.

Sincerely,

Namsook Casseday

January 30, 2007

Honorable Kollar-Kotelly
United States District Judge
333 Constitution Avenue, N. W.
Washington, D. C.  20001

Dear Judge Kollar-Kotelly:

Randall Casseday is our middle child in a family of five.  Our family regularly attended church in Newbury, Ohio.  Randy now attends the religious services in the facility where he is incarcerated.

While in high school Randy was president of the Student Council, in National Honor Society, on the newspaper staff, in high school plays, played varsity sports, and represented the school in the Cleveland Press spelling contest.

In order to earn money to attend Bowling Green University, in Ohio, he worked two summer jobs.  His work ethic continued when he was employed by the Washington Times and went home to Dobbs Ferry, N. Y., each weekend, to help his family with bill paying, car repair, and other fatherly duties.

He finished college at Empire State, N. Y., having earned a paralegal degree while in Ohio.

Randy volunteered in Little League, in Dobbs Ferry school functions, and while being incarcerated volunteers in the law library and helps teach English in a second language class.

He has had a great relationship with all of his family and relatives and is a very amiable person.

He and his wife have sacrificed much to send their three children to college.

Hopefully, Randy can be transferred to a prison close his home in Dobbs Ferry, N. Y. where he may receive counseling.  A reduced sentence would enable him to give much needed financial support to his family.

Sincerely,

Roger and Lou Casseday

Roger and Lou Casseday
13960 Meadowlark Lane
Newbury, OH  44065-9629

Phone:  440-564-5039

Dear Judge Kollar-Kotelly-

My name is Patrick Casseday. I am 47 years old, and a junior high math teacher in Ohio for the past 26 years. I am also Randy Casseday's brother.

I know what Randy did was wrong, and from the letters I have received from Randy he is very remorseful for what he did. Randy was the main financial support for his family in New York, regularly commuting 5 hours each way fom Washington to NY each weekend and back. His family was very upset at him for what happened. Randy realizes that he cannot change what has happened and must move forward.

What would help Randy the most I believe are three things:

1) If he could be transferred closer to his family in New York where they could visit him while incarcerated.

2) If Randy could get counseling while incarcerated.

3) If Randy's sentence could be shortened so as to allow him to return to work to help financially support his family.

Randy has indicated to us that he has been attending regular church services while incarcerated. Randy has also worked in the law library and helped teach English to other incarcerated men.

I know what Randy has done has brought alot of shame to his and our family. It has been Randy's worst nightmare, being away and out of easy communication with his family. Randy's wife and children are the biggest victims of this mess.

I ask you Judge Kollar-Kotelly to please consider Randy and his family in this case.


Thank you-

Patrick Casseday
11225 Wellington Drive
Chardon, Ohio 44024
440-285-2651

Honorable Judge Kollar-Kotelly
United States District Judge
333 Constitution Avenue, N.W.
Washington, D. C. 20001

Honorable Judge Kollar-Kotelly:

    This letter is being written for the sentencing of Randall Casseday of Washington, D. C.,
and Dobbs Ferry, New York. I am the eldest of five children in the Casseday family. Randy is
my second brother. Our family, though not perfect, has always cherished education, religion, and
active lifestyles. All of us have achieved different successes at different times in our lives, and
we have always been taught to try our best. In his own way, Randy worked very hard to support
his family and raise good children. He did not have an easy adult life, nor did he always make
choices suitable for being a good husband and father. From the letters I have read while he has
been in prison, I believe he has come to realize the negative, far-reaching impact some of his
choices encompassed. Again in his own way, I know he wants to reverse the downward spiral
his life has taken, and begin to rebuild his familial relationships. (Randy attended many of his
children's extracurricular events in public school, and he encouraged them to enroll in university
so that they could have the skills to contribute to their careers, as the five of us original
Cassedays have done.) It is my husband's and my belief that these two important steps can only
be achieved by his continued desire to improve himself, to want to change for the better by
engaging in meaningful therapy, and to clear his mind and body of destructive elements.

    If possible, in your sentencing, please consider the best placement with treatment
facilities. Randy is a bright and inquisitive man who will, when confronted with the truth of
statistics and realistic problems, will choose the right path.

    Because Randy is a devoted father, it would be appreciated if his placement could be a bit
closer to his family in New York. I believe they will provide him with visitations that will
encourage him to become a healthier man. Those of us who are able will also attempt to visit
him when possible.

    Judge Kollar-Kotelly, we appreciate you taking the time to read our letters on behalf of
our brother. His lawyer, Dani Jahn, has worked very hard on his behalf, and for this we are also
grateful. We also respect the integrity of the court system and the laws that need to be upheld.
We are sure it can be a difficult and complex process.

Sincerely,

Connie Badour
(Mrs. Peter J. Badour)

February 2, 2007


Honorable Kollar-Kotelly
United States District Judge
333 Constitution Avenue, NW
Washington, DC 20001

Your Honor,

I am writing on behalf of my brother, Randall Casseday, who is close to his sentencing
hearing. Believe me when I tell you that our entire family is in shock and grief. This
situation is harder to accept than if he would have died, because we cannot share this
openly with our friends who would normally give emotional support. Nor can we as a
family share, face to face, our concerns because we all live states apart from each other.
I pray for Randy and his family every day.

Randy was typically a person who kept himself busy and self-motivated growing up,
somewhat quiet, active on school baseball and basketball teams, school plays, and very
interested in tinkering with minor repair and maintenance of vehicles. All five of us
siblings were raised to carry our share of chores and responsibilities at home and at
school. We grew up in a small town SE of Cleveland, Ohio in the country. Both of our
parents were teachers at our school, and high expectations were held for each of us.

Randy never lost his self-motivation into adulthood. He worked very hard and long
hours when he was a member of the Unification Church for years. He kept pushing
forward even after he was married and became a father of three children. He finished his
college degree albeit years after he stared.

When Randy lived near my parents for a few years in Mentor, he was always inviting all
of his extended family to sporting and school events that his children participated in. He
was and is proud of them. When he moved to New York City, he would constantly email
pictures of his kids in softball and cross country events. If we couldn't attend their high
school graduation, he would share those pictures proudly as well. He made extra efforts
to learn the Korean language to communicate with, and honor, his wife. He traveled to
Korea more than once to meet and get to know her family. He and Nam Sook have been
married more than 25 years.

Randy was the main supporter of his family, especially since all three are in college. It
became extremely evident how dependent they are on him when he was incarcerated.
His wife works, but doesn't earn enough to pay their mortgage alone. The family is
really struggling financially as well as emotionally. All Randy can do now is support
them verbally, and constantly is asking us (the rest of his family) to encourage his
children and wife right now. We do what we can, but none of us can financially carry

them through for years to come.   We do offer emotional support and advice, if they need it.

My hope for Randy mimics what my brother, Pat, expressed in his letter:
1) If Randy could be transferred closer to home
2) If Randy could receive counseling and a training for a new life style
3) A shortened sentence for his efforts to heal and be exemplary in his behavior
4) I add one more hope in that Randy may be able to work within the prison system or learn a new trade (maybe to the point of earning another degree to help him earn a law-abiding living)

We all know that life from now on will be very difficult for him personally, especially when he completes his sentence. We all want Randy to be able to once again support his family. Hope is a delicate and very valuable piece in all our lives, and I fear that Randy will lose this if he has nothing to look ahead to.

I will pray that your sentence will be fair. I believe the true victims are Randy's family, and respectfully ask that you give consideration to the requests listed above.

Thank you for reading this letter, Judge Kollar-Kotelly.

Sincerely,


Terry E. Carver
Administrative Secretary
Office of the Vice President for Student Affairs
Bowling Green State University
305 Saddlemire
Bowling Green, OH  43406-0160
419-372-2147

Dear Judge Kollar-Kotelly:

I am Dan Casseday, 54, Randy Casseday's older brother by one year. I live in the Tampa, Florida area and work at the Children's Board of Hillsborough County.

I am writing you in regard to the sentencing hearing for Randy.

As with the rest of Randy's immediate family and birth family, I am horrified by what Randy has pleaded guilty to that has resulted in his federal incarceration. I believe that the crime he has been charged with deserves punishment.

However, for the sake of his immediate family, which has historically been dependent upon him as their main source of income, I ask you to strongly consider permitting Randy to be transferred closer to his family, which lives just outside New York City. They are being punished the most by Randy's incarceration, not just because they must also bear the consequences of his actions, which include major financial loss, but because they must travel from New York to Washington, D.C. to visit him.

Randy obviously needs serious counseling while he is incarcerated. But he also needs encouragement from his immediate family, and they need encouragement from him.

For the family's sake, I ask you to let him be closer to his family while he serves his sentence. I ask you, Judge Kollar-Kotelly, to take Randy's family into consideration in this case and allow him to be transferred to a facility closer to them.

Thank you for your consideration of this.

Sincerely,

Daniel R. Casseday

Daniel R. Casseday
607 Colebrook Court
Lutz, FL 33548
Cell phone (813) 892-1239

Dear Judge Kollar Kottelly

Your Honor, with all due respect,

I have known Mr. Randall Casseday for 30 years now. As bachelors, we dormed across the hall together our first 5 years, both accepted arranged marriages to Korean women and raised our children together their first 10 years. Our family visited Randy's family when they resided in Ohio and we got together occasionally after they moved back to the New York area.

I thought I knew Randy, but apparently not well enough. He has recently expressed to me that the 'gulf' between him and his wife to be the base root of his problem. To that end may I express my opinions?

Your task, if I may, is to uphold the law, protect the public from repeat predators and put teeth into cases like this. My hope is to see the healing and normalcy of his married relation as the preventative for Randy to never gravitate this way again. What sentence will expedite both goals?

You may find it surprising, but I feel he needs to do 'some time' to re-enforce the weight of the law and teach him to never go the way of fantasy again to fulfill his lonely mind and satiate his empty heart. Yet there is the 'opportunity of the moment' that he and his wife are starting to show genuine feeling and sympathy for each other again and that 'too long of a sentence' may snuff out that spark.

I feel Randy is genuinely remorseful, honest and repentful. I pray your decision have the right balance that does well by all.

Humbly and respectfully submitted,

Daniel Bozarth
New York City

Dear Judge Kollar-Kottely

These past few months have honestly been the worst I've ever experienced in my life. My father meant so much to my 2 sisters, my mother and I that this ordeal has been a nightmare. He's always been a part of my life, whether he was teaching me to play baseball when I was in little league to when he watched graduate high school and me go away to college. He has always had a good heart and wanted the best for his family. Seeing him over Thanksgiving when my family and I went to visit him were hard on all of us because I never imagined seeing him in this situation.

My sisters and I are all currently in college and are trying to get through it now on our own. We've always had the comfort of our father being there for us whether we needed financial help, or if it was just a visit up to our schools just to say hi. It upsets me to know that he will no longer be there for us. He always made the effort to call us everyday to see how we were, and if we needed anything. He never forgot to ask if I were having car trouble because of the poor condition of my car and always insisted on helping to fix it. I could never be where I am today without him.

I know he committed this crime and I wish things could be different, but they aren't so I just wanted to let you know that Randy is a good person. He has a conscious and is hurting worse than any of us back home. He knows what he did is wrong, and I know my father would never do something so horrible again. He would spend the rest of his life trying to fix what he did and make it up to my family. I just can't wait to see him again, away from a place that other criminals are kept because he is not a criminal.

I just want to thank you for taking the time to read my letter and consider how much me and my family miss our father and can't wait to see him.   –His son, Lee

February 2, 2007

Dear Judge Kollar-Kotelly,

This letter is a little hard for me to write primarily because I never thought I would ever be writing to a judge on behalf of my father. My name is In Jung Casseday and I am Randy's youngest daughter, or the "baby of the family".

First and foremost, I would like to say Randy was the best father that he could be to me, my brother and my sister. I know for a fact that our family was always his number one priority, and I have never met a father who has worked as hard as my dad to keep my family happy, healthy, and keep a roof over our head.

Growing up was not easy for us because, no matter how hard both my parents worked, they could not make enough money; however, they did all they could to keep us growing strong. Both my father and mother kept us busy by participating us in activities such as swimming, ice-skating, and baseball. I remember my father always trying his best to show up to as many games, concerts, and shows as he could for us because he knew how important it was for us for him to be there. My father was also the biggest supporter for me in joining the high school boys varsity wrestling team. When everyone was telling me I couldn't do it, he was right there telling me I could. My father believed in me. He was always more than happy to drive my friends and I to places such as the mall, or movies, or just to a friend's house, and I know many parents who would not even consider doing that for their kids. He was always there volunteering to help out. That was just his nature.

My parents never had very much money to give to us, but my father always made sure we had lunch money so we could eat at school, even if it was just a few dollars. That

1

was more than enough to keep us going. When he would have just five dollars to spare on the weekends, my brother, my sister and I were the first ones he would think to either give or spend that money on.

He made us realize the importance of working hard, not being spoiled, and doing well in school. I studied hard and earned myself a scholarship to SUNY Cortland University because of him. However, I had to withdraw from school and lose that scholarship because now my mom is home alone, and I need to be there to take care of her and help her out. I can say that there are many fathers who don't even give their kids just one hour of their time. Whenever I had a problem with anything, my father would always listen to what I had to say, and the one thing I hold him high for was that he never scolded us. My father made sure it was important to understand whatever it was we did wrong, why it was wrong, and why we never should do it. I always respected that, and from him I know I want to raise my kids in the future just the way he did.

My father never has any free time. The last time we all took a vacation was thirteen years ago, when my mom won a trip to the Bahamas. He is so dedicated to his family because he drives down to Washington D.C. every Sunday to work, and drives back up to New York every Friday just so he can spend a day with his family. I regret never paying too much attention to the times that he was home because I never got to see him during the week. He was always there to help me fix up my car, whether it was an oil-change, a leak, or even just to wash my car. Also, I would come to him for help on my homework, or even doing my taxes. I don't know what I am going to do because he was always there to help me. Now I have no one. I cherished every moment with him

2

because I knew that one day he was going to be too old for that to help me. Yet, instead of being too old to help me out, he is in Washington D.C., in a jail. It's just not right.

Basically, my father did everything he could to keep his family happy because that's all he has. It kills me to think about what he has done, but I know my father is not a criminal. He was just misguided by things that are freely put on the internet. If you could understand what happened in my parent's relationship, and how much pressure and stress my dad was under, you could understand how he became vulnerable to such immorality, although it was wrong, he was releasing his stress in a way he could not control.

Your Honor, I know my father won't commit this sort of crime again because it took him getting arrested to see the evil and the harm he has caused not only to himself, but to his family, friends, and co-workers. He now sees "the light", and he knows what he needs to do to change his life. In his letters, he talks about religion and God and how he needs to devote his life back to the Holy Spirit. We grew up a religious family, but ever since we moved away from our church, our family slowly strayed from our prime religious values. I fully support my father in getting help, and I know, as his youngest daughter, he won't ever do this again.

If you could just see that he has his family to support, as well as our support for him too, with just some counseling he will get better. I do not believe that putting him in jail for years would do anyone good. My father deserves a second chance because I know he will turn his life around. He already has, it's just a matter of him being free. I want to thank you for your time in reading my letter to you, I just hope you will consider my support for my father.

Sincerely,

In Jung Casseday

3

James A. Borer
100 Maple Drive
Middletown, NY 10941

February 1, 2007

Honorable Kollar-Kotelly
United States District Judge
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re: Randall Casseday

Your Honor:

I have known Mr. Casseday since the fall of 2004 when I took a job at the company
where he worked and he applied for and was hired as my replacement at *The Washington
Times*. Since then I have come to know him as a sincere and hard-working person with a
wonderful family.

I am aware of the crimes to which he pled guilty. I am as shocked as anyone, with
perhaps the exception of his family. It makes me so sad that he got involved with
something so wrong.

I have received letters from him deeply repenting, praying to God for forgiveness and
hoping that his family will heal from the hurt he has caused them. I pray for his family as
well as for him. He truly treasures them. This time is very difficult emotionally and
financially for them. His three children (two daughters and one son) are unsure whether
they can remain in college without his support.

In one of his letters he wrote that he may be moved, after sentencing, to a federal
institution near where I live. I would visit him often if that happens.

I believe that he will never get involved in such conduct again. He has a firm foundation
of faith and realizes fully his sin. I hope he can be released, after completing counseling,
at the earliest possible time under whatever conditions are deemed necessary. I will
remain a friend and do all I can to assist him in finding employment.

Thank you for the opportunity to write this letter on his behalf.

Sincerely,

James A. Borer, Esq.

DATE: February 9, 2007
TO: The Honorable Kollar-Kotelly
     United States District Judge
     333 Constitution Ave, N.W.
     Washington D.C. 20001

Dear Judge Kollar-Kotelly,

I have known Mr. Randall Casseday for thirty years and considered him a dear friend. For at least 10 of those years we worked together daily and for a time lived in adjoining apartments. I spent many hours together with him his wife and three children.

Without any hesitation, I can say he has been a person of conscience and integrity. He has consistently demonstrated an attitude of public concern and service throughout the time that I have known him. Mr. Casseday comes from a religious community of people that cherish virtue and a God-centered ideal for the family. He has aspired to and practiced an ideal of respecting those who were different than himself. Through his marriage he raised three beautiful children who serve as a testimony to his faith in action.

Mr. Casseday's arrest came as a complete surprise. Neither I nor any of the many people with whom we have had a mutual association, could have anticipated his arrest and guilty plea. I never remember him having any inappropriate attitude toward or conduct with children. If there were, I would have most certainly remembered it.

We have spent many hours together in the past discussing every imaginable subject. I firmly believe that Mr. Casseday knows that through his conduct he has let his family, friends and associates down in the most profound way. I understand through his wife, he has been quite remorseful and tearfully repentant for the hurt he as inflicted.

Your Honor, it is important to know that he has a close community of people who clearly understand the seriousness of what he has done and who will be supporting him and his family in the crucial months and years that follow his sentencing. As an example, I have been very impressed with his 20 year old daughter. Where fully aware of her father's situation, she is able to act with forgiveness and love in order to support him.

I believe professional help and supervision is required yet, in several important areas of concern, Mr. Casseday has the kind of character, attitude and support network that will enable him to reestablish himself in a normal life style.

Sincerely,

Robert G Smart
110 Sheldon Ave.
Tarrytown, NY 10591

February 7, 2007


Honorable Kollar-Kotelly
United States District Judge
333 Constitution Avenue, N.W.
Washington, D.C. 20001

In re Randall Casseday, DC# 312072

Dear Judge Kollar-Kotelly,

I am writing to request that the court consider extending as much leniency and compassion as
possible in the sentencing of Mr. Casseday. I know that he has pleaded guilty to the very serious
charges of enticing a child and possessing child pornography, but I believe that there are
extenuating circumstances that merit such consideration.

I have known Mr. Casseday very well for the last nearly two and a half years. We were both
renting rooms in the same private residence in the D.C. area, while we worked in Washington,
away from our families (his in New York, mine in New Jersey). We have come to know each
other very well during this period, and I count him as a good friend and colleague.

He would often tell me about his family and I could see how much he missed them and how
frustrating it was to be separated from them. I have personally witnessed how he would often
arrive home in the evening with his ear glued to his cell phone, talking in an animated fashion to
one of his three college-aged kids. You knew it was one of his kids because he sounded just like
an exasperated parent talking to an I-know-everything-already teenager.

Almost without fail, he would make the arduous weekly trip, sometimes by car, but more often
by Greyhound bus and local rail to his home in New York, to spend the weekend with his family.
That trip would take him seven hours each Friday evening to go up to New York and seven hours
each Sunday afternoon and evening to come down to D.C. I often called him late Sunday
afternoon on his cell phone to get an idea where on I-95 the traffic was congested, so I could
avoid it. Clearly, he endured the long, stressful weekend commute because he wanted to be with
his family.

He might have attenuated the stress of that weekly commute by taking the faster, but more
expensive Amtrak service to New York, but the measure of his self-sacrifice was the way he
would forego the comfort and speed of such travel in order to save for his childrens' college
tuitions and expenses. In many ways, his sacrifices were at the point of being almost too painful
to watch. He even laundered and <u>ironed</u> his dress shirts and pants, instead of spending money on
drycleaning!

The lack of money was one of the reasons he expressed to me a certain frustration with his job in
Washington. Although that job held a prestigious title, it did not pay him enough to warrant his
commuting to and from New York each weekend out of his own money. Because his wife

apparently could not consider moving to Washington until after their youngest daughter started college, he needed to keep working to support his family. I understood from his wife that he had been actively seeking and was close to obtaining a comparable position in the New York area. In the meanwhile, he had to live with these mounting frustrations and deal with them.

How he apparently dealt with them appears to be a matter of public record now. Despite the shock of learning what he has done, however, my experiences with him lead me to believe that he was (and still will be) a good husband, a good provider for his family, a good father, a hard-working employee and a good friend.

I have visited him several times and have exchanged letters with him a half dozen times since his incarceration. He is deeply remorseful for what he has done. He has joined an inmates' Christian prayer group and has told me that his experiences there have been deeper and more meaningful than anything he has experienced in years, maybe decades. I sincerely believe that he is now fully cognizant of his illness, has truly repented of his transgression, is seeking the spiritual help he needs to face his guilt and will seek the professional help that he will need in order not to relapse, if given the chance.

Your Honor, I sincerely hope you will take my experiences with Mr. Casseday into account and extend to him as much leniency and compassion as possible in his sentencing. I believe that his recovery would be greatly enhanced if he were to be placed in a facility that is close to his family and which will provide the opportunity to get professional help. With such help and support from his family and friends, I believe that he will courageously confront the enormous challenges he will face once he is released, and be a positive and productive member of society again.

Thank you for taking the time to read through my lengthy plea on his behalf.

Sincerely,

Christopher Ching
Middletown, NJ

February 8, 2007

Honorable Kollar-Kotelly
United States District Judge
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Kollar-Kottelly,

I have known Randall Casseday for approximately two years. During that whole time I worked closely with him on a daily basis for approximately eight hours a day in a small department of four people. His job and mine were closely linked, so we had a chance to get to know one another as friends as well as co-workers.

I came to respect Randy on a few levels during the two years I worked with him. First, he was my boss and a very fair one. He worked really hard to make our office happy and to boost morale. He took everyone's needs and requests to heart and struck a good balance between his allegiance to his employees and the company.

Second, as HR Director, I saw him handle many difficult situations within the company, both legal and humanistic. He took his job very seriously and attended a lot of training seminars online or in person to improve his knowledge and abilities. He wanted to be the best he could be for the company.

Third, as a friend, I found Randy to be very personable. He talked about his life and feelings occasionally and seemed to try to make me a confidant. I was not ready for that, as his need seemed great, and I have wondered if having someone in that position could have prevented what happened. I heard him often on the phone with his children, listening and giving them advice. His daughter visited and seemed to love and respect him very much, and he seemed to be a good and patient dad. He often mentioned as he left for home on the weekend that he needed to spend the weekend doing something with one of his children's cars or taking a child to visit colleges or to visit one of his children at school.

Fourth, I came to know that Randy deeply loved God. He mentioned in talking about his life how God worked, and he referred to how his faith in God guided what he taught his kids.

Randy had inordinate pressures on his life. His family seemed the most important thing to him, yet the long commute from New York allowed him to go home only on weekends. I believe in two years he only missed going home for the weekend twice. He either drove or took the bus, both of which were stressful. Another was his wife losing her job a couple of times. Another was having enough money to put three children in college. He took his financial responsibility to his family very seriously. And there were the stresses of work.

Randy is an emotionally intense person with the need for a close friend and confidant. The life he was leading in Washington, DC was not conducive to his being able to establish this person in

his life. I feel Randy would do well with an arrangement where he could share openly his feelings with someone.

Sincerely,
Libby Henkin

Dear Judge Kollar-Kotelly

How is your character measured? And for that much, what makes you either willingly or non-willingly a good person? These are the questions I ask myself as I write to you, your Honor. Understanding bias, indifference without prejudice is how you will conduct yourself as a professional; however, I simply ask before you resume to read the remainder of the letter; perhaps, to listen as a person, an equal, a peer, as I am also trying to be indifferent and bias. Through change, good and bad experience finding morals and virtues I have grasped the concept to not judge a man on just the present but also his past. Previous to his incarceration I witnessed family respect, devotion, love and care. You may only see him as an unlawful character; you are then wrongfully judging him; none the less, he is a father, an accomplished father with children who have been provided care, shelter, clothes and education. Not only has Mr. Casseday cared for his family, he has also offered me charity. As I was just a stranger to him, he offered to help me fix my car, because he genuinely cared. Washington, Maryland is an extended journey; but it paid college fees, food and shelter, despite the distance. Through the pain of losing a father and spouse I have supported the family upon Randy's incarceration and can truly say I have not heard a negative word or remark about him. The family has allowed me to live among them as part of their own; I truly feel to be part of the Casseday family and am privileged to add my opinion to you. Please do not mistake my writing as a ploy; I simply would like you to see another point of view I am almost certain you have already considered. I see pain in a situation where I am unfamiliar with.

How do you measure a man?  You cannot judge a man until you have understood him completely; I do not claim to understand Randy completely or remotely well enough to judge him; however, I know enough to say he is better then the crime he has committed.  Does the crime in which Mr. Casseday will be incarcerated define him as father or a human?  The answer is only found in his past and the hearts of his spouse and children who know him well enough to judge.

Sincerely,

Seann Lefferts

Holly Haft
12315 Whitehall Drive
Bowie MD 20715
301-464-3831

February 7, 2007

Honorable Kollar-Kotelly
United States District Judge
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Honorable Kollar-Kotelly,

I am writing to you on behalf of Randall Casseday.

I came to know Randy a few years ago when he was looking for a place to stay in DC as he had recently gotten a job at the Washington Times. My husband and I agreed that he could stay at our home during the week (he usually traveled to NY on the weekends to spend time with his wife and children). I would not have considered him to stay if I thought that he had serious problems in the area of sexuality. I try to be protective of my home and family.

As were others, I was utterly shocked when he was arrested for enticement of a minor and possession of child pornography. There was no indication of that type of behavior when he was in our home or in relating to our children (now ages 23, 22 and 20 years). I had been very impressed with his commitment to his wife and family—so many nights I would hear him talking to his wife or to one of his children. Sometimes supporting his wife with her job difficulties, guiding his daughter to find a good doctor for health needs, helping his children with their college choices, etc. I was impressed to see no matter how exhausted he was, he would travel almost every weekend to New York to support the needs of his family. Even now, when I visit him in the correctional facility, on the top of his list of concerns is his family.

He was also generous with his time for others. He wouldn't hesitate to help a stranded friend whose car broke down.

I know he was quite stressed about money and his job. I think he couldn't keep up with all that he felt he should keep up with. It may have been the beginning point of his wrong behavior, but he knows that it is no excuse.

He has written many letters to my husband and myself. We have visited often.

1

As much as I was painfully shocked to find that he could do what he did, I am deeply grateful that he unquestionably knows how wrong such behavior was and that he is finding ways to clear out such thinking and attitudes from his mind and replacing it with something good and true (he calls the 'holy spirit').

In the midst of 'hell,' he seems to be able to recognize God's pearls of wisdom given through other prisoners and the Bible (he regularly attends a prayer and Bible study created by fellow prisoners). He read a book sent by a friend called *Every Man's Battle* by Stephen Arterburn, Fred Stoeker, and Mike Yorkey which I think has also helped him to understand his failure in the 'battle' but has given him tools to turn it around.

I went to the website for the book, www.everymansbattle.com, and found that they offer intensive workshops, and group and personal counseling. It is under the umbrella of New Life Ministries. Their slogan is 'transforming lives through God's truth.' It seems to me that so far, it is Randy's seriousness to apply 'God's truth' to himself that is giving him the tools to defeat the serious temptations that he previously succumbed to. I wish that in the future he could have the opportunity to participate in their workshops and counseling (including phone coaching).

In the past, he was an active member of his church. From what he has told me, during that time, he did not allow himself to indulge in any kind of pornography and did not participate in online chats. For his own reasons, he drifted from his church and from his faith. He is now finding that his association with friends from his church and his study again of its teachings is giving him a renewed view of himself and of life and more support to keep sexually immoral thoughts out of his mind (at present, he says that the thoughts are completely gone. We remind him that he has to strengthen and prepare himself for the unexpected temptation in the future. He indicates that he has heard that from a number of people).

I hope that he can have a chance to participate in programs to further his awareness and personal changes for his sake, his family's sake and the community at large. I imagine that the 12 step programs for 'sex-addiction' and 'sexaholics' would also support his serious commitment to never allow such attitudes and behaviors again. (My husband and I recently started attending S-Anon, a 12-step for friends and families of 'sex-addicts,' and find that the principals support what Randy has so far been learning and applying through his readings, prayer and spiritual study with fellow inmates.)

Thank you for your seriousness to determine the best sentence for Randy—of course for the sake of the community and his family, and in addition for his sake. After conquering that within him that allowed him to pursue such destructive behavior, he can be such a good man for his family, his friends and the community at large. I know that is the vision he holds for himself . . . as do we.

Sincerely,

Holly Haft

Holly Haft

2

February 9, 2007

Dear Judge Kollar-Kotelly,

I understand that my friend and former co-worker Randall Casseday has entered a guilty plea to some very serious charges involving enticing a child and possessing child pornography.

I have known Mr. Casseday for over 7 years both as a friend and an employee at my company. Mr. Casseday's wife and children have been to my house for cookouts during the summer. I have worked together with Mr. Casseday at various business events such as trade shows and sales presentations. We also spent time together on weekends at the local shooting range.

On numerous occasions Mr. Casseday invested his time and energy to support his children's social and sports activities. When we spent time together he would always talk about his children and how much he cared for them and wanted them to do well. He invested his heart into his children and I could feel he loved each of them very deeply.

When Mr. Casseday and I worked together at various business events he conveyed a sense of professionalism and integrity to customers and prospects. He was also a good listener and would make every effort to understand a customer's needs and concerns. When I asked Mr. Casseday to do a project or follow-up with a customer he would perform his responsibilities in a timely manner. He is a conscientious worker and was always a good, dependable team player. I could count on him to do what he said he would do.

Since Mr. Casseday was put in jail he has written me three letters. In each letter he takes full responsibility for his actions and does not blame anyone for his situation but himself.

He expressed deep regret and sorrow for his actions and feels badly that he has disappointed his family and friends.

I sincerely believe Mr. Casseday is a good person and has a trustworthy character. He is deeply sorry for what he has done and will work very hard to redeem his character.

Regards,

Frank E. Harris