**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| | * | **Criminal No. 06-329 (CKK)** |
| | * | **(Civil Action No. 08-332)** |
| **v.** | * | |
| | * | |
| **RANDALL CASSEDAY,** | * | |
| **Defendant.** | * | |

**UNITED STATES' CONSOLIDATED OPPOSITION TO
DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR
CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY, AND TO
HIS AMENDED 28 U.S.C.§ 2255 MOTION TO VACATE, SET ASIDE, OR
CORRECT SENTENCE BY A PRISONER IN FEDERAL CUSTODY PURSUANT TO
RULE 15 OF FEDERAL CIVIL JUDICIAL PROCEDURE**

The United States, by and through its attorney, the United States Attorney's Office for

the District of Columbia, respectfully submits its Opposition to defendant's Motion under 28

U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("initial

§ 2255 motion"), and to his Amended 28 U.S.C. § 2255 Motion to Vacate, Set Aside, or Correct

Sentence by a Prisoner in Federal Custody Pursuant to Rule 15 of Federal Civil Judicial

Procedure ("amended § 2255 motion").

<u>**SUMMARY**</u>

In late 2006, pursuant to Fed. R. Crim. P. 11(c)(1)(C), defendant pled guilty to two

charges, one of which was Possessing Material Constituting or Containing Child Pornography

("the Possession of Child Pornography charge" or "Count 2") and agreed to an aggregate

sentence of 90 months' imprisonment.  In exchange for this plea, the United States agreed to

dismiss a third charge; that count carried a mandatory minimum term of imprisonment of 10

years.  On February 15, 2007, the Court accepted the plea agreement and imposed the agreed-

upon sentence of 90 months.

Although the plea agreement allowed defendant to avoid a ten year minimum sentence, he has now filed two § 2255 motions seeking to withdraw his plea.  In his initial motion, he argues that, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, his guilty plea was not knowing, voluntary, or supported by a factual basis because the Court did not inform him of all of the elements of Count 2 (namely, that the images of child pornography had been transmitted in interstate commerce before coming into his possession); that defense counsel was constitutionally ineffective because she failed to adequately explain Count 2 to him and permitted him to plead guilty to it even though it was not supported by a factual basis; and that counsel also was ineffective because he instructed her to file a Notice of Appeal but she failed to do so.

In his amended § 2255 motion, defendant argues that the Court violated Rule 11 when it purportedly did not inform him about the reasons for his sentence; that counsel was constitutionally ineffective because she did not object to this purported failure by the Court; and that the recovery from his office of a CD containing images of child pornography violated his Fourth Amendment rights.

As explained below, defendant's claims that there were Rule 11 defects in the plea colloquy should be summarily denied because these claims are conclusively refuted by the record.  The record also refutes his claims that his attorney was ineffective in representing him during the plea proceedings, and hence these claims too should be summarily denied. Defendant's remaining ineffective assistance of counsel claim - that he instructed counsel to file a Notice of Appeal but she failed to do so - is directly rebutted by counsel's sworn Declaration. Because the Court will need to make credibility determinations to resolve the differing accounts

of defendant and counsel, this claim should be denied after an evidentiary hearing. Finally, defendant's claim that his Fourth Amendment rights were violated by the recovery of the CD from his office should be dismissed because it is time-barred.

## BACKGROUND

A.    **The Written Plea Agreement**

On October 31, 2006, defendant was charged by Information in this case with three counts, as follows: <u>Count 1</u> - Attempted Enticing of a Minor (18 U.S.C. § 2422(b)) ("Count 1" or "the federal Enticement charge"); <u>Count 2</u> - Possession of Child Pornography (18 U.S.C. § 2252(a)(4)(B)); and <u>Count 3</u> - Enticing a Child (D.C. Omnibus Public Safety Congressional Review Emergency Act of 2006, Act 16-445, § 209(d)) ( "Count 3" or "the D.C. Enticement charge" ).

Also on October 31, 2006, the United States sent defense counsel, Danielle Jahn of the Federal Public Defender, a written plea agreement pursuant to Rule 11(c)(1)(C). Exh. A. In paragraph one of the agreement, defendant agreed to plead guilty to Counts 2 and 3 (punishable by a term of imprisonment of up to ten and five years, respectively). <u>Id.</u> ¶ 1. The United States agreed to dismiss Count 1 at sentencing and to "not bring any additional charges against [defendant] in connection with the conduct described in the Statement of Facts." <u>Id.</u> ¶ 10. The parties agreed to "a sentence of 30 months on the Possession of Child Pornography Charge, and a sentence of five years (60 months) on the [D.C.] Enticement charge, to be served consecutively, resulting in an aggregate sentence of 90 months, and a term of at least ten years supervised release. . . ." <u>Id.</u> ¶ 3. The United States reserved its right to recommend a term of supervised release greater than 10 years, within the limits of the law. <u>Id.</u> ¶ 8. The agreement

3

also stated that if rejected by the Court, either side could withdraw from the plea and "the government has full and complete discretion to file a Superseding Information or to seek a Superseding Indictment prior to defendant's entering a guilty plea to any criminal offense in this case." Id. ¶ 3. Paragraph 14 of the agreement specified that defendant's statements during the plea proceedings would be admissible if the guilty plea later was withdrawn. Id. ¶ 14.

The last page of the agreement includes a heading entitled "Defendant's Acceptance." Id. at 6. The paragraphs under this heading state:

> I have read this plea agreement and have discussed it with my attorney, Danielle Jahn, Esquire. I fully understand this agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this agreement fully. I am pleading guilty because I am in fact guilty of the offense(s) identified in paragraph one.
>
> I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in the plea agreement. I am satisfied with the legal services provided by my attorney in connection with this plea agreement and matters related to it.

Id.

On November 20, 2006, defendant signed and dated the agreement immediately beneath these paragraphs. Defense counsel also signed the document, signifying that she had reviewed it with defendant. Id.

B.     **The Written Statement of Facts**

The Statement of Facts is a four-page document that describes in detail the factual basis

supporting defendant's guilty plea to Counts 2 and 3.  Exh. B.  In summary, the Statement of

Facts says:

- On September 26, 2006, defendant entered a Yahoo Internet chat room and contacted an individual who was using the screen name "daddysgrl.dc."  Id., ¶ 1.  During the almost two-hour chat, defendant stated that he was on New York Avenue, N.E., that he had a wife and children in another state, that he rented a room in Bowie during the week, and that he was 53 years old.  He also forwarded "daddysgrl.dc" a photograph of his face.  Id.

- "Daddysgrl.dc" was, in reality, a Metropolitan Police Department detective.  Id. ¶ 2.  Using that screen name, the detective told defendant (among other things) that she was 13, that she lived in the District of Columbia, that her father had engaged in some unspecified sexual behavior with her, and that she had not had sexual intercourse.  The detective also sent defendant a photograph of a young girl in swimming pool, telling him that this was "daddysgrl.dc."

- During the on-line chat, defendant asked whether he could be the girl's daddy, talked about "daddys" liking to watch girls urinate, sent several digital images of his erect penis, and asked, in graphic terms, if his penis would fit inside her body.  He also arranged to meet her and engage in sexual intercourse later that night at a location that she identified as her home.  Id. ¶ 4.  He was arrested when he arrived, in a car with New York license plates, at the appointed time and location.  Id. ¶ 5.

- Investigation revealed that defendant was 53, that he worked at the Washington Times building on New York Avenue, N.E., that he was a resident of New York, and that he rented a room in Bowie.  Id. ¶ 6.  Law enforcement also learned that on September 26, 2006, before beginning his on-line chat with "daddysgrl.dc," defendant had entered the Washington Times building.

- A search warrant was obtained for defendant's office at the Washington Times and, on September 27, 2006, law enforcement recovered his laptop computer and several memory sticks, among other items.  Id. ¶¶ 7-9.  The computer contained the text of the chat between defendant and "daddysgrl.dc" and the photograph that she had sent him.  Id. ¶ 8.  The memory sticks contained the pictures that defendant had sent "daddysgrl.dc."  Id. ¶ 9.  In addition, on September 28, 2006, a CD was recovered from defendant's office desk.  Id. ¶ 10.

The final paragraph in the Statement of Facts describes the images on the CD and specifies that the images "had traveled in interstate commerce by means of the Internet prior to coming into the defendant's possession." Id. ¶ 11 (emphasis added).

Defendant's signature on the Statement of Facts appears directly underneath this paragraph. Id. at 4.

**C.    The Plea Colloquy**

On November 20, 2006, the date that the plea colloquy was held, defendant was fifty three years old. Exh. C at 7. He was a college graduate with a Bachelors of Arts degree in Media Studies, and had received some "professional training" in, among other areas, paralegal studies. Id. at 8. Before his arrest, he had been employed as a Human Resources Director at the Washington Times. Id.

At the outset of the hearing, defendant was given a copy of the Information, waived a formal reading of it, and entered his plea. Exh. C at 3. He was then placed under oath. Id. The Court began the colloquy by telling him that he could "consult with [his] lawyer at any time if you want to ask her any kind of questions" and that "[w]e'll go through this slowly and carefully to make sure this is what you want to do." Id. at 4. The Court also told him that "you can't just sort of change your mind in a week and say, *Well, you know, I've changed my mind, Judge.* So I want to make sure this is what you actually . . . want to do." Id. (emphasis in original). Defendant indicated that he understood. Id. The Court then reviewed the three charges in the Information and confirmed that defendant would plead guilty to Counts 2 and 3. Id. at 5-6. The Court also stated that this is "a Rule 11(c)(1)(C) plea in which the government and your counsel

have agreed, and you, have agreed to what the sentence would be" and that the sentence would include an aggregate term of imprisonment of 90 months.  Id. at 6.

When asked if "had read [the plea agreement] carefully yourself," defendant said that he had.  Exh. C at 9.  He also noted that he "went over [the agreement] with my attorney face to face previously, and then today I had additional questions face to face."  Id. at 8-9.  He answered affirmatively when asked if he was "completely satisfied with the services of your lawyer in this case."  Id. at 9.  After he stated that he had been unable to have telephone contact with counsel and could only communicate with her through written correspondence, the Court inquired whether he needed more time to consult with counsel and encouraged him to "please speak up" because he could not later change his mind about this "important decision."  Id. at 10-11.

Defendant stated that he had "raised issues" with counsel about the plea agreement "and from what I understand it is what it is."  Exh. C at 11.  After the Court reminded him that "[t]he question is whether you understand what you're agreeing to and whether this is what you want to actually agree to,"defendant responded that he understood "what it is [that] I'm agreeing to."  Id. He also noted that he "had some difficulty digesting it; not because I don't understand it, but because of the conditions in it."  Id.

The prosecutor made clear that "[t]he government is not prepared to negotiate any further in this case, and I've communicated that to Ms. Jahn."  Exh. C at 12.  The Court commented that defense counsel "is telling you accurately that the government is not willing to make any other modification" and again asked if defendant needed more time, warning that "you can't change your mind later."  Id.  Defendant responded that, "I understand what both attorneys are saying.... if there's no room for negotiation, then I believe I have to accept what they've offered me."  Id.

After the Court confirmed that defendant understood that, by pleading guilty, he was forfeiting certain constitutional rights, the Court and the parties discussed in greater detail the fact that the plea was pursuant to Rule 11(c)(1)(C). Exh. C at 14-17, 19-27. Unlike the usual such plea, however, the written plea agreement in this case specified that if the Court did not accept the agreed-upon sentence, both defendant and the United States retained the right to withdraw from the plea. Id. at 22-23. The prosecutor explained that the agreement was drafted this way because if the Court rejected it, the government wished to retain the right to prosecute him under Count 1, which carried a mandatory minimum term of imprisonment of ten years. Id. at 20. The Court confirmed that defendant understood that if the plea agreement were rejected by the Court, either party could withdraw from the plea. Id. at 27-28.

At this point, the prosecutor gave a factual proffer based on the information in the written Statement of Facts. Exh. C at 28-32. During the proffer, the prosecutor stated that the CD recovered from defendant's office desk contained images of child pornography and that "all of them at some point had been transmitted in interstate commerce." Id. at 32.

The Court then reviewed the elements of Count 2:

> In terms of the elements of the offense, . . . the defendant knowingly possessed – videotapes in this case - involved the use of a minor engaging in [sexually] explicit conduct. The visual depiction of such [sexually]-explicit conduct, had been mailed, shipped, or transported in interstate [commerce]. Minor [means] the child [is] under the age of 18.

Id. at 32.

The prosecutor briefly interrupted the Court's recitation of the elements to note that the case involved a CD, not videotapes. Exh. C at 32-33. The Court then completed its review of

the elements of Count 2, reading in part the definition for sexually explicit conduct.  Id. at 33.

The Court requested that the prosecutor summarize how this element, which the prosecutor did.

The Court then reviewed the elements of Count 3 and discussed how the actions described in the prosecutor's proffer fit the elements of that offense.  Id. at 33-34.

The Court next inquired whether defendant had signed the written Statement of Facts, and he responded affirmatively.  Exh. C at 34.  The Court also asked whether he agreed with the Statement of Facts.  Id.  He responded, "[a]s it's stated in here, yes, I agree with it, Your Honor." Id.

Defendant then was asked a series of questions about the "key facts" in the government's proffer.  Exh. C at 36-42.  In this portion of the colloquy, the Court confirmed with defendant that evidence of his chat with "daddysgrl.dc" was provided to the defense, that counsel had reviewed it with him, and that defendant had a CD in his office that contained approximately 10 images of child pornography, including the two described earlier by the prosecutor.  Id. at 37, 40. Defendant said that he was uncertain of the ages of the girls shown in these two images, and the prosecutor stated that, through separate investigation, the approximate ages of the girls had been learned and that one of the girls was in North Carolina when the photographs were taken and the second girl was in Ohio.  Id. at 40-41.

At the conclusion of this exchange, the Court again reviewed and recited the elements of Counts 2 and 3.  Regarding Count 2, the Court stated:

> In terms of possessing material constituting or containing child pornography, the defendant knowingly possessed a CD which depicted visually the use of a minor engaging in sexually-explicit conduct.  The visual depiction was of sexual[ly]-explicit conduct which had been shipped in interstate commerce.  The minor was under the age of 18.  And it can be either lascivious simulated conduct involving the genitalia.  So it would appear to fit all of the elements of the offense.

Exh. C at 41-42.

The Court concluded by asking "[a]nything else that I need to know factually?" Id. at 42. Defense counsel said no. The Court directed the same question to defendant, who responded no. Id.

The Court then turned to the written plea agreement, reviewing its provisions paragraph by paragraph with the defendant. Exh. C at 42-53. During this review, the Court told defendant the maximum penalty for Counts 2 and 3, and that the plea agreement called for him to serve 90 months' imprisonment and a supervised release term of at least 10 years. Id. at 42, 46. Defendant understood these points, just as he understood the other provisions in the plea agreement. Id. at 42-53.

The Court explained in detail how defendant's sentence under the advisory guidelines would be calculated with respect to Count 2, which was a federal charge. Exh. C at 53-56. Specifically, the Court explained that his sentencing range under the guidelines would be based on his offense level and his criminal history category, and reviewed in general terms how these two components would be calculated. Id. at 53-54. The Court also explained that "[t]here are departures that the court can consider which could either increase the sentence or decrease the sentence." Id. at 54-55. The Court noted as well that "ordinarily sentences are governed by 18 USC 3553(a) which sets out a whole series of factors to decide what's appropriate and what's a reasonable sentence." Id. at 55.

The Court also reviewed how the sentence for Count 3 (the D.C. Enticement charge) would be calculated. Defense counsel stated that the parties had agreed to the statutory maximum sentence of 5 years on that charge. Exh. C at 55 The Court asked defendant if he had

10

spoken with counsel about this and whether "based on those discussions you came to the decision that you did about agreeing to it[?]" Id. at 58. Defendant responded, "[t]hat's correct." Id.

The Court confirmed with defendant that no other promises had been made to him about his plea or sentence other than those stated in the plea agreement. Exh. C at 59-60. The following questions and answers then ensued:

Q: Are you entering this plea of guilty voluntarily [and] of your own free will?

A: Yes, Your Honor.

Q: Are you entering this plea of guilty because you are guilty of the charges you are pleading to?

A: Yes, Your Honor.

Q: Anything you don't understand about the proceeding or your plea in this case, anything you want to ask me or your lawyer?

A: At this time, no, Your Honor.

Id. at 60.

Defendant then pled guilty to Counts 2 and 3. Exh. C at 60. The Court concluded that he understood the "nature and consequences of what he's doing," that he was "acting voluntarily of his own free will," and that there was "an adequate factual basis for the plea. Id. at 61. However, because the plea agreement was in accordance with Rule 11(c)(1)(C), the Court did not accept the plea at that time. Id.

**D.      The Amendment to the Plea Agreement**

After the plea colloquy, the prosecutor and defense counsel learned that the agreed-upon sentence - 30 months' imprisonment on Count 2 and a consecutive term of imprisonment of 60

months on Count 3 - was not possible because the D.C. Code prohibited a sentence of 60 months on Count 3. Exh. D at 65-66. It was thus agreed that the sentence would be "flipped"; that is, the plea agreement was modified to reflect that defendant would be sentenced to 60 months on Count 2 and to a consecutive term of imprisonment of 30 months on Count 3. Id. at 65-67. Because a 60-month sentence on Count 2 would be an upward departure from the advisory sentencing guidelines of 30 to 37 months, at a hearing on December 21, 2006, the Court put on the record "the advantage to Mr. Casseday and why the government was making this . . . plea. . . ." Id. at 66-67.

The prosecutor explained that Count 1 in the Information carried a mandatory minimum sentence of 10 years' imprisonment. Exh. D at 67-68. She further explained that, by entering the plea, defendant avoided this mandatory minimum sentence:

> The government's position was that this was a serious offense, that the conduct required a substantial period of incarceration; at the same time, there should be some incentive to a defendant who, like Mr. Casseday through his attorney, indicated early in this case that he was willing to accept responsibility.
>
> . . .
>
> Had Mr. Casseday gone to trial and been convicted he would face not only a mandatory minimum sentence on the federal enticement [charge] of 10 years, he would face an approximate guideline sentence of four and a half years on the child pornography count.
>
> Had a court run those sentences consecutively he would be looking at between 14 and 15 years imprisonment. This plea will give him the opportunity to have a sentence of approximately half of that.

Id. at 69.

The Court confirmed with defense counsel that if defendant had pled guilty to Count 1, the Court would "wouldn't have any choice except to give him the 10 years." Exh. D at 72. Counsel stated that she had discussed this fact "at length" with defendant. Id.

Defendant then was placed under oath and the Court directly addressed him regarding the modification to the plea agreement. Id. at 72-73. At the outset of this colloquy, the Court told him that "if you have any other questions, please bring them up." Id. at 73. The Court confirmed that defendant still wished to waive his constitutional rights, that it was still his voluntary decision to plead guilty, and that he still agreed with government's factual proffer from the last hearing. Id. at 77.

The Court next reviewed in detail the modification to the plea agreement. Exh. D at 73-85. During this review, the Court called defendant's attention to the proposed sentencing change:

> Now, the important part, probably is paragraph 3 of this new addendum because this is a major change. The agreed sentence is that on the possession of child pornography, which is the federal offense, you would be agreeing, and the court would be agreeing, to a sentence of 60 months - which, as I've indicated, would be a variance of the advisory sentencing guidelines, but is within the statutory maximum sentence so the court can impose this - and a sentence of 30 months or two and a half years on the enticement charge which is the federal one. Again, this is a variance from the DC advisory voluntary sentencing guideline range. And the 60 months and 30 months would be served consecutively, one sentence after the other, so that it would result in an aggregate or total sentence of 90 months.

Id. at 84.[1]

_____

[1]    As this passage makes clear, the modification to the agreement also was memorialized in writing. Exh. E. The last page of this document includes a heading entitled "Defendant's Acceptance" followed by two paragraphs stating that the defendant had, among other things, "read this agreement and . . . discussed it with my attorney" and that he was "satisfied" with counsel's legal services. Id. at 3. Defendant signed and dated the document on December 21,

Defendant stated that he understood.  Id.

The Court then confirmed that defendant understood the advantage that the plea

agreement offered him and, in doing so, specifically addressed the upward departure:

> And we've discussed earlier the advantage to you in terms of what you would be
> facing, although it's in a variance from the advisory sentencing guidelines in both
> federal and DC, and the variance is higher than the guidelines, the advantage to
> you still is to . . . have dismissed the charge that you would be facing with the
> mandatory minimum.

Exh. D at 84-85.

Defendant again stated that he understood.  Id. at 85.  Moreover, he did not have any

questions, he voluntarily agreed to the modification to the plea agreement, and he adopted the

answers he gave in response to the Court's questions at the initial plea colloquy.  Id. at 85-86.

The Court concluded the hearing by directing the prosecutor to justify in writing the basis

for this Rule 11(c)(1)(C) plea.  Exh. D at 95.

**E.     The Sentencing**

Before sentencing, the United States submitted a Memorandum in Aid of Sentencing

explaining the basis for the plea and the sentence.  The memorandum stated in part that "the

advisory United States Sentencing Guidelines are relevant to the Court's determination of an

appropriate sentence pursuant to 18 U.S.C. § 3553, and to the Court's decision whether to accept

the plea agreement submitted to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C)."  2/8/07

Sent. Memo. at 2.  The memorandum noted that the plea agreement called for a 90-month term

of imprisonment and it explained why this sentence and the plea agreement itself were justified

---

2006.  Id.  Defense counsel also signed the document, signifying that she had reviewed it with
her client.

using the factors set out in 18 U.S.C. § 3553(a).  Id. at 3.  The memorandum thus described the

nature of the offenses and defendant's history and characteristics; explained how the sentence

reflected the seriousness of defendant's crimes, protected the public, and served as a deterrent;

and discussed the ten year mandatory minimum sentence for Count 1 that defendant avoided by

accepting the plea agreement.  Id. at 3-5.

        A presentence report ("PSR") also was prepared before sentencing and submitted to the

parties and the Court.  The PSR stated in part that the CD recovered from defendant's office

contained images of child pornography and that "[a]ll of those images had traveled in interstate

commerce by means of the internet prior to coming into the defendant's possession."  PSR ¶ 16.

It also noted that defendant had "continued to express acceptance of responsibility" when he

spoke with the probation officer.  Id. ¶ 20.  The PSR further stated that in 1996, "defendant

received a paralegal certificate from the American Institute of Paralegal Studies, based in

Chicago, Illinois, and that before joining the Washington Times, defendant was employed at a

company in New York where he "was charged with providing legal services and public

relations."  Id. ¶¶ 54, 59.

        Defendant was sentenced on February 15, 2007.  At the outset of the hearing, the Court

reviewed the portions of the PSR that set forth his sentencing range.  Exh. F at 3-5.  The Court

then announced that it would accept the plea under Rule 11(c)(1)(C) and also that it had

concluded that there were "justifiable reasons" for the sentence, including the upward departure

for Count 2:

> In terms of the Rule (c)(1)(C) sentence agreement, I'll find that there are
> justifiable reasons, and the government has set them out, which the court would
> adopt, such that it would be an upward departure under the federal [charge] but
> still within the statutory maximum of 60 months for Count 2, and 30 months on

Count 3 which is the DC offense, and then the agreement of at least 10 years supervised release on Count 2 and three years - and these were concurrent, if I'm not mistaken - and three years on Count 3.

So, if there's nothing else, I will go ahead and adopt the presentence report as written, [and] indicate that I've accepted the Rule 11(c)(1)(C).

Id. at 5-6.

The Court then heard from the attorneys and from the defendant, who stated that "throughout this entire nightmare I've – I have not ducked my responsibility from this and I have taken full responsibility from the very beginning." Exh. F at 25. He added that "even after this is all finished ... I'm not looking to be untruthful to anybody about anything regarding my behavior or anything like that." Id. at 26. He was "very sorry for all that's happened." Id. at 26-27.

Before imposing sentence, the Court discussed "the factors [that it had considered], among others, in determining what is an appropriate and reasonable sentence pursuant to 18 USC 3553(a). . . ." Exh. F at 27. The Court described defendant's personal and professional background, the nature and circumstances of the crimes to which he had pled guilty, the harm those crimes caused children, the need to protect children from such crimes, the conditions that would apply to defendant's term of supervised release, and why those conditions were appropriate. Id. at 27-43.

The Court sentenced defendant to 60 months' imprisonment on Count 2 and to a consecutive term of 30 months on Count 3. Exh. F at 37. The Court also imposed concurrent supervised release terms of 240 months and 36 months on Counts 2 and 3, respectively. The Court thus imposed the sentence that defendant had agreed to in the plea agreement.

Defendant did not note an appeal.

**F.**     <u>**Defendant's Section 2255 Claims**</u>

On or about February 14, 2008, defendant filed his initial § 2255 motion.  In that motion, he claims, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, that his guilty plea to Count 2 was not knowing, voluntary, or supported by a factual basis; that his counsel provided ineffective assistance because she did not explain Count 2 to him and permitted him to plead guilty even though there was no factual basis to support his plea to this charge; and that counsel also was ineffective in that defendant instructed her to file a Notice of Appeal but she failed to do so.

On or about April 23, 2008, defendant filed his amended § 2255 motion.  There, he claims that the Court violated Rule 11(b)(1)(M) when it purportedly did not inform him about the reasons for his sentence; that counsel was constitutionally ineffective because she did not object to this purported failure by the Court; and that the recovery of the CD from his office violated his Fourth Amendment rights.

As explained below, all of these claims should be denied, with the exception of defendant's Fourth Amendment claim, which should be dismissed as time-barred.

<u>**ARGUMENT**</u>

A prisoner may contest the validity of his sentence by moving the Court that imposed the sentence to "vacate, set aside or correct the sentence."  28 U.S.C. § 2255.  To gain relief under section 2255, he must show "a good deal more than would be sufficient on a direct appeal from his sentence."  <u>United States v. Pollard</u>, 959 F.2d 1011, 1020 (D.C. Cir. 1992).

I.      **Defendant's Fourth Amendment Claim Is Time-Barred And Should Be Dismissed**

Before addressing the merits of defendant's claims, the Court must determine if they are

timely.  See United States v. Cicero, 214 F.3d 199, 202 (D.C. Cir. 2000).  In enacting the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress "adopted a tight

time line, a one-year statute of limitation period" for claims made under section 2255.  Mayle v.

Felix, 545 U.S. 644, 662 (2005).  Section 2255's one-year limitation period runs from the latest

of:

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

Here, as "[i]n most cases," the applicable limitation period is "the one identified in

[(f)(1)]: 'the date on which the judgment of conviction becomes final.'"  Dodd v. United States,

545 U.S. 353, 357 (2005) (quoting 28 U.S.C. § 2255[(f)(1)]).  In this case, defendant did not file

a direct appeal.  Where "a criminal defendant does not file a notice of direct appeal within the

required ten-day period, circuits have held that the proper date for beginning the § 2255 statute

of limitations [under (f)(1)] is either the date judgement is entered or the date by which a notice

of appeal must be filed."  United States v. Washington, 271 F. Supp. 2d 278, 281 (D.D.C. 2003);

see also Moshier v. United States, 402 F.3d 116, 118 (2d Cir. 2005) ("for purposes of § 2255 motions, an unappealed federal criminal judgment becomes final when the time for filing a direct appeal expires"); Sanchez-Castellano v. United States, 358 F.3d 424, 428 (6th Cir. 2004) (same); United States v. Sanders, 247 F.3d 139, 142 (4th Cir. 2001) (where no appeal is taken, judgment becomes final on the date that it is entered).

The Judgment and Commitment Order in this case was entered on February 20, 2007. Defendant's convictions thus became final on March 6, 2007, which is ten business days after February 20, 2007. Fed. R. App. P. 4(b)(1)(A), 4(b)(6) & 26(a). Therefore, defendant had until March 6, 2008 to timely file his § 2255 motion.

Defendant's initial § 2255 motion was filed on or about February 14, 2008, and hence is timely. However, defendant did not file his amended § 2255 motion until on or about April 23, 2008. This motion thus was filed almost two months after March 6, 2008, and is untimely. Therefore, defendant's amended claims are "time-barred, and properly struck by the District Court, unless [these claims are] subsumed by the timely . . . [initial § 2255] motion pursuant to the 'relation back' doctrine." United States v. Hicks, 283 F.3d 380, 387 (D.C. Cir. 2002).

"An amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." Mayle, 545 U.S. at 650. Defendant's amended claims therefore will be considered timely "only [if] the claims added . . . arise from the same core facts as the timely filed claims, and not [if] the new claims depend upon events separate in both time and type from the originally raised episodes." Id. at 657 (internal quotation marks and citation omitted).

19

Here, defendant's first two claims in his amended § 2255 motion are that the Court did not comply with Rule 11(b)(1)(M) and that counsel was ineffective for not objecting to this failure.  In his timely initial § 2255 motion, he asserts that the Court violated Rule 11 in other respects in accepting his guilty plea to Count 2 and that his counsel was ineffective for not objecting to that failure.  Hence, defendant's first two claims in his amended § 2255 motion arise from the same set of core facts as, and are similar in time and type to, claims in his timely initial motion.  Therefore, these two claims in defendant's amended § 2255 motion are not time-barred because they relate back to his timely raised claims.

The same cannot be said for the third claim in defendant's amended § 2255 motion.  In that claim, he asserts that the recovery from his office of the CD containing images of child pornography violated his Fourth Amendment rights.  This claim clearly is different in both time and type from the claims in his timely initial § 2255 motion.  Therefore, defendant's Fourth Amendment claim does not relate back to any of his timely-filed claims and it should be dismissed as time-barred.  See Hanson v. United States, 2006 WL 1071479, *3 (D.D.C. April 21, 2006) (dismissing section 2255 motion as time-barred); Wyche v. United States, 317 F. Supp. 2d 1, 12 (D.D.C. 2004) (same).[2]

---

[2]  Even if this claim were not time-barred, it would fail.  "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."  Tollett v. Henderson, 411 U.S. 258, 267 (1973).  Hence, in pleading guilty, defendant forfeited his right to raise a Fourth Amendment challenge.

II.     **Defendant's Rule 11-Related Claims Should Be Summarily Denied**

Although the Court warned him more than once that he could not later change his mind about pleading guilty, and although the plea agreement allowed him to avoid a mandatory minimum sentence of ten years' imprisonment, defendant now seeks to withdraw his guilty plea, claiming that the Court violated Fed. R. Crim. P. 11 during the plea colloquy.  Specifically, he asserts (in his initial § 2255 motion) that his plea to Count 2 was not knowing, voluntary, or supported by a factual basis, and (in his amended § 2255 motion) that he was not informed of the reasons for his sentence.  These claims are contradicted by the record, which shows that the Court's Rule 11 colloquy was careful, thorough, and complete.  Therefore, defendant's Rule 11-related claims should be summarily denied.

A.     **Legal Principles**

To withdraw a guilty plea based on Rule 11 defects, a defendant is obliged to meet a difficult standard.  Where such a motion is made before sentencing, the motion may be granted if the defendant shows a fair and just reason for the request.  Fed. R. Crim. P. 11(d)(2)(B).  "After sentencing, however, a plea 'may be set aside only on direct appeal or by motion under 28 U.S.C. § 2255,' [Fed. R. Crim. P. 11(e)], and the defendant must meet a more stringent standard than the obviously more lenient fair and just standard."  United States v. Farley, 72 F.3d 158, 162 (D.C. Cir. 1995) (emphasis in original) (internal quotation marks and citation omitted); see also United States v. Watley, 987 F.2d 841, 847-48 (D.C. Cir. 1993) ("[p]ost-sentence withdrawal of a guilty plea depends on a showing of 'manifest injustice'").  Indeed, "[t]o prevail under section 2255 the defendant must show that the plea proceeding was tainted by a 'fundamental defect which inherently results in a complete miscarriage of justice' or 'an

21

omission inconsistent with the rudimentary demands of fair procedure.'" Farley, 72 F.3d at 162

(quoting Hill v. United States, 368 U.S. 424, 428 (1962)); see also United States v. Weaver, 265

F.3d 1074, 1077 (D.C. Cir. 2001) (same).

In an attempt to satisfy this difficult standard, defendant contends that his guilty plea was

not knowing because, during the plea colloquy, he was not informed that one of the elements of

Count 2 (the Possession of Child Pornography charge) was that the images of child pornography

found on the CD found in his office had been transmitted in interstate commerce. According to

defendant, because he was not told about this element, he did not admit his guilt to it and hence,

his guilty plea to this count was not voluntary and lacked a factual basis. He further contends

that he was not informed of the reasons for the sentence that the Court imposed. The record

conclusively refutes defendant on all of these points.[3]

### B.    Defendant Understood Count 2 and Voluntarily Pled Guilty to It

The record makes plain that defendant understood the nature of Count 2 and that his

guilty plea to this charge was voluntary. "For a plea to be voluntary under the Constitution, a

defendant must receive 'real notice of the true nature of the charge against him.'" United States

v. Ahn, 231 F.3d 26, 33 (D.C. Cir. 2000) (quoting United States v. DeWalt, 92 F.3d 1209, 1211

(D.C. Cir. 1996)) (other citation omitted). "In assessing whether the defendant has such an

---

[3] Specifically, the record contradicts defendant's claim that the Court did not comply
with Rule 11(b)(1)(G), which requires the Court to inform the defendant on the record and while
he is under oath of the nature of the charges he is pleading guilty to and to ensure he understands
this; Rule 11(b)(2), which requires that the Court ensure that the defendant's plea is voluntary;
Rule 11(b)(3), which requires that there be a factual basis for the plea; and Rule 11(b)(1)(M),
which requires the Court to inform the defendant that, in imposing sentence, it will consider the
applicable Sentencing Guidelines range, any departures from that range, and the other factors set
forth in 18 U.S.C. § 3553(a).

understanding, the record of the plea colloquy must, based on the totality of the circumstances, 'lead a reasonable person to believe that the defendant understood the nature of the charge.'" Id.

Here, a reasonable person would conclude that defendant understood the nature of Count 2 and voluntarily pled guilty to it. Indeed, the record starkly contradicts the claim in his initial motion (at 5) that he was not informed that one of the elements of Count 2 is that the images of child pornography on the CD found in his office had moved in interstate commerce before coming into his possession. The final paragraph of the Statement of Facts specified that the images of child pornography on the CD found in his office "had traveled in interstate commerce by means of the Internet prior to coming into the defendant's possession," and defendant signed the Statement of Facts directly beneath this very paragraph. Exh. B at 4, ¶ 11; see also In re Sealed Case, 283 F.3d at 353 (noting that in signing the factual proffer, defendant evidenced his agreement with it). Moreover, defendant stated under oath during the plea colloquy that he agreed with the facts "as stated in" the Statement of Facts and that he had reviewed the plea agreement, by himself and with his counsel. Exh. C at 8-9, 34. "'[T]he representations of the defendant [at a plea hearing] as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceeding' and the defendant's 'declarations in open court carry a strong presumption of verity.'" Farley, 72 F.3d at 163 (quoting Blackledge v. Allison, 431 U.S. 63, 73-74 (1977)).

The record further shows that during the United States' detailed factual proffer, the prosecutor stated that the CD contained images of child pornography and that "all of them at some point had been transmitted in interstate commerce." Exh. C at 32. Indeed, at the Court's prompting, the prosecutor even discussed how this fact had been learned, explaining that one

photograph on the CD was of a six or seven-year old girl in North Carolina and that one was of a

girl between the ages of 8 and 11 in Ohio. Id. at 40-41. And the Court twice reviewed, out loud,

the elements of Count 2 (and Count 3). Id. at 32, 42. After its second recitation, the Court asked

defense counsel and defendant if there were "anything else I need to know," and both responded

no. Id. at 42. Hence, the record is replete with references to this element and, overall, to the

nature of Count 2. Compare In re Sealed Case, 283 F.3d at 355 (rejecting claim that defendant

did not understand the nature of the charge to which he had pled guilty where record showed,

among other things, that he was informed "numerous" times of the charge, the factual proffer

was detailed, and he was represented by counsel), with DeWalt, 92 F.3d at 1212 (concluding that

defendant should be allowed in pre-sentence context to withdraw his plea to charge involving

possession of a weapon where court did not inform him that this was the charge involved and did

not ask if he had received or read a copy of the indictment).

The record also plainly shows that defendant was not confused about what he was doing

and that his plea was voluntary. In the written plea agreement, defendant signed his name under

the paragraph stating in part that he was entering the plea "voluntarily and of [his] own free

will," and not because of any threats. Exh. A at 6. During the colloquy, the Court told him more

than once that he could ask questions of the Court or his counsel whenever necessary and that he

could take more time to think about his decision. Exh. C at 4, 10-11, 42, 60. At the conclusion

of the colloquy, the Court confirmed with defendant that his plea was voluntary, that he was

entering the plea because he was guilty, and that he understood the proceedings. Id. at 60.

Defendant had no questions. Id. On December 21, 2006, the date that the plea agreement was

modified in open court, he had another opportunity to express any confusion or hesitation about

the plea, but he did not do so. Instead, he confirmed - again under oath - that his decision to plead guilty was voluntary and that he agreed with the factual proffer made at the initial plea hearing. Exh. D at 77, 85-86. Even after he was sentenced, defendant continued to accept responsibility and did not express any confusion about his guilty plea in speaking with the PSR writer. PSR at ¶ 20. Significantly, when he entered his plea, defendant was fifty-three, college educated, had earned a paralegal certificate, and, according to the PSR, had done some legal work. Exh. C at 7-8; PSR ¶¶ 54, 59. Hence, his "ability to comprehend is not open to doubt." United States v. Liboro, 10 F.3d 861, 864 (D.C. Cir. 1993); see also In re Sealed Case, 283 F.3d 349, 352 (D.C. Cir. 2002) (stating that in considering if the totality of the circumstances show that defendant understood the charge to which he was pleading guilty, the Court may consider his intelligence level). For all these reasons, the record shows that defendant understood Count 2 and voluntarily pled guilty to it.

**C.    Defendant's Guilty Plea to Count 2 Was Supported by a Factual Basis**

The record shows that defendant's guilty plea to Count 2 was amply supported by a factual basis. "To establish a satisfactory factual basis, the Government must proffer evidence from which a reasonable juror could conclude that the defendant was guilty as charged." Anh, 231 F.3d at 31 (quotation marks and citation omitted); see also United States v. Abreu, 964 F.2d 16, 19 (D.C. Cir. 1992) ("the factual basis of which [Rule 11] speaks is merely sufficient evidence from which a reasonable jury could conclude that the defendant committed the crime"). The Statement of Facts described in detail the facts supporting Counts 2 and 3, as did the prosecutor during her detailed factual proffer. Both the Statement of Facts and the prosecutor's proffer specifically made note of the fact that the sexually explicit images of young girls on the

CD found in defendant's office had traveled in interstate commerce before coming into his possession. Indeed, the prosecutor even explained in her proffer how "independent investigation" had revealed this fact. Exh. C at 40-41. Defendant, under oath, agreed with the proffer and he signed the Statement of Facts. Hence, on this record, a reasonable juror certainly could conclude that there was a factual basis for his guilty plea to Count 2. See Anh, 231 F.3d at 32 ("in cases in which courts have held that there was an insufficient factual basis for a defendant's plea, the government has offered no evidence to support an element of the charge").

**D.     Defendant Was Informed About the Reasons for His Sentence**

The record establishes that the Court informed defendant, more than once, about the reasons for his sentence and the reasons for the Court's conclusion that the upward departure on Count 2 was justified. During the initial plea colloquy on November 20, 2006, the Court reviewed in detail how defendant's sentence on Count 2 would be calculated, explained that there could be departures from the sentencing range that could increase or decrease the sentence and discussed defendant's sentence for Count 3. Exh. C at 53-58.

When it was later discovered that the sentence in the plea agreement would need to be "flipped" - that is, defendant would be sentenced to 60 months on Count 2 and to a consecutive term of imprisonment of 30 months on Count 3 - that change to the agreement, the fact that the change would constitute a variance from the guidelines range on Count 2, and the reasons for the agreement, all were extensively discussed at the December 21, 2006 hearing. Exh. D. Indeed, the Court directly spoke with defendant to ensure that understood the advantage that the plea agreement offered him and, in doing so, specifically noted the upward departure:

> And we've discussed earlier the advantage to you in terms of what you would be
> facing, although it's in a variance from the advisory sentencing guidelines in both

<u>federal and DC</u>, and the variance is higher than the guidelines, <u>the advantage to
you still is to . . . have dismissed the charge that you would be facing with the
mandatory minimum</u>.

<u>Id.</u> at 84-85 (emphasis added).  Defendant understood this.  <u>Id.</u> at 85.

      Moreover, the Court expressly directed the prosecutor to justify in writing the reasons for

the sentence and the advantages that the plea offered the defendant.  <u>Id.</u> at 95.  The prosecutor

did so in the United States' sentencing memorandum, explaining that the crimes were serious,

that defendant had early on indicated that he was willing to accept responsibility, and that the

plea permitted him to avoid the ten-year mandatory minimum sentence required by Count 1

(which would be dismissed as part of the plea).  2/8/07 Sent. Memo. at 2-5.

      At the sentencing on February 15, 2007, the Court expressly adopted the United States'

written statement of reasons when it accepted the Rule 11(c)(1)(C) plea and sentence:

> <u>In terms of the Rule 11(c)(1)(C) sentence agreement, I'll find that there are
> justifiable reasons, and the government has set them out, which the court would
> adopt, such that it would be an upward departure under the federal [charge] but
> still within the statutory maximum of 60 months for Count 2</u>, and 30 months on
> Count 3 which is the DC offense, and then the agreement of at least 10 years
> supervised release on Count 2 and three years - and these were concurrent, if I'm
> not mistaken - and three years on Count 3.
>
> So, if there's nothing else, I will go ahead and adopt the presentence report as
> written, [and] indicate that I've accepted the Rule 11(c)(1)(C).

<u>Id.</u> at 5-6 (emphasis added).

      The Court then discussed at length the factors that it considered under 18 U.S.C. 3553(a)

in deciding to accept that the agreed-upon sentence was just and reasonable.  <u>Id.</u> at 27-43.

In sum, the record plainly contradicts defendant's claim that the Court did not comply with Rule 11(b)(1)(M) in this case.[4]

**E.     Defendant Has Not Alleged, Much Less Proffered an Objectively Reasonable Argument, that He Is Innocent**

"'[A] defendant who fails to show some error under Rule 11 has to shoulder an extremely heavy burden if he is ultimately to prevail'" on his motion to withdraw his guilty plea. United States v. West, 392 F.3d 450, 456 (D.C. Cir. 2004) (quoting United States v. Cray, 47 F.3d 1203, 1208 (D.C. Cir. 1995)). Here, defendant has not shown any defect in the Rule 11 colloquy, nor has he shown any other reason that his motion should be granted. Specifically, he has not "affirmatively advance[d] an objectively reasonable argument that he is innocent." West, 392 F.3d at 456 (internal quotation marks, citation omitted); see also Farley, 72 F.3d at 163 (same). Indeed, defendant does not even claim that he is innocent of Count 3, and, as to Count 2, he merely (and erroneously) asserts in his initial motion (at 7-8) that there was no proof that the illicit images on the CD had traveled in interstate commerce before coming into his possession.

---

[4] Defendant alludes in his amended motion (at 6-7) to U.S.S.G. § 6B1.2(c)(2), which states that the Court may accept a Rule 11(c)(1)(C) plea that calls for an outside-the-guidelines sentence if the Court concludes the departure is for "justifiable reasons" and "those reasons are specifically set forth in writing in the statement of reasons or judgment and commitment order." Defendant asserts that the Court did not comply with this provision because the Judgment and Commitment Order does not include a written statement explaining the departure. Even if this provision of the Guidelines had not strictly been complied with, that would not constitute a manifest injustice such that defendant must be permitted to withdraw his guilty plea. In any event, the Court did comply with this provision when, at sentencing, it adopted the United States' written statement of reasons justifying the plea and the sentence. If the Court has any uncertainty on this point, however, it could simply amend the judgment and commitment order. Defendant also appears to claim that the Court did not comply with 18 U.S.C. § 3553 at sentencing, but the record plainly shows otherwise.

On this record, where there is no Rule 11 defect and where defendant has not even

asserted that he is innocent, it is clear that he has not carried his "extremely heavy burden" of

showing that he should be allowed to withdraw his plea.  See Abreu, 964 F.2d at 20 ("[a] simple

change in tactics or change of heart is not an adequate reason to force the government to incur

the expense, difficulty, and risk of trying a defendant who has already voluntarily and

intelligently waived his right to trial").  For this reason, as well as those discussed above,

defendant's Rule 11-related claims should be summarily denied.[5]

## III.    Defendant's Ineffectiveness Claims Regarding Counsel's Representation During the Plea Proceedings Fail

Defendant claims in his initial § 2255 motion that his attorney provided ineffective

assistance of counsel regarding his guilty plea to Count 2.  In this regard, he asserts that counsel

---

[5]  Ultimately, these Rule 11-related claims should be denied as procedurally barred.  With the exception of an ineffective assistance of counsel claim, a claim raised on collateral attack is procedurally barred if it was not raised on appeal unless the movant can show cause and prejudice to excuse his failure to raise the claim on appeal. See United States v. Pettigrew, 346 F.3d 1139, 1144 (D.C. Cir. 2003); see also Massaro v. United States, 538 U.S. 500, 504 (2003) (a defendant may raise an ineffective assistance of counsel claim after an appeal is concluded, "whether or not the petition could have raised the claim on direct appeal").  To establish cause, a defendant must demonstrate "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim."  McCleskey v. Zant, 499 U.S. 467, 493-94 (1991)  (internal quotation omitted).  To show prejudice, defendant must demonstrate "'actual prejudice' resulting from the errors of which he complains."  United States v. Frady, 456 U.S. 152, 168 (1982). Here, defendant attempts to establish cause and prejudice to excuse his failure to raise his Rule 11 claims on appeal by arguing that his counsel was ineffective for allegedly failing to file his Notice of Appeal as directed.  As discussed below, counsel contests this ineffectiveness claim. We submit that once the Court holds an evidentiary hearing to assess the credibility of defendant and his counsel on this claim, the Court will conclude that defendant is not credible and will deny this ineffectiveness claim.  The denial of that claim necessarily will compel the conclusion that defendant has not established cause to excuse his failure to raise his Rule 11 claims on appeal and thus that these claims are procedurally barred.  We nonetheless address the merits of defendant's Rule 11 claims here because, while we believe the claims ultimately will be procedurally barred, the record clearly shows that they lack any merit.

did not explain to him the elements of this charge and that, although he told her that the images of child pornography on the CD had not traveled in interstate commerce, she nonetheless permitted the plea to be accepted even though there was no factual basis to support it. In his amended § 2255 motion, he claims that counsel was ineffective for not objecting to the Court's alleged violation of Rule 11(b)(1)(M). Both these claims fail.

### A.  Legal Principles

To prevail on his ineffective assistance of counsel claims, defendant must make a two-part showing. First, he must "show . . . that counsel's advice was not 'within the range of competence demanded of attorneys in criminal cases.'" United States v. Horne, 987 F.2d 833, 835 (D.C. Cir. 1993) (quoting Hill v. Lockhart, 474 U.S. 52, 58 (1985)). Second, he must demonstrate that he suffered "prejudice" as a result of counsel's deficient performance. Id. Defendant must show both deficient performance and prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). The Court need not examine the two components of an ineffective assistance claim in any particular order. Id. at 697. Indeed, the Court is not required "even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id.

### B.  Defendant Has Not Shown That His Counsel Was Deficient

Defendant's claims that his counsel ineffectively represented him during the plea proceedings essentially assert that she should have objected to the Rule 11 defects in those proceedings. However, as discussed above, the record establishes that there were no Rule 11 defects. Hence, counsel certainly was not deficient for failing to object to a defect-free Rule 11 colloquy.

30

More specifically, defendant has failed to show deficiency for at least three reasons. First, his claims in his initial motion that counsel did not inform him of the elements of Count 2 and that she permitted him to plead guilty to this charge even though he told her that the sexually explicit images on the CD had not traveled in interstate commerce are not credible. These claims are inconsistent with each other: it is not possible that he did not know the elements of Count 2 _and_ that he told counsel that one of those elements of that count was not met. Second, his claim that he told counsel that the illicit images on the CD did not travel in interstate commerce before coming into his possession is contradicted by the written Statement of Facts, which specifically stated that the images had traveled in interstate commerce, and which defendant signed, and by his sworn statements during the plea colloquy agreeing to the government's factual proffer. See Blackledge, 431 U.S. at 74 (a defendant's "declaration in open court carry a strong presumption of verity"). Hence, on this record, defendant has not overcome the "strong presumption" that counsel actions fell within "the wide range of professional assistance." Strickland, 466 U.S. at 689.

Third, counsel certainly was not deficient regarding the sentence imposed here, as defendant's amended motion itself shows. He states there (at 6) that "Counsel informed Petitioner on more than one occasion that the Government could charge him with a crime carrying a higher sentence, thus inducing Petitioner to accept the plea agreement with the sentencing package construed outside the range of sentencing defined in the USSG." Counsel's sound and accurate advice on this point clearly did not fall "below an objective standard of reasonableness." Id. at 688.

31

The record thus shows that defendant has not established deficiency.  Therefore, the Court should summarily deny his ineffective assistance of counsel claims.[6]

### C.    Defendant Has Not Established Prejudice

These claims also should be denied because defendant has not shown prejudice.  "To satisfy the prejudice requirement in the context of an attack on a guilty plea, 'the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'"  In re Sealed Case, 488 F.3d 1011, 1016 (D.C. Cir. 2007) (quoting Hill, 474 U.S. at 59).

Here, defendant does not squarely state, much less establish, that but for his counsel's alleged deficiencies, he would have gone to trial.  In his initial § 2255 motion, he asserts that he would have gone to trial, unless he had done something else.  Hence, he claims that, but for his counsel's alleged deficiencies, he would have gone to trial: or (at 8) he would have pled only to Count 3 without agreeing to a consecutive sentence; or (at 9) he would have entered into a valid and competently understood guilty plea; or (at 13) he would have pled guilty only to Count 3.[7] And in his amended § 2255 motion, he nowhere even alleges that it is reasonably probable that he would have gone to trial, but for counsel's failure to object to the Court's purported violation of Rule 11(b)(1)(M).  Defendant's qualified assertions in his initial motion that he would have gone to trial, and the complete absence in his amended motion of any assertion that he would

---

[6] If the Court does not summarily deny defendant's ineffectiveness claims, we reserve the right to present counsel's testimony.

[7] Pleading guilty only to Count 3 was never an option for defendant, as the United States never made such a plea offer to him.

have done so, are insufficient to establish prejudice. See United States v. Eli, 379 F.3d 1016,

1018 n.4, 1022 n.10 (D.C. Cir. 2004) (where defendant alleged that his plea counsel was

ineffective but stated that he did not wish to withdraw his guilty plea, noting that to prevail on an

ineffectiveness claim in the plea context, the defendant must show that, but for counsel's

deficiency, defendant would have insisted on going to trial).

Moreover, even assuming that defendant had squarely asserted that, but for counsel's

deficiencies, he would have gone to trial, he still would not be able to bear his burden of showing

prejudice. "It is clear enough that a defendant must make more than a bare allegation that he

'would have pleaded differently and gone to trial.'" Horne, 987 F.2d at 836 (quoting Key v.

United States, 806 F.2d 133, 139 (7th Cir. 1986)). To satisfy this standard, a defendant "does not

need to show that he would have prevailed at trial, only that there is a reasonable probability that

he would have gone to trial." United States v. Hanson, 339 F.3d 983, 991 (D.C. Cir. 2003)

(emphasis in original; internal quotation marks and citation omitted). "[A]ny rational decision

regarding the latter would have required a realistic assessment of the former." Id. It is thus of

significance that the case against defendant was strong. The text of his on-line chat with

"daddysgrl.dc" was found on the computer in his office, as was the photograph that the police

detective (acting as "daddysgrl.dc") sent him. In addition, the digital images of his face and

erect penis that he sent to "daddysgrl.dc" were found on the memory sticks found in his office.

Also recovered from his office was the CD containing at least ten images of child pornography,

and the United States had proof that those images had traveled in interstate commerce before

coming into his possession. In addition, defendant was arrested at the time and location that he

had agreed to meet "daddysgrl.dc." Notably, he has not proffered any defense to Counts 1 and 3,

33

and as to Count 2, has merely (and erroneously) asserted that the United States lacked proof that

the sexually explicit images of children on the CD traveled in interstate commerce before

coming into his possession.  See In re Sealed Case, 488 F.3d at 1018 (rejecting defendant's claim

of prejudice in part because he offered no defense to one of the charges against him).

Compare United States v. Streater, 70 F.3d 1314, 1322-23 (D.C. Cir. 1995) (defendant

established a reasonable probability that he would have gone to trial but for his counsel's advice

where defendant had rejected prior plea offers and stated in affidavit that he was innocent and

identified three witnesses who would support his defense).

        By pleading guilty to Counts 2 and 3, defendant avoided the ten-year mandatory

minimum term that he would have faced at trial on Count 1 and assured himself of a lesser

sentence of 90 months.  The prosecutor explained this benefit at the December 21, 2006 hearing:

> Had Mr. Casseday gone to trial and been convicted he would face not only a
> mandatory minimum sentence on the federal enticement [charge] of 10 years, he
> would face an approximate guideline sentence of four and a half years on the
> child pornography count.
>
> Had a court run those sentences consecutively he would be looking at between 14
> and 15 years imprisonment.  This plea will give him the opportunity to have a
> sentence of approximately half of that.

Exh. D at 69 (emphasis added).

        On this record, defendant has not carried his burden of showing that, but for the

purported deficiencies of his counsel, it is reasonably probable that he would have forfeited the

considerable benefits he received by pleading guilty and gone to trial instead.  See Hanson, 339

F.3d at 991-92; see also United States v. Del Rosario, 902 F.2d 55, 58 (D.C. Cir. 1990)

(upholding trial court's conclusion that defendant did not establish prejudice in plea withdrawal

case in part because evidence of his guilt was strong). Hence, defendant has not established

prejudice and these ineffective assistance of counsel claims should be summarily denied.

**IV.     Defendant's Claim That Counsel Failed To File A Notice Of Appeal As Instructed
Should Be Denied After An Evidentiary Hearing**

In his initial § 2255 motion, defendant contends that his attorney was ineffective because

he instructed her to file a Notice of Appeal but she failed to do so. Where a defendant claims

that counsel provided ineffective assistance by not filing a notice of appeal, the Court should

determine "whether counsel in fact consulted with the defendant about an appeal." Roe v.

Flores-Ortega, 528 U.S. 470, 478 (2000). While there is no "bright line rule that counsel must

always consult with the defendant regarding an appeal," see id. at 480, a counsel who does

consult with the defendant "performs in a professionally unreasonable manner only by failing to

follow the defendant's express instructions with respect to an appeal.'" United States v. Taylor,

339 F.3d 973, 978 (D.C. Cir. 2003); see also Roe, 528 U.S. at 477 (explaining that the Supreme

Court has "long held that a lawyer who disregards specific instructions from the defendant to file

a notice of appeal acts in a manner that is professionally unreasonable" and provides ineffective

assistance under Strickland). Thus, in a case where counsel consulted with the defendant about

whether to appeal, the defendant's ineffective assistance of counsel claim will fail unless the

defendant can show that counsel did not follow his or her explicit instructions regarding an

appeal.

Where there has been no consultation between defendant and counsel about whether to

file an appeal, the Court must assess "whether counsel's failure to consult with the defendant

itself constitutes deficient performance." Roe, 528 U.S. at 478; see also Taylor, 339 F.3d at 978.

"'[C]ounsel has a constitutionally imposed duty to consult' only when 'there is reason to think

either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing.'" Taylor, 339 F.3d at 978 (quoting Roe, 528 U.S. at 480). The fact that the defendant pled guilty is a "highly relevant factor" in this analysis, "both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings." Roe, 528 U.S. at 480.

Here, defendant asserts in his initial motion (at 15) that "soon after the conclusion of his sentencing proceedings," he "adamantly instructed" counsel to file a notice of appeal. He further asserts (at 15) that he wrote counsel "more than once to express his interest in challenging his conviction or sentence," that counsel replied once by letter, and she did not respond to his "continuing requests." His affidavit adds a few details to his claim, specifying that a few days after sentencing, he spoke with counsel by telephone and "requested that she file a Notice of Appeal challenging the conviction or sentence"; that counsel refused, explaining that his sentence was not illegal; that he wrote her a letter "specifically" requesting that she file a Notice of Appeal"; and that counsel again refused, explaining in a letter that his sentence was not illegal. Def. Aff. ¶¶ 14-16. Notably, defendant has not attached any of these letters to his initial § 2255 motion or, for that matter, to any other filing.

In any event, in her Declaration, counsel rebuts defendant's claims and attests to her "firm belief" that defendant never asked her to file a notice of appeal. Exh. G ¶ 10. Specifically, counsel recalls that, after the Court imposed sentence, she spoke with defendant in the cell block and that he did not ask her, or suggest to her, that he wanted her to file a notice of appeal. Id. ¶ 3. She further attests that she has received three letters from him since he was sentenced and

that in none of these letters did he tell her to file a notice of appeal. <u>Id.</u> ¶¶ 4, 6-7.[8]  (Copies of these letters, and counsel's letters in response, are attached to counsel's Declaration.)  Further, counsel is unable to recall any other type of communication from or with him after he was sentenced. <u>Id.</u> ¶ 9.

Hence, counsel's account squarely contradicts defendant's claim.  To resolve this factual disagreement, the Court should conduct an evidentiary hearing and make credibility findings about the differing accounts of defendant and counsel.  At the conclusion of the hearing, the defendant's claim should be denied because his version of events is not credible.

## V.    <u>Most Of Defendant's Claims May Be Summarily Denied</u>

A district court is not required to hold an evidentiary hearing on a motion to vacate, set aside, or correct a sentence if the "motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255.  Here, with the exception of defendant's claim that his counsel was ineffective for not filing a Notice of Appeal, the Court need not hold an evidentiary hearing to resolve his claims.  As discussed at length above, the record conclusively contradicts defendant's other ineffectiveness claims. <u>See</u> <u>United States v. Carr</u>, 373 F.3d 1350, 1354 (D.C. Cir. 2004) (no evidentiary hearing necessary on defendant's ineffective assistance claim "because it is clear from the record that [defendant] is not entitled to relief"); <u>United States v. Sayan</u>, 968 F.2d 55, 66 (D.C. Cir. 1992) (no need for hearing in § 2255 proceeding in part because the same judge who presided over the original proceedings ruled on

---

[8]  Defendant's letters to counsel to counsel are dated March 29, 2007, June 1, 2007, and April 3, 2008.  Hence, all of these letters were sent after the ten-day period for filing an appeal had expired.  <u>See</u> Fed. R. App. P. 4(b)(1)(A) (stating that a criminal defendant must file a notice of appeal within ten days of the date that the judgment is entered).

the § 2255 motion).  In addition, the record squarely refutes defendant's various Rule 11 claims

and hence, no hearing is necessary to resolve them.  See West, 392 F.3d at 457 n.4 ("[a] district

court need hold an evidentiary hearing on a plea withdrawal only where the defendant offers

substantial evidence that impugns the validity of the plea") (internal quotation marks and citation

omitted).  Finally, the record also makes clear that defendant's Fourth Amendment claim is time-

barred, and therefore a hearing is not necessary on that claim.

<div align="center">

**CONCLUSION**

</div>

For all the reasons stated herein, the Court should: (1) dismiss defendant's Fourth

Amendment claim as time-barred; (2) deny, after an evidentiary hearing, his claim that his

counsel was ineffective for not filing a Notice of Appeal as he allegedly directed; and (3)

summarily deny all of his remaining claims.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
D.C. Bar Number 498-610

JOHN P. MANNARINO
Assistant United States Attorney
Chief, Special Proceedings Division
D.C. Bar Number 444-384

___/s/_____
MARGARET J. CHRISS
Assistant United States Attorney
D.C. Bar Number 452-403
Special Proceedings Division
555 4th Street, N.W.
Washington, D.C.  20530
(202) 307-0874
Margaret.Chriss@usdoj.gov

<div align="center">

38

</div>

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that, this 9th day of September 2008, a copy of the foregoing Consolidated Opposition to defendant's <u>pro se</u> Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody and to defendant's <u>pro se</u> Amended 28 U.S.C. § 2255 Motion to Vacate, Set Aside, or Correct Sentence by a Prisoner in Federal Custody Pursuant to Rule 15 of Federal Civil Judicial Procedure, and attached exhibits, was served via first class mail, postage pre-paid, upon:

Mr. Randall Casseday
Fed. Reg. # 28791-016
FCI Petersburg Low
P.O Box 1000
Petersburg, VA 23804

                                      /s/
                                      Assistant United States Attorney

**Exhibit A**



U.S. Department of Justice

Jeffrey A. Taylor
United States Attorney

*District of Columbia*

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

# FILED

NOV 2 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

October 31, 2006

Danielle Jahn, Esquire
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Washington, D.C. 20004

*Re: United States v. Randall Casseday*
*Criminal Case Number 06-329(CKK)*

Dear Ms. Jahn:

This letter confirms the agreement between your client, Randall Casseday and the Office of the United States Attorney for the District of Columbia (hereinafter also referred to as "the Government" or "this Office"). If your client accepts the terms and conditions of this offer, please have your client execute this document in the space provided below. Upon receipt of the executed document, this letter will become the plea agreement. The terms of the offer are as follows:

### Randall Casseday's Obligations, Acknowledgments and Waivers:

1. Your client, Randall Casseday agrees to admit guilt and enter a plea of guilty to Counts Two and Three of a criminal Information, a copy of which is attached, in violation of 18 U.S.C. §2252(a)(4)(B) (Possession of Child Pornography) and of Section 216(d) of the District of Columbia Omnibus Public Safety Congressional Review Emergency Act of 2006, Act 16-445, amending 22 D.C. Code § 3010 (Enticement of a Minor (herein after "Enticement"). Your client understands that pursuant to 18 U.S.C. §§2252(1)(4)(B), 3571(b) and 3583(k), the offense of Possession of Child Pornography carries a penalty of up to ten years imprisonment, a fine of up to $250,000, and a term of supervised release of any term of years up to life. The offense of Enticement is punishable pursuant to 22 D.C. Code 3010 by up to five years imprisonment and a fine of up to $50,000. In addition, your client agrees to pay a special assessment of $~~100~~ per felony conviction to the ~~Clerk of the United States District Court for the District of Columbia~~ prior to the date of sentencing. Pursuant to U.S.C. Section 3571 and Section 5E1.2 of the Sentencing Guidelines, the Court may also impose a fine that is sufficient to pay the federal government the costs of any imprisonment, term of supervised release and period of probation.

*[handwritten margin notes: suspend Victims of Crime Fund PS- DCJ RC]*

Danielle Jahn, Esquire
October 31, 2006
Page two.

2.  Your client agrees and will acknowledge at the time of the plea of guilty to the criminal charge stated above that, pursuant to Section 1B1.3 of the Sentencing Guidelines, your client is possessed at least ten images of child pornography as defined in 18 U.S.C. § 2256, and that at least two images depicted children under the age of twelve years.

3.  Your client and the Government agree that a sentence of 30 months on the Possession of Child Pornography Charge, and a sentence of five years (60 months) on the Enticement charge, to be served consecutively, resulting in an aggregate sentence of 90 months, and a term of at least ten years supervised release is the appropriate sentence for the offenses to which your client is pleading guilty. The Government also agrees, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, to present this plea agreement between the parties to the Court for its approval. If the Court accepts the plea agreement and the specific sentence agreed upon by the parties, then the Court will embody in the judgment and sentence the disposition provided for in this plea agreement, pursuant to Rule 11(c)(4) of the Federal Rules of Criminal Procedure.  The parties understand, however, that in light of other factors the Court may not agree that such a sentence is an appropriate one and may reject the plea agreement pursuant to Rule 11(c)(5) of the Federal Rules of Criminal Procedure.  Your client understands that if this happens, the Court, in accordance with the requirements of Rule 11(c)(5), will inform the parties of its rejection of the plea agreement and will afford your client an opportunity to withdraw the plea, or if your client persists in his plea of guilty will inform your client that a final disposition may be less favorable to your client than that contemplated by this agreement. In addition, the parties intend, understand and agree that if the Court rejects the plea agreement, the government has full and complete discretion to file a Superseding Information or to seek a Superseding Indictment prior to the defendant's entering a guilty plea to any criminal offense in this case. This agreement with respect to the appropriate sentence effects only incarceration and supervised release.  The otherwise applicable statutory and Guideline provisions are applicable to other any other incidents of sentencing.

**Administrative Forfeiture**

4.  Your client agrees waive your client's interest in and not to contest the administrative forfeiture of the following property: **Toshiba Satellite Laptop computer, serial number 80836016U, Sony Cypershot 3.2 Dis-P7, serial number #365388, Sony Memory Sticks recovered from his office on September 27, 2006 and a CDR disc recovered from that office on September 28, 2006** as property constituting, or derived from, proceeds obtained, directly or indirectly, or property used or intended to be used to commit or to facilitate the illegal activity charged in the Information filed in this case. Your client acknowledges and agrees that the Government reserves its right to bring civil actions, if necessary, in any jurisdiction for the forfeiture of any of your client's assets, real or personal, that are subject to forfeiture pursuant to any federal statute.

5.  Your client warrants that your client is the sole owner of all of the property listed above, and agrees to hold the United States, its agents and employees, the District of Columbia and the District of Columbia Metropolitan Police Department  harmless from any claims whatsoever in connection with the seizure or forfeiture of property covered by this plea agreement.

Danielle Jahn, Esquire
October 31, 2006
Page three.

## Detention Pending Sentencing

6. Your client agrees not to object to the Government's recommendation to the Court at the time of the plea of guilty in this case that, pursuant to 18 U.S.C. § 3143, your client be detained without bond pending your client's sentencing in this case.

## Waiver of Rights

7. In entering this plea of guilty, your client understands and agrees to waive certain rights afforded to your client by the Constitution of the United States and/or by statute, including: the right against self-incrimination with respect to the offense(s) to which your client is pleading guilty; the right to an indictment; the right to be tried by a jury, or by a judge sitting without a jury; the right to be assisted by an attorney at trial; and the right to confront and cross-examine witnesses. Your client further agrees that the District Judge should make any Sentencing Guidelines determinations.

## Allocution

8. Your client understands that subject to the provisions of paragraph 3 of this agreement, this Office reserves its full right of allocution for purposes of sentencing in this matter. In particular, the United States reserves its right to recommend a specific fine and term and conditions of supervised release allowable by law. In addition, if in this plea agreement the Government has agreed to recommend or refrain from recommending to the Court a particular resolution of any sentencing issue, the Government reserves its right to full allocution in any post-sentence litigation in order to defend the Court's ultimate decision on such issues. Your client further understands that the Government retains its full right of allocution in connection with any post-sentence motion which may be filed in this matter and/or any proceeding(s) before the Bureau of Prisons. In addition, your client acknowledges that the Government is not obligated and does not intend to file any downward departure sentencing motion under Section 5K1.1 of the Sentencing Guidelines, 18 U.S.C. Section 3553(e), or any post-sentence downward departure motion in this case pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure.

## Sex Offender Registration

9. Your client acknowledges and agrees that pursuant to 18 U.S.C. §§ 3563, 3583, and 42 U.S.C.§14071, he is required to register as a sex offender as a as a mandatory condition of probation and or supervised release. Specifically, your client must report the address where he will reside and any subsequent change of residence to the probation officer responsible for his supervision and he must register in any state where he resides, is employed, carries on a vocation, or is a student. Additionally, your client agrees that as a term of this agreement, and as a specific term of probation or supervised release, he will register a current address, fingerprints and current photograph with the Federal Bureau of Investigation for inclusion in its national sexual offender database. He further agrees that he will notify the FBI and the state in which he establishes a new residence, not later than 10 days after he establishes a new residence, of the change, and will register a current address, fingerprints and photograph with the FBI and the state.

Danielle Jahn, Esquire
October 31, 2006
Page four.

## The Government's Obligations, Acknowledgments and Waivers

10.  This Office will dismiss Count One of the Information at the time of sentencing. Your client, agrees and acknowledges however, that the charge to be dismissed at the time of sentencing was based in fact. In addition, the government will not bring any additional charges against your client in connection with the conduct described in the Statement of Facts to be signed by the parties and submitted to the Court.

## General Conditions

11.  This letter sets forth the entire understanding between the parties and constitutes the complete plea agreement between your client and the United States Attorney's Office for the District of Columbia. This agreement supersedes all prior understandings, promises, agreements, or conditions, if any, between this Office and your client.

12.  This agreement only binds the United States Attorney's Office for the District of Columbia. It does not bind any other United States Attorney's Office or any other office or agency of the United States Government, including, but not limited to, the Tax Division of the United States Department of Justice, the Internal Revenue Service of the United States Department of the Treasury, or any state or local prosecutor. These individuals and agencies remain free to prosecute your client for any offense(s) committed within their respective jurisdictions.

13.  Your client understands and agrees that if, after entering this Plea Agreement, your client fails specifically to perform or to fulfill completely each and every one of your client's obligations under this Plea Agreement, or engages in any criminal activity prior to sentencing, your client will have breached this Plea Agreement. In the event of such a breach: (a) the Government will be free from its obligations under the Agreement; (b) your client will not have the right to withdraw the guilty plea; © your client shall be fully subject to criminal prosecution for any other crimes, including perjury and obstruction of justice; and (d) the Government will be free to use against your client, directly and indirectly, in any criminal or civil proceeding, all statements made by your client and any of the information or materials provided by your client, including such statements, information and materials provided pursuant to this Agreement or during the course of any debriefings conducted in anticipation of, or after entry of this Agreement, including your client's statements made during proceedings before the Court pursuant to Fed. R. Crim. P. 11.

14.  Your client acknowledges discussing with you Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410, rules which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. Your client knowingly and voluntarily waives the rights which arise under these rules.

15.  Your client understands and agrees that the Government shall only be required to prove a breach of this Plea Agreement by a preponderance of the evidence. Your client further understands

Danielle Jahn, Esquire
October 31, 2006
Page five.

and agrees that the Government need only prove a violation of federal, state, or local criminal law by probable cause in order to establish a breach of this Plea Agreement.

16. There are no other agreements, promises, understandings or undertakings between your client and this Office . Your client understands and acknowledges that there can be no valid addition or alteration to this agreement unless the modification is made on the record in open Court or made in a writing signed by all of the parties.

Sincerely yours,

JEFFREY A. TAYLOR.
United States Attorney

PATRICIA STEWART
Assistant United States Attorney

## DEFENDANT'S ACCEPTANCE

I have read this plea agreement and have discussed it with my attorney, Danielle Jahn, Esquire. I fully understand this agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this agreement fully. I am pleading guilty because I am in fact guilty of the offense(s) identified in paragraph one.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this plea agreement. I am satisfied with the legal services provided by my attorney in connection with this plea agreement and matters related to it.

Date: __11/20/2006__                         _Randall Casseday_
                                             RANDALL CASSEDAY
                                             Defendant


## ATTORNEY'S ACKNOWLEDGMENT

I have read each of the pages constituting this plea agreement, reviewed them with my client, and discussed the provisions of the agreement with my client, fully. These pages accurately and completely sets forth the entire plea agreement. I concur in my client's desire to plead guilty as set forth in this agreement.

Date: __11/20/06__                          _Danielle Jahn_
                                             DANIELLE JAHN, Esquire
                                             Attorney for the Defendant

**<u>Exhibit B</u>**

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA            :

·v.                                 :        **Criminal Case No. 06-329(CKK)**

RANDALL CASSEDAY                    :

**FILED**

NOV 2 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

### STATEMENT OF FACTS

The parties in this case, the United States of America and the defendant, Randall Cassedy, stipulate and agree that the following facts are true. These facts do not constitute all of the facts known to the parties concerning the charged offenses; they are being submitted to demonstrate that there exists probable cause that the defendant committed the offenses to which he is pleading guilty.

1. On September 26, 2006, using a laptop computer in the District of Columbia, the defendant entered a Yahoo Internet chat room. The defendant, using the screen name "Taurus1053" contacted an individual using the screen name "daddysgrl.dc". During the on-line chat, which lasted from approximately 7:23 p.m. until approximately 9:17 p.m., the defendant told "daddysgrl.dc" that he was on New York Avenue, N.E., that he had a wife and children in another state, that he rented a room in "Bowie" during the week and that he was 53 years old. He forwarded a photograph of himself that depicted his face.

2. A Metropolitan Police detective acting in an undercover capacity and using the screen name "daddysgrl.dc" stated that she was a 13 year old girl, that her name was Amanda, that she lived with her mother in the District of Columbia, that her father had engaged in some unspecified inappropriate sexual behavior with her and that she had not had sexual intercourse. The detective

sent to the defendant a photograph of a young girl in a swimming pool and represented that the photograph was of "Amanda".

3. During the chat, the defendant stated that he like "it when girls pee" and asked whether he could watch "daddysgrl.dc" urinate. The defendant forwarded to "daddysgrl.dc" several photographs of an erect penis, and referring to photographs, asked whether "it would fit inside" her. The defendant told "daddysgrl.dc" that she could "slide your pussy back and forth on it without going inside". When "daddysgrl.dc" expressed concern about becoming pregnant, the defendant stated that he would "take it out before cumming".

4. Following this exchange, the defendant made arrangements with "daddysgrl.dc" to meet for the purpose of engaging in sexual intercourse. The undercover detective as "daddysgrl.dc" said that she lived at 1317 Adams Street, N.E., in the District of Columbia, and the defendant instructed "daddysgrl.dc to be in front of that location at about 9:30 p.m.

5. At approximately 9:40 p.m. a Metropolitan Police detective observed the defendant operating a black Toyota Camry automobile bearing New York state license plates in the vicinity of the intersection of Adams, Downing and 13th Streets, N.E. The detective activated the lights on his cruiser and the defendant drove a short distance to the 1300 block of Brentwood Road, N.E. where he was arrested.

6. Subsequent investigation determined that the defendant was 53 years old, that he worked at the Washington Times building on New York Avenue, N.E., that he had entered that location on the evening of September 26, 2006 prior to the time "Taurus053" contacted the undercover detective, that he was a resident of New York State and that he rented a room in Bowie, Maryland.

2.

7. After the defendant's arrest, security personnel at the Washington Times building were notified and in the early hours of September 27, 2006, the defendant's office was locked and secured. Washington Times personnel maintained a presence at the office and prevented anyone from entering the office until the afternoon of September 27, 2006.  On September 27, 2006, a United States District Court Magistrate Judge issued a search warrant authorizing the search of the defendant's office, and specifically of data storage devices in that location. The warrant was executed by Metropolitan Police detectives  and a United States Secret Service Agent later the same date.

8. Among the items recovered during the search of the defendant's office was a Toshiba Satellite computer. The computer was one that  defendant had obtained at his former place of employment and brought with him to the Washington Times. A forensic analysis of the computer by a  United States Secret Service examiner was conducted. On the computer was the text of the internet chat between the defendant and the Metropolitan Police detective posing as "Amanda", a photography of two females who appeared to be in their teens, one of whom was urinating on the other, and the photograph of the young girl in the swimming pool that the undercover detective had forwarded to "taurus51053".

9. Also recovered during the search were several "memory sticks",  storage devices for digital photographs. Several of the pictures that had been sent to "daddysgrl.dc", including pictures of the penises, and the picture of the defendant's face were located on the memory sticks.

10. After the search of the office was completed, Washington Times security staff changed the lock on the door to the office and resecured it. On September 28, 2006, Washington Times staff entered the office for the purpose of removing the defendant's personal possessions from the office. A staff member found a compact disc ("CD") in the defendant's desk. The CD was turned over to

3.

a detective who submitted it to the United States Secret Service for analysis.

11. The CD was found to contain at least ten images of child pornography, as defined in 18 U.S. C. § 2256. All of those images had traveled in interstate commerce by means of the Internet prior to coming into the defendant's possession. Two of the images were of children who had previously been identified by the National Center for Missing and Exploited Children. Both of the children were under the age of twelve when the photographs found on the CD were taken of them.


PATRICIA STEWART
Assistant United States Attorney

DANIELLE JAHN, Esquire
Attorney for Defendant

RANDALL CASSEDAY
Defendant

November 20, 2006
Date

11 / 20 / 2006
Date

4.

**Exhibit C**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA     :    CR No. 06-329
                                :    November 20, 2006
            Plaintiff,        :
                                :    11:03 a.m.
   v.                            :
                                :    Washington, DC
   RANDALL G. CASSEDAY,      :
                                :
            Defendant.       :
   ...........................:

DAY ONE OF TWO
TRANSCRIPT OF ARRAIGNMENT/GUILTY PLEA
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Plaintiff:          PATRICIA STEWART, AUSA
                           U.S. ATTORNEY'S OFFICE
                           555 Fourth Street
                           Washington, DC   20001

For the Defendant:          DANIELLE JAHN, AFPD
                           FEDERAL PUBLIC DEFENDER
                           625 Indiana Avenue, NW
                           Washington, DC   20004

Court Reporter:             EDWARD HAWKINS, RMR
                           Official Court Reporter
                           Room 6806, U.S. Courthouse
                           Washington, D.C. 20001
                           (202) 682-2555


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription

2

```
 1                      P R O C E E D I N G S

 2            THE COURT:  All right.  Good morning, everyone.

 3            MS. STEWART:  Good morning, Your Honor.

 4            MS. JAHN:  Good morning, Your Honor.

 5            THE DEPUTY CLERK:  Criminal Case 06-329.  The United

 6   States of America versus Randall G. Casseday.

 7            Patricia Stewart for the government.  Dani Jahn for the

 8   defendant.  The defendant is present in the courtroom.

 9            THE COURT:  Is it pronounced Cass-a-DAY?

10            THE DEFENDANT:  Yes, Your Honor.

11            THE COURT:  Okay.  Just a couple of things.

12            Is it correct, then, the same elements of the offense

13   for enticing a minor, whether it's a federal or a DC offense, is

14   that correct?  Just looking at this?

15            MS. STEWART:  We believe that it is, Your Honor, and

16   frankly, that would be a litigable matter, but we do believe

17   they are close enough.  The wording of the statutes is not

18   exactly the same, but the elements appear to be.

19            THE COURT:  Does defense counsel have a differing view

20   about that?

21            MS. JAHN:  No, Your Honor, we don't.

22            THE COURT:  The other thing is that I noticed in terms

23   of the special assessments, one is a special assessment that

24   goes to the Clerk of the Court on the federal offense, which I

25   think is -- it's in the first paragraph of the letter -- but the
```

Randall Casseday - Court                                    3

1    DC offense, it goes to the Victims of Crime Fund, which doesn't

2    seem to be included, which I think is a range of 50 to $250, if

3    I'm not mistaken.

4           May I suggest that we just add it and people initial

5    it?

6           Okay.  I think, then, the only thing we need to do is

7    present him on the information that he's going to be pleading to

8    and proceed.

9           MS. JAHN:  Should we come to the lectern?

10          THE COURT:  Yes, if you would, Mr. Casseday.

11          THE DEPUTY CLERK:  May the record reflect that the

12   defendant has received a copy of the information.

13          Does the defendant waive formal reading of the

14   information?

15          MS. JAHN:  On behalf of Mr. Casseday, we waive formal

16   reading of the information and, pursuant to the plea agreement,

17   we enter a not guilty plea to Count 1, but a guilty plea to

18   Count 2 and Count 3 of the information, Your Honor.

19          THE COURT:  All right.  If we're ready to go forward,

20   let me have him sworn in and proceed.

21          THE DEPUTY CLERK:  Would you raise your right hand,

22   please?

23   RANDALL G. CASSEDAY, Defendant, SWORN

24   BY THE COURT:

25   Q.  All right, sir.  I'm going to be asking you some questions

Randall Casseday - Court                                        4

1    as part of this plea.  It's to make sure that you understand

2    what you're doing and that you're entering this plea both

3    knowingly as well as voluntarily of your own free will.

4             As I go through these questions, if you don't

5    understand what I'm asking, I'll have a series of questions.  I

6    will also go over the plea letter and will ask whether you agree

7    or whether you understand it, and I sometimes summarize it.  If

8    it doesn't sound like what you've discussed with your lawyer or

9    as you understand it, please speak up.

10            You can also consult with your lawyer at any time if

11   you want to ask her any kind of questions.

12            We'll go through this slowly and carefully to make sure

13   this is what you want to do.

14            I just want to make it clear that we need to put on the

15   record the complete agreement, either in writing or orally.  You

16   can't come back in a week or so and say *I thought this or that*

17   *was part of the plea.*  We need to make sure everything is on the

18   record, either orally or in writing.  And also you can't just

19   sort of change your mind in a week and say, *Well, you know, I've*

20   *changed my mind, Judge.*  So I want to make sure this is what you

21   actually what you want to do.  All right?

22   A.   Yes, Your Honor.

23   Q.   What I'm going to do is go over very briefly what the basics

24   of the plea agreement are without getting into what's in the

25   letter.

1          I'll have some background questions to ask you.

2          I'll go over your constitutional rights that you're

3    giving up by pleading guilty.

4          We'll discuss the facts in this case.  The court needs

5    to make a finding that the government has proffered facts beyond

6    a reasonable doubt on each of the elements related to the

7    offenses you're pleading guilty to.

8          I need to hear from you in terms of your admitting what

9    these facts are as well in order for me to find you guilty.

10         We'll then discuss the sentencing options, which will

11   be the statutory maximums as well as any of the calculations

12   that would be done either under the advisory federal sentencing

13   guidelines, which we would have to start with, as well as the DC

14   ones.  And then I will have some questions that get to the

15   voluntariness.

16   A.   Yes, Your Honor.

17   Q.   Do you understand, now that I've placed you under oath, that

18   if you don't answer my questions truthfully you could be

19   prosecuted for perjury or for making a false statement?

20   A.   Yes, Your Honor.

21   Q.   Now, as I understand the plea agreement, let me start with

22   the charges in the information.

23         Count 1 is attempted enticing a minor, which is a

24   federal offense; Count 2 is possessing material constituting or

25   containing child pornography, which is also a federal offense;

Randall Casseday - Court                                    6

1   and Count 3 is enticing a child or minor, and that's a DC

2   offense.

3           The agreement is that you will plead to Count 2, the

4   federal offense of possession of material constituting or

5   containing child pornography, and Count 3, which is a DC offense

6   enticing a child or minor.

7           The government will dismiss Count 1 attempted enticing

8   a minor, which is the federal offense, and will not bring any

9   additional charges relating to these events or their

10  investigation.

11          This is also a Rule 11C1(c) plea in which the

12  government and your counsel have agreed, and you, have agreed to

13  what the sentence would be.

14          The agreement, as I understand it, is that you would be

15  sentenced to 30 months on possession of child pornography, and

16  on the enticement charge 60 months to be consecutive, so that it

17  would be a total of 90 months.

18          Now, a Rule 11C1(c) the court would need to agree to

19  it.  Generally, I request Probation to do a presentence

20  investigation, and once I've looked at that, so I have some idea

21  of what information, I will then indicate whether I will accept

22  it.  If I accept it, then this will be the sentence that you

23  would be getting.

24          If I don't accept it, which I would let you know, we

25  would come back in court and at that point you have two choices.

1    You can move to withdraw the plea based on the fact that I have

2    not accepted the agreement as to what the sentence should be, or

3    you can decide to leave the plea and go forward not knowing what

4    the sentence could be, and the sentence could be a different

5    sentence and could be one that's less favorable than the one

6    that's agreed to.

7              Is that your understanding?

8    A.   It is, Your Honor.

9    Q.   The other aspect, in terms of just the basics, is that you

10   will have agreed to be held without bond pending the sentencing.

11             The government has reserved the right to make

12   recommendations to the court at the time of sentencing.  The

13   agreement as to the sentence only goes to the actual jail time;

14   it does not get into supervised release or any other kinds of

15   conditions that might be set.  There are a few that are in the

16   plea letter, but they've left open the idea that they could ask

17   for other things, and I'll go over them in the plea letter

18   itself.

19             But is that your understanding?

20   A.   Yes, Your Honor.

21   Q.   All right.  Then let me at this point ask some background

22   questions.  How old are you, sir?

23   A.   Fifty-three.

24   Q.   And what is your date of birth?

25   A.   May 10, 1953.

Randall Casseday - Court                                    8

1    Q.   How far have you gone in school?

2    A.   College degree and some professional training.

3    Q.   What was the college degree in?

4    A.   Media studies, Bachelor of Arts.

5    Q.   And the professional training is additional training that

6    you would have gotten as part of your job or something else?

7    A.   Well, it was part of my job, and also further education for

8    possible other types of employments, such as real estate studies

9    to prepare for real estate sales, paralegal certificate, and

10   training in Human Resources, law, many seminars in that, and

11   training from General Motors and Ford Motor Company in customer

12   service skills.

13   Q.   And what job did you have before you got arrested?

14   A.   I was a Human Resources director at the Washington Times.

15   Q.   Where were you born?

16   A.   In Virginia.

17   Q.   Have you taken any kind of medication or anything else that

18   would affect your ability to understand what you're doing by

19   pleading guilty?

20   A.   No, Your Honor.

21   Q.   So you're not on any medication?

22   A.   No, Your Honor.

23   Q.   How did you go over the plea letter?  Did you read it

24   yourself?  Did you go over it with your lawyer?  How did you go

25   through it?

Randall Casseday - Court                                    9

1   A.   I went over it with my attorney face to face previously, and

2   then today I had additional questions face to face.

3   Q.   Have you read it over carefully yourself?

4   A.   Yes, Your Honor.

5   Q.   Have you ever received any treatment for any type of mental

6   illness or emotional disturbance?

7   A.   No, Your Honor.

8   Q.   All right.  Now you have a copy of the information which

9   sets out the pending charges against you.

10          Have you fully discussed those charges and the case

11  with your counsel?

12  A.   Yes, Your Honor.

13  Q.   Are you completely satisfied with the services of your

14  lawyer in this case?

15  A.   So far, yes, Your Honor.

16  Q.   Have you had enough time to talk with your lawyer, discuss

17  the case, the plea offer, and whether or not you should accept

18  it?

19  A.   I've had time.  I wish I had had more time, but it's been

20  difficult to contact her because of the facilities where I'm

21  being housed.  I don't have phone contact with her, and at this

22  point I'm only being able to contact her by letter.

23  Q.   Okay.  Are there particular areas that you would want more

24  time to discuss it with her?

25          I don't want to go forward with this if you still have

1    some questions or still wish to have some further talks with

2    her.  That's the reason I ask the question.

3            And I know that -- where are you housed at this point?

4    A.  I'm housed at the Correctional Treatment Facility in DC.

5    Q.  I know that they've had some issues recently with counsel

6    trying to get in, although that may have been the jail.

7            MS. JAHN:  Your Honor, if I may, just to supplement the

8    record.

9            The phone service that CTF provides for the inmates

10   there; for some reason, the Federal Public Defender's main

11   office number has been blocked.  AJ Kramer has brought it to the

12   attention of the warden.

13           There, right now, is a group of defense attorneys, two

14   members of this bench, a Judge from Superior Court, and various

15   Department of Correction officials that are aware of this issue.

16           Mr. Casseday is not the only person that this has been

17   affecting.  I would note that I have had the opportunity to meet

18   with Mr. Casseday face to face at CTF.

19           THE COURT:  I know that they've had some problems, and

20   obviously this is one of them.

21   BY THE COURT:

22   Q.  But are you -- do you need more time?

23           This is the kind of thing where I want to make sure

24   that this is what you want to do.  If you need more time to talk

25   to her about it to make sure you understand it or that there are

Randall Casseday - Court                                    11

 1    any issues, please speak up.  I'll give you the additional time.

 2    This is an important decision on your part.  And, as I mentioned

 3    to you, you can't come back and change your mind later.  That's

 4    why I ask this question.

 5    A.  Well, I have raised issues with her about the plea

 6    agreement, and from what I understand it is what it is.

 7    Q.  Well, that may be the case.  That may be what has been

 8    offered and what -- it may be that there can't be any other --

 9    that they've reached the end of the negotiation.  I mean, that

10    may be the case.

11         The question is whether you understand what you're

12    agreeing to and whether this is what you want to actually agree

13    to.

14    A.  I understand what it is what I'm agreeing to.

15         In all honesty, I've had some difficulty digesting it;

16    not because I don't understand it, but because of the conditions

17    in it.

18         I have requested her to continue to negotiate, but

19    apparently, from what I understand from my attorney, that her

20    attempts to continue to negotiate have resulted in what we see

21    in this plea agreement.  So...

22    Q.  Well, let me take that issue up just so that we do the

23    complete circle.  And that really is to some degree -- I mean,

24    obviously, this is not only your counsel and you agreeing to

25    this, but the government has to make the offer.  If they are not

Randall Casseday - Court                    12

1    willing to make changes, then you have to make a decision based

2    on what they have offered.

3             THE COURT:  Is it correct then, Ms. Stewart, that

4    what's offered is basically the deal to be offered?

5             MS. STEWART:  That's correct, Your Honor.  The

6    government is not prepared to negotiate any further in this

7    case, and I've communicated that to Ms. Jahn.

8             THE COURT:  Okay.

9    BY THE COURT:

10   Q.  So, you know, Ms. Jahn is telling you accurately that the

11   government is not willing to make any other modifications.  So

12   the question is then left to you as to whether or not you want

13   to accept it and whether you're prepared to do it today.

14            Do you want to talk to her for a few minutes and see?

15            I mean, I'd be willing to put it off a day or two or

16   something to give you a little more time if that's what you

17   want, or whatever.  I want to make sure this is what you want to

18   do, because you can't change your mind later and just say, *"I*

19   *shouldn't have done it."*

20   A.  No, I understand what both attorneys are saying.  And if

21   there's -- excuse me -- if there's no room for negotiation, then

22   I believe I have to accept what they've offered me.

23   Q.  Well, let me word it this way.

24            There evidently is -- your attorney has gone as far as

25   she can in terms of getting any other more favorable terms for

1    you.  The government has said *this is the end,* and obviously

2    this is an agreement between both sides and the government has

3    to be willing to do any different -- a different agreement.

4         From your perspective, you have a choice of accepting

5    it or not accepting it.  If you accept it, then we'll go

6    forward.

7    .    The court would ask for the presentence report to make

8    sure that I'm in agreement with this, and part of it is to

9    figure out the calculation, et cetera.  And if I accept it, then

10   this would be -- you would not be able to withdraw.  This would

11   be the sentence that you would be receiving.

12        If I don't accept it, then you do have a choice.  You

13   have a choice of either withdrawing your plea or leaving it

14   there and going forward with whatever the sentence is that I

15   would ultimately make a decision about.

16        But I want you to understand that if, under the

17   Rule 11C1(c) type of plea, if we go through this whole plea and

18   I get the presentence report and it comes back and I agree that

19   this is an appropriate and reasonable sentence, and I accept it,

20   then you're not in a position to back off from this plea.

21        So I want to make sure that you understand it and I

22   want to make sure that you're prepared to go forward.  You have

23   the choice.  You obviously get advice from your lawyer.  Your

24   choice is to either accept this or to go forward for trial and

25   have an indictment and whatever else they are going to do.

Randall Casseday - Court                    14

1    A.  I accept, Your Honor.

2    Q.  All right.  So at this point then, based on the record we

3    have here, have you had enough time to make a decision about

4    whether or not you want to accept it?

5    A.  (Pause) Yes, Your Honor.

6    Q.  All right.  Then let me proceed with your constitutional

7    rights that you're going to be giving up by pleading guilty, and

8    I'm, in essence, going to be asking you whether you understand.

9         You're pleading to a felony information, which means

10   that your case has not been indicted, and you do have a right to

11   a grand jury indictment.

12        In other words, you have a right to have the government

13   convince 12 grand jurors, it has to be out of at least 16 but

14   not more than 23, that there's probable cause that this crime

15   was committed and that you're the person who committed it.

16        So do you give you up your right to have the case

17   indicted and to plead guilty based on a felony information?

18   A.  Yes, Your Honor.

19   Q.  Now, you have a right to plead not guilty and have a jury

20   trial in this case, and that would mean that you, along with

21   your counsel and the government counsel and the court, would

22   participate in choosing a jury.

23        They would sit in the jury box.  They would hear the

24   evidence presented, and they would review that evidence and they

25   would determine your guilt or innocence based on the evidence

1    presented in the courtroom.

2             Do you understand your right to a jury trial?

3    A.  Yes, Your Honor.

4    Q.  Do you understand that if you did go forward to trial, you

5    would have a right to be represented by your lawyer at that

6    trial?

7    A.  Yes, Your Honor.

8    Q.  Do you understand that at a trial you would have the right,

9    through your lawyer, to confront and cross-examine any witnesses

10   against you?

11   A.  Yes, Your Honor.

12   Q.  Do you understand that you would have the right to present

13   your own witnesses and you would have a right to subpoena them

14   to require them to testify in your defense?

15   A.  Yes, Your Honor.

16   Q.  Do you understand that if you went forward to trial you

17   would have the right to testify and present evidence on your own

18   behalf if you wanted to, but that you wouldn't have to testify

19   or present any evidence if you didn't want to, and that's

20   because you can't be forced to incriminate yourself; that is, to

21   present evidence of your own guilt?  Do you understand?

22   A.  Yes, Your Honor.

23   Q.  Do you understand that unless and until I accept your guilty

24   plea you are presumed by the law to be innocent because it's the

25   government's burden to prove your guilt beyond a reasonable

1    doubt and until it does you cannot be convicted at trial?

2            Do you understand?

3    A.  Yes, Your Honor.

4    Q.  Do you understand that if you went forward to trial and were

5    convicted you would have a right to appeal your conviction to

6    the Court of Appeals and have a lawyer help you prepare your

7    appeal?

8            Do you understand that?

9    A.  Yes, Your Honor.

10   Q.  Do you understand that by pleading guilty you're giving up

11   all of your rights to appeal, except for the following:

12           You can appeal your conviction if you believe that your

13   guilty plea was somehow unlawful or involuntary or there was

14   some fundamental defect in the proceeding, because the court is

15   required to go through certain procedures.

16           You also have a statutory right to appeal your

17   sentence.  Now, this will depend -- and let me just say that I'm

18   going to go through the questions -- both to cover if I agree to

19   it, it will be a set sentence, so some of this wouldn't apply --

20   but if for some reason I don't accept it and you decide not to

21   withdraw it, then these questions would be pertinent.

22           Do you understand that?

23   A.  Can you?

24   Q.  Let me explain that again.  Some of the questions -- if I

25   accept your sentence, then you won't be appealing it because you

1    will have agreed to the 90 months.  I will have agreed to it,

2    and there won't be any real reason to be -- there won't be a

3    basis to appeal what the sentence is because we've all agreed to

4    it. Do you understand?

5    A.   That I understand.

6    Q.   But if, for some reason, I don't accept it and you decide

7    not to withdraw your plea, you would then -- and I would

8    sentence you to whatever I thought was appropriate -- if the

9    sentence was contrary to the law or illegal, then you could

10   appeal it.

11   A.   I understand, Your Honor.

12   Q.   So some of these questions -- and I'll try and indicate

13   which ones -- some of them are not going to be pertinent if I

14   accept the 90 months because there won't be any reason -- you

15   know, that will be the sentence.

16        I'm going to go over some information with you, that if

17   I don't accept it and you don't withdraw your guilty plea would

18   apply.  Okay?  But I'll indicate which ones they are.

19   A.   Okay.

20   Q.   And, again, if you don't understand something, speak up, or

21   if you want to talk to your lawyer.

22        Now, do you understand that if you plead guilty in this

23   case, I accept your guilty plea, you'll be giving up all of the

24   rights I've explained to you because there won't be any trial or

25   any appeal?

Randall Casseday - Court                                        18

1   A.   I understand.

2   Q.   Except as I've explained it.

3   A.   I understand, Your Honor.

4   Q.   Okay.  Do you want to plead guilty in this case, give up

5   your rights to a trial, and your right to an appeal, and all the

6   rights I've explained that you would have if your case went to

7   trial?

8   A.   Yes, Your Honor.

9   Q.   All right.  At this point, we're going to go over the

10  factual basis.  You can go ahead and sit down.  I want you to

11  listen carefully.

12         We will be putting on the record the factual proffer.

13  The court needs to then go through the elements in order to find

14  you guilty, and I'll have questions at the end about it.

15         MS. JAHN:  Your Honor, if I could briefly.  I've

16  conferred with Ms. Stewart about this request.

17         There is a lengthy statement of facts, I believe it is

18  four pages, and it has been executed by Ms. Stewart, myself, and

19  Mr. Casseday, and we would ask that the court rely on that

20  statement of facts instead of having a colloquy with government

21  counsel.

22         This is very sensitive matters.  It's going to be filed

23  publicly.  But, as the court may be aware, there has been a lot

24  of publicity with regard to Mr. Casseday in this case, and on

25  that basis we would ask that the court submit the factual

1    proffer.

2                THE COURT:  I'm willing to submit it up to a point, but

3    I have found that even though defendants sign facts -- I mean,

4    there's certain things he is not going to be aware of because

5    he's not going to know what they would have done in terms of the

6    investigation, but I do think at least the facts that match up

7    with the elements of the offense should be stated by the

8    government.

9                And I do want to make sure that Mr. Casseday is in

10   agreement with it and understands it.  I realize he has signed

11   it, but I have found that on occasion when you start going

12   through and asking, people have differing perceptions or raise

13   different issues.

14               So I don't have to have the whole thing read into the

15   record, but I do want to hear at least what you view as the key

16   facts here matching up with the elements of the offense, which

17   is what I will limit my inquiry to.

18               MS. JAHN:  Yes, Your Honor.  Thank you.

19               MS. STEWART:  Your Honor, before I go forward, I wanted

20   to bring to the court's attention, just to complete the record,

21   one aspect of the plea agreement between the parties that's

22   found on page 2, and it has to do with -- it's the underscored

23   portion at the end of paragraph 3.  It has to do with the

24   consequences of the court's rejecting this proposed plea

25   agreement.

1              Clearly, the defendant has the right to withdraw his

2      plea under the rule.  Also the parties have agreed that if the

3      court rejects the plea agreement, the government will have the

4      opportunity to file a charging document before the defendant's

5      plea is accepted.

6              And I think the court questioned at the very beginning

7      of these proceedings as to whether or not the Superior Court

8      offense and the federal offense had the same elements if -- that

9      is the reason for this language.

10             In the case that the court rejects the plea agreement

11     and the defendant goes forward with his plea to Counts 2 and 3,

12     the government would be prejudiced, because the import of this

13     plea agreement is the government is agreeing to dismiss Count 1

14     which has a 10-year mandatory minimum sentence.  And if, in

15     fact, the elements of the Superior Court enticement and Count 1

16     are, in fact, the same, there's a single sovereign, we would be

17     precluded from bringing that charge.

18             THE COURT:  Then I'm not sure what you're telling me.

19             I mean, the general Rule 11C1(c) has the three options

20     under the rule.  The court either accepts it.  If I don't accept

21     it for some reason, then -- and, presumably -- and I would ask

22     you to put on the record probably at the end the reason for --

23     in very summary terms -- why this is a good agreement in terms

24     of the interests of justice, you know, in very summary terms.

25             But he then has the option of either withdrawing his

1    plea, as I understand it under the rule, unless you've made some

2    different agreement, or he can go forward with the case and just

3    take his chances as to whether it would be a different sentence.

4              MS. STEWART:  That's correct, Your Honor.  And in most

5    cases what happens is, as the court already advised the

6    defendant, that the sentence might be harsher if he persisted in

7    his plea.

8              Under the peculiar fact of this case it would not only

9    not be harsher if the defendant persisted in the plea to Count 2

10   and 3.  Ordinarily in these cases the government would be free

11   to bring the count that it agreed to dismiss.

12             I think there's an argument to be made that we would

13   not be free to re-bring Count 1 because it is essentially the

14   same offense as the Superior Court, enticing.  And thus the

15   defendant would be looking at a sentence that would be far

16   below --

17             THE COURT:  Where are you reading from?  I mean, I have

18   the plea in front --

19             MS. STEWART:  Paragraph 3, Your Honor.  The end of

20   paragraph 3, the underscored language.  The sentence --

21             THE COURT:  Paragraph 3 of what?  Are we talking about

22   Roman numeral three?  What page?  Are we talking about the

23   submission?

24             MS. STEWART:  No, Your Honor.  I'm talking about the

25   actual plea agreement.

1          THE COURT:  Okay.  Let me get that, then.  Hold on.

2          (Pause)

3          All right.  So I didn't understand it in that way in

4    reading this.  So let me see if I understand it.

5          If the court rejects the plea agreement, then the

6    agreement is that you could file a superceding information or

7    indictment prior to his entering a guilty plea to any criminal

8    offense in this case.

9          If he's entered the plea of guilty, would there be a

10   second plea?  Is that what you're talking about?

11         I mean, I didn't understand the language here, so maybe

12   you can be more explicit to me.  I didn't understand it in the

13   way you appear to be presenting it.

14         If we go through the whole plea -- okay -- and,

15   generally, my practice then has been to accept everything except

16   whatever the sentence portion of it is, to get the presentence

17   report, look at it, and unless there's something that is there

18   that makes me feel differently, then I would indicate that I

19   would accept it.  If, for some reason, I reject it, that's what

20   I'm trying to figure out.

21         Then are you indicating that it would not be the same

22   plea that he would go forward with?

23         MS. STEWART:  It essentially would give both parties

24   the right to withdraw the plea.

25         It would give not only the defendant the right to

Randall Casseday - Court                              23

1    withdraw the plea, but the government to negotiate, attempt --

2           THE COURT:  So it's not the typical -- I wish you had

3    said something as I was going through this description with him,

4    that the options are for me to accept it.  If I don't accept it,

5    that it appears that either he can withdraw it or you can

6    withdraw it.

7           MS. STEWART:  That's correct, Your Honor.

8           THE COURT:  Now, I would not have interpreted that way,

9    frankly, reading that.  But I would have hoped you would have

10   said something as I started to talk to him because it's not a

11   correct explanation.

12          MS. STEWART:  It's not, Your Honor, and I apologize.  I

13   didn't want to interrupt the court with my --

14          THE COURT:  Well, don't have me telling him the wrong

15   thing.  That's not useful for any of us.

16          I mean, if you've agreed to something different, I

17   don't have a problem with it.  I would not have understood that.

18   I didn't understand reading that, that's what your intention

19   was, which is fine if both of you have agreed to it.  It's just

20   that it's a little different than what the usual Rule 11C1(c)

21   is.

22          So part of the Rule 11C1(c) is he agrees to it, and I

23   agree to it, which is the 90 months, or if I don't agree to it,

24   then either one or both of you can withdraw the plea, period.

25          MS. STEWART:  That's correct.

1          THE COURT:  Period.  All right.  Then let me go over

2     this again with him.  Is there anything else I haven't explained

3     correctly or is different from the plea?

4          MS. JAHN:  Your Honor, I was following the court in

5     terms of the documents you were referring to that didn't seem to

6     be line-by-line for the plea agreement.  I know the court's

7     practice is typically to do that.

8          So I thought there would be a second portion where we

9     would be going through the paragraphs and there would be a

10    summary.

11         THE COURT:  We would, but I don't want it to be

12    contradictory.  I mean, when I discuss the 11C1(c), that's the

13    typical 11C1(c).  I frankly, although I read this paragraph, I

14    didn't interpret it this way.

15         MS. JAHN:  Because there are some additional things

16    that are a part of this plea agreement.  For example, the

17    supervised release component --

18         THE COURT:  Right.

19         MS. JAHN:  -- that is mentioned in here, I think the

20    court referred to that earlier, I didn't indicate one way or

21    another at that point.  And there's obviously other things that

22    are contained in this plea agreement that the court hasn't.

23         THE COURT:  No.  And I will get to those, but in

24    explaining what a Rule 11C1(c) is, you've done a slight

25    variation of it and he needs to be told what the variation is.

1    I don't have a problem with it.  I just want to be accurate with

2    him.

3            MS. JAHN:  Yes, Your Honor.

4            THE COURT:  All right.

5    BY THE COURT:

6    Q.  So, before we get to the factual part, Mr. Casseday, I am

7    going to go over the plea letter carefully with you because it

8    does have a lot of different conditions and things in there.

9            When I discuss the basic plea, that hasn't changed in

10   terms of you're pleading to Count 2 and 3, which is a federal

11   offense and a DC offense.

12           Count 1 would be dismissed, and they would be agreeing

13   not to bring any additional charges relating to these events or

14   their investigation.

15           And the agreement, the typical Rule 11C1(c) is that

16   everyone agrees to a specific sentence, which in this case would

17   be 30 months, 60 months consecutive, for a total of 90 months,

18   and there's some aspects of the agreement that I didn't get

19   into.

20           But I do want to correct something.  If the court

21   accepts it, then it's the 90 months and whatever other

22   conditions are in the plea letter.  If I reject it, evidently

23   then either you or the government, or both of you, can move to

24   withdraw the plea agreement as it presently stands.  So it's not

25   only just you, but the government can as well.  And then they

Randall Casseday - Court                                        26

1    can bring whatever charges they think are appropriate.  You can

2    enter another plea or you can go to trial.

3            Do you understand?  Is that your understanding?

4            Because I did not explain it to you as evidently the

5    agreement is in this case.

6    A.   I guess let me say that I understood part of that.

7            The second part that you mentioned about entering

8    another plea is based on -- based on any superseding agreement

9    or going to trial -- you know, I'm --

10   Q.   Okay.  Let me back up.  I'm going to go over this in detail,

11   but since I explained what a Rule 11C1(c) in terms of options,

12   let me -- and they've made a slight variation to it, let me go

13   through this again.

14           If I accept the total 90 months -- plus there's some

15   other things with provisions that are in the plea letter -- but

16   if I accept the 90 months and whatever other provisions are in

17   here, then you cannot withdraw the plea and the government

18   cannot withdraw the plea; this is the agreement.  Okay?

19   A.   I understand, Your Honor.

20   Q.   All right.  Now, this only comes up if I don't accept the

21   90 months and the other terms that are in the plea letter.  If

22   that happens, you have the choice of withdrawing the plea and

23   the government has the choice of withdrawing the plea.

24   A.   Your Honor, I'm sorry.  May I ask you a question?

25   Q.   Sure.

1  A.  How can the government withdraw my plea?  I don't quite

2  understand that.

3           MS. JAHN:  Your Honor, could I have a moment?

4           THE COURT:  Sure.

5           MS. JAHN:  Could we sit at counsel table for one

6  second?

7           THE COURT:  No problem.

8       **(Attorney/client conference.)**

9           MS. JAHN:  Thank you, Your Honor.  I think I've

10  explained it.

11  BY THE COURT:

12  Q.  All right.  Let me try this again to make sure that we

13  understand.

14           Let's assume we go through all of the questions here

15  and the letter and you indicate you understand it and you agree

16  to it, then the court will get the presentence report and make a

17  final decision about accepting it, once I get a chance to look

18  at it to see if there's any reason why I shouldn't accept it.

19  The court needs to make decisions about whether -- and because

20  this includes a sentence and some other provisions -- whether I

21  think, under the circumstances, it's an appropriate and

22  reasonable sentence, because it is my obligation.

23           If I accept it, then this is the agreement and you're

24  bound by it and the government is bound by it.

25           If, for some reason, I don't accept it, then neither

1    party -- the better way to put it -- is bound by this specific

2    agreement, which means that they can bring other charges, you

3    can negotiate a different agreement or you can go forward to

4    trial, but this agreement wouldn't necessarily stand and go

5    forward if I reject it.

6            Does that make sense to you?

7    A.  I understand now.

8    Q.  Okay.  I just wanted to correct that.  We'll go through this

9    in a little more detail in the letter, but since I gave you an

10   explanation up front and it didn't quite fit the actual

11   agreement I wanted to make sure that I corrected it.

12           All right.  So let's go back to now the facts.  You can

13   go ahead and sit down.

14           THE COURT:  I don't know whether it's easier to simply

15   take the elements of the offense and, you know, fit the facts to

16   it or go through the factual statement, whatever is easier from

17   your perspective.

18           MS. STEWART:  I'll try and summarize it, Your Honor.

19   If the court has questions, to answer them.

20           The underlying facts in this case are as follows:

21           On September 26, 2006, a Metropolitan Police detective

22   was acting in an undercover capacity.  He was located within the

23   District of Columbia and he entered an online chat room using

24   the name *Daddy's Girl.DC*.  From approximately --

25           THE COURT:  Who entered that?  The undercover or the

1  defendant?

2          MS. STEWART:  The undercover was in the chat room.

3          THE COURT:  Okay.

4          MS. STEWART:  While he was in the chat room he was

5  using the screen name *Daddy's Girl.DC*.

6          THE COURT:  Okay.

7          MS. STEWART:  And he identified himself as a

8  13-year-old girl living in the District of Columbia.

9          The defendant, using the name *Taurus 1053*, made contact

10 in the chat room with the undercover officer.  And the person,

11 subsequently identified as the defendant using that screen name,

12 identified himself as a 53-year-old man who was at that time on

13 New York Avenue, Northeast, who rented a room in Bowie and who

14 lived in New York State.

15         All of those facts were subsequently confirmed to be

16 true about the defendant during the investigation of this case.

17         During the course of this online conversation, which

18 took place over a period of approximately two hours on

19 September 26th, the defendant sent sexually-explicit photographs

20 of his genitalia over the Internet to the undercover officer and

21 engaged in sexually-explicit conversation with her.

22         Specifically with respect to the photographs, the

23 defendant asked her if it would fit inside her and told her she

24 could slide herself back and forth on it -- referring to the

25 pictures of his penis -- and when she expressed -- when the

1    undercover, acting as a child, expressed concern about being

2    pregnant, the defendant said he would take it out before coming.

3          We would submit Your Honor that those facts support the

4    element of enticing a person who represented himself to be a

5    child to engage in a sexual act under District of Columbia law;

6    a sexual act being, of course, defined as penetration of the

7    vulva, however slight, by the male penis.

8          Following this exchange, the defendant made

9    arrangements with the undercover to meet for the purpose of

10    engaging in sexual intercourse.

11          The arrangements were that they would meet outside of

12    1317 Adams Street, Northeast, in the District of Columbia where

13    the undercover indicated that the girl lived.

14          The defendant instructed *Daddy's Girl.DC* to be at that

15    location in front of the apartment at 9:30.  At approximately

16    9:40 a Metropolitan Police detective saw the defendant operating

17    a Toyota Camry automobile.  He recognized the defendant because

18    in the course of the online conversation the defendant had

19    photographed -- excuse me -- had sent over the Internet a

20    photograph of his face.

21          The detective activated the lights on his cruiser,

22    followed the defendant a short distance and placed him under

23    arrest.

24          After the defendant's arrest, security personnel at the

25    Washington Times' building where he was employed secured his

1    office where he was Director of Personnel, and that security was

2    maintained until a search warrant was executed on September 27,

3    2006.

4         Among the items recovered during the search of the

5    defendant's office was a Toshiba Satellite laptop computer.  An

6    investigation revealed that the defendant had been issued that

7    computer at his previous place of employment.

8         During a forensic analysis of the computer, the Secret

9    Service analyst found on the computer the text of the

10   conversation between the undercover and the defendant.  The

11   defendant had downloaded the actual text of their conversation.

12   He had also downloaded on to the computer a photograph of the

13   young girl that the undercover detective sent over the Internet

14   and purported was a photograph of himself, the 13-year-old

15   child.

16        Memory sticks, which are storage devices for digital

17   photos, were recovered and analyzed, and on them was found the

18   picture of the defendant's face that had been sent to the

19   undercover as well as several pictures of the genitalia that had

20   been sent to the undercover.

21        After that search was completed, the room was secured

22   again and the locks were changed.

23        On September 28th personnel of the Washington Times

24   were in the office to remove the defendant's personal

25   possessions, as his employment had been terminated.  They found

1   in his desk a CD containing images of child pornography.  There

2   were at least ten of those images, and all of them at some point

3   had been transmitted in interstate commerce.  Among them were

4   two of known victims who had been identified, and both of those

5   children were under the age of 12 when the photographs were

6   taken, that were found on the defendant's computer.

7        We would submit that those facts would support the

8   offense of possession of child pornography as charged in Count 2

9   of the information.

10       If the court wishes, I could describe the photographs

11  and why they would constitute child pornography within the

12  definition.

13       THE COURT:  Looking at the factual statement, where is

14  it?

15       MS. STEWART:  At the end, Your Honor.

16       THE COURT:  Oh, I see it.  Okay.

17       In terms of the elements of the offense, which is the

18  possessing material constituting or containing child

19  pornography, the defendant knowingly possessed -- videotapes in

20  this case -- involved the use of a minor engaging in sexual

21  explicit conduct.  The visual depiction was of such

22  sexual-explicit conduct, had been mailed, shipped, or

23  transported in interstate.  Minor meets the child under the age

24  of 18.

25       MS. STEWART:  Your Honor, again -- I'm sorry.

1            THE COURT:  I'm sorry.  And then --

2            MS. STEWART:  These were a compact -- it was a compact

3    disc, Your Honor, on video, a CD-ROM.

4            THE COURT:  Okay.  That's right.  This is on CD-ROM.

5            Sexually-explicit conduct means actual or simulated

6    sexual intercourse, and it defines what a sexually-explicit

7    conduct is.  Can you, just in summary terms, indicate what it

8    fits into?

9            MS. STEWART:  Yes, Your Honor.

10           Of the two photographs of the known victims, one was of

11   a child who was between the ages of six and seven, and the

12   photograph would be sexually-explicit conduct in that it was a

13   lewd and lascivious exhibition of the genitalia.  The photograph

14   depicted the girl lying with her legs spread apart and her

15   genitalia exposed.

16           The other picture of a known victim was of a child that

17   was taken, according to police, sometime between the ages of

18   eight and eleven, and it was a picture of her genitals with a

19   penis about to penetrate them.

20           THE COURT:  All right.  Let me just look at the other.

21           And then the enticement of a child or minor, attempted

22   to seduce or entice in terms of making this arrangement.  A

23   person who's represented to be a child, which is the undercover

24   person, under the age of 16 to engage in a sexual act or

25   contact, which is the -- you've talked about it in terms of the

1    conversation over the Internet that they had in terms of what he

2    had suggested to her, and what her concern was about getting

3    pregnant.

4         MS. STEWART:   That's correct, Your Honor.

5         We would submit it was a sexual act that is vaginal

6    intercourse as defined under D.C. Code, and that his language,

7    together with the photographs, make clear that his intent was to

8    engage in vaginal intercourse with the child.

9         THE COURT:   All right.   Mr. Casseday, I need to have

10   you come up.

11   BY THE COURT:

12   Q.   Let me ask to begin with.   As I understand it you've signed

13   this statement of facts; is that correct?

14   A.   That's correct.

15   Q.   Okay.   Is there anything that you disagree with, which

16   Ms. Stewart has gone over certain facts that fit the elements of

17   the offense?   There's obviously other material in here that she

18   has not explicitly put on the record.   It gives the full

19   context, but doesn't necessarily -- isn't necessary in terms of

20   meeting the elements of the offense.

21        But I'm asking you overall if you've read it carefully?

22   Is there anything you disagree with?

23        I know you've signed it, but I want to make sure that

24   you're agreeing to everything.

25        (Pause) At least, I'm assuming you signed it.   Yes.

1   A.   (Pause) As it's stated on here -- on the --

2   Q.   Statement?

3   A.   -- statement of facts.

4   Q.   Okay.  Which page are you on?  It should be at the bottom.

5   A.   I'm at...

6   Q.   Page and paragraph.

7   A.   I'm in paragraph -- page 2, paragraph 4.

8        MS. JAHN:  Your Honor, could I have one moment?

9        THE COURT:  Sure.

10   **(Attorney/client conference.)**

11        THE COURT:  If you want to sit at the table and talk to

12   him away from the microphone, please go ahead.

13        MS. JAHN:  Thank you, Your Honor.

14   **(Attorney/client conference.)**

15        MS. JAHN:  Thank you, Your Honor.

16   BY THE COURT:

17   Q.   Do you have --

18   A.   Could you repeat the question?

19   Q.   Sure.  What I'm asking is -- I know you signed this, but do

20   you agree with everything that's in here?

21        I mean, obviously, some things you wouldn't know from

22   the end of the undercover person.  But from what you would know,

23   do you agree with everything in here?  Is it accurate?

24   A.   As it's stated in here, yes, I agree with it, Your Honor.

25   Q.   Okay.  So let me go over the key portions for the elements

1    of the offense that the court would need to find.

2              I found that the government has stated evidence that

3    would meet those elements and I need to hear from you whether

4    you agree with it.  So let me go through the key facts in here

5    that relate to the elements.

6              So we're talking about September 26th, this year.  A

7    person purporting to be a 13-year-old girl in the District of

8    Columbia using the screen name *Daddy's Girl* dot *DC* entered an

9    online Yahoo! chat room with you.  And were you at the other end

10   with the screen name *Taurus 1053*?

11   A.   Actually, it was *Taurus 51053*.  That's incorrect in there.

12   Q.   What is it?

13   A.   *Taurus 51053*.

14   Q.   Okay.

15            MS. JAHN:  Your Honor, it's his date of birth.

16            THE COURT:  We should -- this should be accurate.

17   BY THE COURT:

18   Q.   So it's *51053*?  Is that what you're saying?

19   A.   Yes, Your Honor.

20   Q.   So it's correct, then, you're on a Yahoo! online chat room

21   as *Taurus 51053*, and you engaged in online chat with *Daddy's*

22   *Girl* dot *DC* who purported to be a 13-year-old girl living in the

23   District of Columbia.  Is that accurate?

24   A.   That's accurate.  If it's going to be technical, I don't

25   remember a *dot* being in that screen name, but basically, it's

1    accurate.

2    Q.   Okay.   And did you describe yourself, as part of this online

3    chat, as being 53 years old on New York Avenue, Northeast; that

4    you rented a room in Bowie and that you lived in New York State?

5    A.   That is correct, but my memory of what the chat was about at

6    this point is a little bit foggy, but basically, that's correct.

7          THE COURT:   I take it, Ms. Jahn, that the evidence that

8    was collected has been made available to you?

9          MS. JAHN:   Yes, Your Honor.   The government provided

10    voluminous discovery in this case.

11          THE COURT:   So you've had an opportunity to review --

12    since it appears that they were able to recover this online

13    chat.   Is that correct?

14          MS. JAHN:   Yes, Your Honor.   It's been reviewed with

15    Mr. Casseday.

16          THE COURT:   Okay.

17    BY THE COURT:

18    Q.   Then is it correct that you engaged in roughly a 2-hour

19    online contact with *Daddy's Girl*?

20    A.   That's correct, Your Honor.

21    Q.   And did you send a sexually-explicit photograph of male

22    genitalia?

23    A.   Yes, Your Honor.

24    Q.   And did you have a sexually-explicit conversation with her?

25    A.   Yes, Your Honor.

Randall Casseday - Court                                          38

1    Q.   In terms of what would be required for the elements of the

2    offense in terms of the enticing -- this is in paragraph 3 of

3    what you're looking at on page 2 -- is it correct, in referring

4    to the photographs that you had already sent to her, did you ask

5    her whether it would fit inside her?

6    A.   Yes, Your Honor.

7    Q.   And did you also indicate that *Daddy's Girl* could slide back

8    and forth without going inside?  Is that correct?

9    A.   Yes, Your Honor.

10   Q.   And when she expressed becoming pregnant, did you indicate

11   that you could take it out before coming?

12   A.   Yes, Your Honor.

13   Q.   And was it your intent, in having this discussion with her

14   and then later setting up a meeting, to have vaginal intercourse

15   with the child?

16   A.   May I talk to my attorney before I answer that, please?

17   Q.   Yes.

18        **(Attorney/client conference.)**

19   A.   Would you please repeat the question?

20   Q.   Sure.  In this chat that you had with *Daddy's Girl* on line,

21   did you indicate through this conversation that you intended to

22   engage in some form of vaginal intercourse with *Daddy's Girl*?

23   In other words, in this conversation.

24   A.   In the conversation, that's what happened, yes, Your Honor.

25   Q.   All right.  And then did you set up a place that you would

1  meet, she was to be outside waiting for you, in front of her

2  apartment at 9:30?

3  A.  Without looking at the actual chat, I don't remember

4  clearly.  But a meeting was set up.  But I don't remember if I

5  initiated it or she did.

6  Q.  All right.  Had you also sent on line a photograph of your

7  face as well?

8  A.  That's correct, Your Honor.

9  Q.  And were you then, when you showed up at this place where

10  you were planning on meeting her, were you then arrested?

11  A.  I was arrested after I drove through the neighborhood but

12  did not stop.

13  Q.  All right.  And in your office did you have a laptop

14  computer that had come from your prior place of employment?

15  A.  Yes, Your Honor.

16  Q.  And had you kept the text of your conversation with *Daddy's*

17  *Girl*?

18  A.  It was on the computer but unintentionally.  I didn't know

19  it was there.  I had not intended to keep it.

20  Q.  But I take it you're not, having looked at the discovery,

21  you're not contesting that that's the text of your conversation;

22  is that correct?

23  A.  That's correct.

24  Q.  And on this computer, were there other two photographs of

25  young girls that had been sent over the Internet?

Randall Casseday - Court                          40

1    A.    That had been sent over the Internet to my computer?

2    Q.    Yes.

3    A.    That's correct.

4    Q.    And was there also -- did you also have a CD in your office

5    which had certain images of child pornography, about 10 of them?

6    A.    Yes, Your Honor.

7    Q.    And were two of them photographs, as Ms. Stewart has ·

8    described, in terms of, one, a 6- or 7-year-old in terms of a

9    lewd and lascivious position?

10   A.    Yes, Your Honor.

11   Q.    And an 8- to 11-year-old, when it looked as if there was

12   about to be penetration?

13   A.    To be honest, Your Honor, I didn't know the ages of these

14   people in these depictions.

15   Q.    Are they depictions accurate as she's described them?

16   A.    Yes, Your Honor.

17        THE COURT:    The government has indicated that the two

18   photographs are of known victims.    Perhaps you could indicate

19   how they are known to be victims.

20        MS. STEWART:    In one case, in the case of the 6- to

21   7-year-old girl, the FBI investigated the actual abuse and

22   photographing of her.    The pictures were taken in North

23   Carolina.

24        The person who was responsible for their sexually

25   abusing her and taking the photographs was prosecuted, and

1   because of the FBI agent's involvement with the child he's aware

2   of the time period in which the photographs were taken and her

3   age at that time period.

4           In the second case there was a longer period of abuse

5   by a family member of the child.  Those photographs were known

6   to be taken in Ohio.

7           The investigating detective and I have been in contact.

8   He is in contact with the family.  He knows that the child was

9   between 8 and 11 when she was sexually abused and the

10  photographs, including the photograph on the defendant's

11  computer, were taken.

12          THE COURT:  So they are based on two investigations

13  that were carried out, so that's how they would know what the

14  ages were.

15          All right.  In terms of the elements of the offense of

16  enticement of a child or minor, the defendant attempted to

17  seduce or entice a person who represented themselves to be a

18  child under the age of 16, represented to be a child, a female,

19  a 13-year-old to engage in a sexual act, and we've discussed the

20  sexual act based on the conversation on line.

21          In terms of possessing material constituting or

22  containing child pornography, the defendant knowingly possessed

23  a CD which depicted visually the use of a minor engaging in

24  sexually-explicit conduct.  The visual depiction was of sexual-

25  explicit conduct which had been shipped in interstate commerce.

1    The minor was under the age of 18.  And it can be either

2    lascivious simulated conduct involving the genitalia.  So it

3    would appear to fit all of the elements of the offense.

4          Anything else that I need to know factually?

5          MS. JAHN:  No, Your Honor.

6    BY THE COURT:

7    Q.  Anything else I need to know from a factual perspective?

8    A.  No, Your Honor.

9    Q.  All right.  We have the letter which sets out the very

10   specific agreement.  I have questions that I ask along with it,

11   so it will be a combination, but we'll go through, and the idea

12   is to make sure that you understand what's in the letter and

13   that you're agreeing to it.

14         If I describe it differently than what you understand

15   or, counsel, if I describe it differently, please speak up.

16         All right.  We'll start -- if you have the letter in

17   front of you, it probably would make it easier for you to have

18   it.

19         We've talked about the two charges that you're going to

20   be pleading to:  a federal offense and a DC offense.

21         And in terms of the statutory penalties, the maximums.

22   For the possession of child pornography the maximum is 10 years

23   in jail, a fine of $250,000, or both, with supervised release up

24   to life.

25         Enticing a child or a minor is a maximum of five years

1    in jail, a fine of $50,000, or both.

2            And I believe under the DC offenses, that they do

3    require supervised release, but they don't indicate the actual

4    time frame, so it's left up to the court.

5            In addition, there's a special assessment.  For the

6    felony conviction that's a federal offense, it's to be paid to

7    the Clerk of the Court; for the DC offense, it's paid into the

8    Victims of Crime Fund.  It's usually a hundred dollars, but the

9    range is actually fifty to $250.

10           Also under the sentencing guidelines, the court is not

11   required to, but could, impose a fine that is sufficient to pay

12   the federal government the cost of any imprisonment, term of

13   supervised release, and period of probation.

14           Is that your understanding?

15   A.   Yes, Your Honor.

16   Q.   And you've agreed in paragraph 2 that -- and this is because

17   the sentencing guidelines will apply, they are advisory but the

18   court needs to at least start with that, and that will be a

19   calculation that will be done in the presentence report -- that

20   pursuant to the advisory sentencing guidelines, that you

21   possessed at least ten images of child pornography as described,

22   and that at least two images depicted children under the age of

23   12.

24           Is that your agreement and understanding?

25   A.   Yes, Your Honor.

1   Q.  And that would be for purposes of the calculation of the

2   advisory sentencing guidelines.

3           Now paragraph 3 sets out -- and probably the core of

4   the agreement.  The government has agreed, and you would be

5   agreeing, to, and the court would make this decision as to

6   whether it also agreed, that there would be a sentence of

7   30 months on the possession of child pornography and a sentence

8   of 60 months on the enticement charge to be served

9   consecutively, which means you would serve one sentence and then

10  the second sentence.  They wouldn't run together.  So there

11  would be a total of 90 months.

12          Is that your understanding and agreement?

13  A.  Yes, Your Honor.

14  Q.  And there would be a term of 10 years of supervised release.

15          Now, supervised release, if I can explain.  If you're

16  given a period of jail time, you can be given a period of time

17  in the community, and there are conditions.  You have to report.

18  You may need to do various other things that are required by the

19  Probation Office.  And that you're agreeing to have that for a

20  period of ten years.

21          You should be aware that at least certainly for the --

22  that if you violate that supervised release, that can be either

23  by new criminal conduct or by -- new criminal conduct or by not

24  following through with it, that that can result in a revocation.

25          MS. JAHN:  Your Honor, if I may.

1            The agreement actually is to a term of at least

2       10 years.

3            THE COURT:  Oh, at least.  So it could be for more.

4            MS. JAHN:  The range is 10 to life, Your Honor.  We're

5       agreeing to, at the minimum, 10 years.

6            THE COURT:  Okay.  Let me make that clear.

7            It would be at least 10 years.

8            MS. JAHN:  And, Your Honor, I think there's another

9       provision in the agreement where it states that the government

10      may ask -- may well, in fact, ask for more than the 10 years,

11      but we at least agreed to ten, and it's up to the court.

12      BY THE COURT:

13      Q.  All right.  So the agreement is at least 10 years, and

14      certainly in one of the offenses -- I believe it's the federal

15      offense -- it can be up to life that you would be under

16      supervised release.

17           Do you understand?

18      A.  Yes, Your Honor.

19      Q.  Now, what I was trying to explain in terms of the supervised

20      release.  The importance is that if you either engage in new

21      criminal conduct or don't follow through with the conditions, it

22      can be revoked or you could be sentenced to a new term of

23      imprisonment or a new sentence.

24           Do you understand that?

25      A.  Yes, Your Honor.

Randall Casseday - Court                                46

1    Q.  Now, if I accept the plea agreement and the specific

2    sentence agreed by the parties -- so it seems to be a total of

3    90 months and at least 10 years' supervised release.

4             THE COURT:  Is that correct?

5             MS. STEWART:  That's correct.

6             MS. JAHN:  Yes, Your Honor.

7    BY THE COURT:

8    Q.  Then that would be the sentence that would be provided

9    pursuant to the Federal Rules of Criminal Procedure.  And if I

10   don't agree that that's an appropriate one, then I can reject

11   the plea, and if this happens, then I would inform the parties

12   of the rejection of the plea agreement, will give you an

13   opportunity to withdraw the plea, or if you decide to...

14            THE COURT:  This is why I had problems with it.

15   Because it says, "or if your client persists in his plea of

16   guilty, inform that a final disposition may be less favorable."

17   Which sounds like it's contradictory with the actual intention

18   that both of you could actually withdraw.

19            So even if he wished to go forward with the plea as it

20   presently stands, the government could still decide to withdraw

21   the plea.  That's my understanding of what it is.

22            MS. JAHN:  Yes, Your Honor.

23            I think the language regarding the less favorableness

24   to Mr. Casseday means that the government also has the option of

25   continuing going forward in the plea agreement if they so choose

1    to do so.  So while they can get out of it, they can also

2    remain.  It's sort of a wipe-the-slate clean by either party can

3    do so, or the government could agree to have Mr. Casseday

4    continue and be sentenced in accordance with whatever sentence

5    the court saw fit.

6    BY THE COURT:

7    Q.  So if you have paragraph 3 in front of you.  What it would

8    be is that I would either agree, but if I don't, if I reject it,

9    then I'd let you know of the rejection.

10         You would have an opportunity to withdraw your plea --

11    we're talking about strictly you -- or you could decide to stay

12    with the present plea and the disposition, which means the

13    sentence could be less favorable than the one that you've worked

14    out with the government at this point.

15         In addition, that if the court -- if I reject the plea,

16    the government also has the discretion to file a superceding

17    information, or an indictment and, in essence, would withdraw

18    the present plea and then you could make a decision as to

19    whether or not you wanted to enter another plea.

20         So do you understand?

21    A.  I understand, Your Honor.

22    Q.  So there's various options.  You have an option and they

23    have options.  This only occurs if the court rejects the plea.

24    Do you understand?

25    A.  I understand, Your Honor.

1   Q.  Now, there are other provisions that are related to the

2   sentencing.

3           You've agreed to the term of imprisonment and at least

4   the 10 years supervised release, which is on the federal

5   offense.

6           THE COURT:  It looks as if you've left open what

7   supervised release there would be under the DC offense.  Or is

8   this a combination of the two?

9           MS. STEWART:  If I may, Your Honor.  It was our

10  understanding that if the defendant was sentenced to the maximum

11  term of imprisonment for the Superior Court, enticing, there

12  would be no way to impose supervised release, because supervised

13  release contemplates that a portion of the sentence is not

14  imposed.

15  BY THE COURT:

16  Q.  Okay.  So it's only going to be supervised release on the

17  federal offense, and it would be at least 10 years.  Under the

18  statute it could be up to the rest of your life.

19          Do you understand that?

20  A.  I do.

21  Q.  All right.  And the rest of it, which would be fines or any

22  other conditions that the court could set as part of the

23  supervised release, have not been specifically agreed to.

24          Do you understand that?

25  A.  Yes, Your Honor.

1    Q.  All right.  In terms of the administrative forfeiture,

2    you're agreeing to waive interest and not contest a forfeiture

3    of a computer laptop, Sony memory sticks, and a CD disc.  Is

4    that correct?

5    A.  That's correct.

6           MS. JAHN:  There's also a camera, Your Honor.

7    BY THE COURT:

8    Q.  I think basically you're agreeing that you'll forfeit any

9    interest, no matter where they bring it, in terms of any of

10   these specific items.  Is that what you're agreeing to?

11   A.  That's correct, Your Honor.

12   Q.  And you're agreeing that you're the sole owner of the

13   property that was listed above.  And that you would hold them

14   harmless -- in other words, if somebody comes in at a later

15   point, I assume, and claims it's their property -- that you

16   would hold them harmless from their seizing or forfeiting any of

17   this property.  Is that correct?

18   A.  That's correct.

19   Q.  And you're agreeing to be detained.  We've also gone over

20   the rights.

21          Okay.  In terms of allocution, which is paragraph 8.

22   Allocution is recommendations to the court at the time of

23   sentencing.

24          The U.S. Attorney's Office is reserving its right to

25   not be silent at the time of sentencing and to make

Randall Casseday - Court    50

1    recommendations about fines, any terms of conditions of

2    supervised release.

3              Is that your understanding?

4    A.  Yes, Your Honor.

5    Q.  And after the sentencing, if there's some litigation

6    associated with the plea or the sentence, the government is not

7    bound by what it had originally recommended and would be in a

8    position to make any recommendations it wished to, to any post

9    sentence motions or anything related that came up in the Bureau

10   of Prisons.

11             Is that your understanding and agreement?

12   A.  Yes, Your Honor.

13   Q.  It also indicates -- and this would only affect the advisory

14   sentencing guidelines -- that they do not plan on filing any

15   downward departures or post sentence departures based on any

16   cooperation you've provided to the government.

17             Is that your understanding and agreement?

18   A.  Yes, Your Honor.

19   Q.  And you've also agreed to, pursuant to the statute, to

20   register as a sex offender as a mandatory condition of probation

21   and/or supervised release.  Presumably supervised release.  Is

22   that correct?

23   A.  That's correct.

24   Q.  So you understand you would have to report your address

25   where you're living, any subsequent change of address to the

Randall Casseday - Court                    51

1    Probation Office responsible for your supervision.

2            You would have to register in any state where you

3    reside, employed, or carry on a vocation, or a student.

4            And you also agree, as part of that, that you will

5    register current address, fingerprints, and current photograph

6    with the FBI for inclusion in their National Sexual Offender

7    database.

8            And you'll notify the FBI and the state in which you

9    establish a new residence not later than 10 days after you have

10   moved to a new residence of this change and will register the

11   current address, fingerprints, and photograph with the FBI and

12   the state.

13           Is that your understanding about your responsibilities

14   under the sex offender registration?

15   A.   Yes, Your Honor.

16   Q.   The government will dismiss Count 1 of the information at

17   the time of sentencing, and as I said, they will not bring any

18   additional charges against you, other than what was in the

19   statement of facts.

20           And then the general conditions -- this is the entire

21   agreement as you understand it.  Is that correct?

22   A.   That's correct.

23   Q.   It only binds the U.S. Attorney's Office for DC.  It doesn't

24   bind any other U.S. Attorney's Office or any other office or

25   agency of the U.S. Government or any state or local prosecutor.

1          Is that correct?  And your understanding?

2     A.   That's correct.

3     Q.   You also understand that if, after entering the plea

4     agreement, you fail to perform or fulfill any of your

5     obligations or you engage in any new criminal conduct prior to

6     the sentencing, you will have been considered to have breached

7     the plea agreement.

8          If you breach it, the government is free from its

9     obligations under the agreement.  You will not have a right to

10    withdraw the guilty plea.  You will be subject fully to criminal

11    prosecution for any other crimes, including perjury and

12    obstruction of justice.

13         The government will be free to use against you,

14    directly or indirectly, in any criminal or civil proceeding, any

15    statements that you have made, including the statements you've

16    made here in court, any information, materials, or anything else

17    that has been provided to them.

18         Ordinarily, any statements that you would make would be

19    more limited and used, in general, to impeach you if you went

20    forward to trial in any proceeding.  This is only in the event

21    that the court has allowed you to withdraw the plea and you've

22    breached the agreement.

23         If you either move to withdraw it or you actually have

24    broken the agreement, then they can use it for any purpose as

25    opposed to the limited purposes of the rules.

Randall Casseday - Court                            53

1          Is that something you've discussed with your lawyer?

2     A.  Yes, Your Honor.

3          THE COURT:  Did you go over this in terms of the

4     difference between here he's agreeing that what he said today

5     and any other statements or information that he's provided can

6     be used fully against him in any proceeding as opposed to the

7     narrower under Rule of Criminal Procedure Rule 11(f) or Rule of

8     Evidence 410.

9          MS. JAHN:  Yes, Your Honor.

10    BY THE COURT:

11    Q.  And if you breach the agreement, the government is only

12    required to prove it by a preponderance of the evidence, and any

13    new criminal offense, they would only have to prove it by

14    probable cause in order to show it.  They've indicated this is

15    the complete agreement.

16         Is that correct?

17    A.  Yes, Your Honor.

18    Q.  Is there anything else we haven't talked about that you

19    think is part of the agreement?

20    A.  No, Your Honor.

21    Q.  All right.  Let me just explain very briefly the

22    calculations that have been done under the advisory sentencing

23    guidelines which would be for the federal offense.

24         The advisory sentencing guidelines are calculated by

25    the Probation Office, and the Sentencing Commission has set out

Randall Casseday - Court                                54

1      two calculations:  an offense level and a criminal history.

2            And the Probation Department will talk to you, your

3      lawyer, other people, gathering information for the court, which

4      I'll consider when I make a final decision about whether to

5      accept the plea and the terms in this plea.  And they will set

6      out the offense level, they will get background information to

7      the court about you, and they'll do this calculation.

8            The offense level has numbers, and it's a number that

9      relates to the specific offense that you are being charged with.

10     You can add additional points.

11           For instance, you can add additional points for

12     adjustments for material involving a minor under the age of 12.

13     If there are at least ten images, there's another two points.

14     If there's an early acceptance of responsibility, you can deduct

15     points.  And then you come up to an adjusted offense level.

16           You then look at criminal history.  You look at

17     convictions, not arrests.  It will depend on the nature of the

18     conviction, how old it is, and what kind of sentence you

19     received, and you're in a criminal history category.

20           You then basically -- I'll hand this up.

21           You determine the offense level, which is going down

22     the left side, and the criminal history above, and when they

23     meet, that's the range -- the advisory sentencing range.

24           There are departures that the court can consider which

25     could either increase the sentence or decrease the sentence.

1    One they've indicated would not apply, which would be any kind

2    of cooperation or downward departure based on that.

3            But the court starts out with, in making decisions

4    about it, the advisory sentencing guidelines and makes a

5    decision about what is the appropriate one.

6            If there are objections that have been lodged with the

7    Probation Office, they'll resolve that before they come to me.

8    If there are still objections that are outstanding, because the

9    probation officer has not agreed with the objection that either

10   party has raised, then the court will resolve that.

11           And that will be what the court will calculate as the

12   sentencing guideline which will inform the court's decision

13   about whether to accept this plea.

14           And ordinarily sentences are governed by 18 USC 3553(a)

15   which sets out a whole series of factors to decide what's

16   appropriate and what's a reasonable sentence.

17           In the ordinary case, the court starts out with the

18   advisory sentencing guidelines, can sentence within that

19   framework, including whatever departures, or the court can vary

20   the sentence.  Since it's now advisory, the sentencing

21   guidelines are not mandatory, the court can, considering the

22   factors in 3553, come up with what it considers an appropriate

23   and reasonable sentence.

24           THE COURT:  So that's sort of the scheme.  I noticed

25   that the government has set out a guideline calculation as to

1    the federal.  It's on page 4.  Is that a calculation that you

2    agree with, Ms. Jahn, and that you've discussed with your

3    client?

4           MS. JAHN:  Yes, Your Honor.  I can put it on the record

5    as to how we determined that number.

6           Pursuant to Section 2G2.2 for the federal charge, the

7    base offense level starts at number 18.  There would be a two-

8    level decrease pursuant to Mr. Casseday's not intending to

9    distribute the material pursuant to the specific offense

10   characteristics within that guideline.

11          In addition, there would be a two-level increase due to

12   the fact that there are images involving minors under the age of

13   12.

14          In addition to that increase, there would be an

15   additional two-level increase because the offense involved the

16   use of a computer.

17          And, finally, there would be one additional two-level

18   increase because the offense involved at least ten images.

19          At that point, Mr. Casseday, if he is consistent with

20   the plea agreement, will receive three points for his acceptance

21   of responsibility; therefore, it nets an adjusted offense level

22   of 19.

23          Both parties believe that Mr. Casseday has no prior

24   criminal history; therefore, he would be in Category 1 with a

25   range of 30 to 37 months; hence, we agree to the 30-month low

Randall Casseday - Court                              57

1   end guideline range, Your Honor.

2          THE COURT:  Okay.  In terms of the --

3   Q.  And is that the discussion that you had, Mr. Casseday, with

4   your lawyer?

5   A.  Yes.

6          THE COURT:  In terms of the DC offense, that appears in

7   the material to be a Category 8 offense.  What does that place

8   him in?

9          MS. JAHN:  Your Honor, as the discussions between

10  government counsel and myself, we have agreed to the statutory

11  max, which is a 5-year term.  Therefore, we have never had a

12  lengthy discussion as to the voluntary sentencing guidelines

13  from the DC Superior Court.

14         THE COURT:  Is that correct, Mr. Casseday?

15         **THE DEFENDANT:**  Yeah, that's correct.

16         MS. STEWART:  Your Honor, I would only add that I've

17  checked with our litigation counsel and she's advised that

18  actually this offense occurred during the first emergency

19  legislation, and the District of Columbia Sentencing Commission

20  has not yet ranked this offense.  So, technically, it does not

21  even have a sentencing guideline range.

22         However, formally, it was a Category 8.  And we've

23  noted the guidelines, if they were to be the same, would

24  probably be in the six to 24-month range.

25         THE COURT:  All right.

1    BY THE COURT:

2    Q.   But those are discussions that you had, Mr. Casseday, and

3    based on those discussions you came to the decision that you did

4    about agreeing to it.  Is that correct?

5    A.   That's correct.

6    Q.   All right.  I won't be able to look at the guideline range

7    in order to be informed whether to accept or not the plea

8    agreement until I've actually received the presentence report,

9    which I've explained to you, others will have to chance to look

10   at, see if it's accurate, either factually or the calculations.

11   And we will make sure that it is accurate because it's important

12   for you for the future in terms of -- since you've agreed to a

13   jail term, the presentence report, it's important to have an

14   accurate one in terms of how it gets used in any way in the

15   future.

16           So we will do that, not only for me to be informed as

17   to whether to agree to it, but also to make sure there's

18   accurate information about you.  Do you understand?

19   A.   Yes, Your Honor.

20   Q.   And I've talked about that once you do this advisory

21   sentencing guidelines, there also can be some departures that

22   can either increase or decrease the range that's been discussed.

23           Do you understand that?

24   A.   Yes, Your Honor.

25   Q.   Do you understand also that parole has been abolished and

Randall Casseday - Court                                          59

1   that if you're sentenced to prison you'll serve the sentence I

2   impose.   There is a possible reduction for good time up to

3   54 days a year, but you won't be released early on parole as

4   used to be the case.

5            Do you understand?

6   A.   Yes, Your Honor.

7   Q.   Also, since your pleading guilty to a felony offense, if the

8   plea is accepted, that may deprive you of valuable civil rights,

9   which these are time-limited ones, it depends on where you live.

10  The right to vote, right to hold public office, the right to

11  serve on a jury.

12           The right to possess any kind of firearm under the

13  federal statute, unless they change it, even if you lived in a

14  place where you could get a license for a gun, under the federal

15  statute you would not be able to.

16           Do you understand the consequences of the felony plea?

17  A.   Yes, Your Honor.

18  Q.   Besides what's been discussed in the plea letter and here in

19  open court, have you been given any other promises, either by

20  your attorney, prosecutors, law enforcement, or anybody else

21  that you've come in contact with since your arrest, that would

22  affect the -- if the court accepts the amount of incarceration,

23  any promises about the rest of the sentence, other than what's

24  in the plea agreement?

25  A.   No.

Randall Casseday - Court                              60

1   Q.  Any other promises?

2   A.  There haven't been any other promises.

3   Q.  Has anyone forced, threatened, or coerced you in any way

4   into entering this plea agreement?

5   A.  No, Your Honor RPTR'S NOTE.

6   Q.  Now if, for some reason, the court does not accept the

7   agreed-to sentence, have you been promised -- or anybody made

8   any promises as to what sentence you might get?

9   A.  No, there hasn't been discussed specifically with me.  No,

10  Your Honor.

11  Q.  All right.  Are you entering this plea of guilty voluntarily

12  of your own free will?

13  A.  Yes, Your Honor.

14  Q.  Are you entering this plea of guilty because you are guilty

15  of the charges you're pleading to?

16  A.  Yes, Your Honor.

17  Q.  Anything you don't understand about the proceeding or your

18  plea in this case, anything you want to ask me or your lawyer?

19  A.  At this time, no, Your Honor.

20  Q.  All right.  How do you plead to Count 2, the federal offense

21  of possession of material constituting or containing child

22  pornography?

23  A.  I plead guilty.

24  Q.  How do you plead to Count 3, which is a DC offense, enticing

25  a child or minor?

1    A.   I plead guilty.

2         THE COURT:  All right.  I'm satisfied the defendant is

3    fully competent, capable of making a decision, understands the

4    nature and consequences of what he's doing.  He's acting

5    voluntarily of his own free will, and there's an adequate

6    factual basis for his plea.

7         I will not fully accept the plea at this point.  I will

8    await the presentence report.  And what I will do is set a

9    presentence date and a sentencing date.  And unless you hear

10   from me, make an assumption that I'm accepting it.

11        You can go ahead and sit down, sir.

12        Let me set dates here for...

13        MS. JAHN:  Your Honor, we would just ask as timely as

14   possible close to the 70-day mark.

15        THE COURT:  Let me sign the waivers for a second, and

16   then I'll look at the date.

17        What's the 70 days?

18        THE DEPUTY CLERK:  January 29th.

19        THE COURT:  I will give them to February 2nd, which is

20   that Friday of the same week, just because we've got a couple of

21   holidays in here.

22        Are you planning on filing memorandum-in-aid of

23   sentencing or not?

24        MS. JAHN:  I don't believe so, Your Honor.

25        THE COURT:  Government, are you?

1      MS. STEWART:  Your Honor, I think the government will,

2   only on the issue of conditions of supervised release.

3      THE COURT:  All right.  If you could file it, then --

4   would you be able to do it the week after that?

5      MS. STEWART:  Yes, Your Honor.

6      THE COURT:  So that's February 9th.

7      MS. JAHN:  Your Honor, if the government does file a

8   pleading, I would just request the right to respond to it.

9      THE COURT:  Look at your calendar.  When would you be

10  potentially responding?

11     MS. JAHN:  I could do it by that following Wednesday or

12  Thursday, the 14th or 15th.

13     THE COURT:  Okay.  I start a two-week trial the

14  following -- the 20th.  The 19th is a holiday.  How about if we

15  did it March 6th?

16     MS. JAHN:  Your Honor, I could actually turn the reply

17  around very quickly.  I know Mr. Casseday is very eager to be

18  sentenced and move out of the DC area.  So if the court has any

19  availability on that 16th, the Friday --

20     THE COURT:  The only reason I'm looking is I have a

21  case that has a sentencing already set on that date that's going

22  to take quite a bit of time and preparation.  I'm a little --

23  well, if you will get it in by the 13th.

24     MS. JAHN:  I could even do the 12th.

25     THE COURT:  If you will do it by the 12th, I'll do the

Randall Casseday - Court                      63

1    sentencing on the 15th.  I'd rather not do it on the same day.

2            I can do it first thing in the morning.  Let me set it

3    for February 15th.

4            So the presentence report is February 2nd.

5            Memorandum-in-aid of sentencing, which looks like will

6    be the government, February 9th.

7            Defense response would be by the 12th, and the

8    sentencing would be done on the 15th at nine.

9            Is there anything else that needs to be done?

10           MS. STEWART:  No, Your Honor.

11           THE COURT:  All right.  Then parties are excused.

12           MS. JAHN:  Thank you, Your Honor.

13       **(Proceedings concluded at 12:45 p.m.)**

14

15

16                        CERTIFICATE

17           I, EDWARD N. HAWKINS, Official Court Reporter, certify

18   that the foregoing pages are a correct transcript from the

19   record of proceedings in the above-entitled matter.

20

21                        _____

22                        Edward N. Hawkins, RMR

23

24

25

64

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA    :   CR No. 06-329
                         :   December 21, 2006
          Plaintiff,     :
                         :   9:10 a.m.
v.                       :
                         :   Washington, DC
RANDALL G. CASSEDAY,     :
                         :
          Defendant.    :
. . . . . . . . . . . . . . . . . . . . . . . . . . . :

DAY TWO of TWO
TRANSCRIPT OF GUILTY PLEA
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Plaintiff:        PATRICIA STEWART, AUSA
                       U.S. ATTORNEY'S OFFICE
                       555 Fourth Street
                       Washington, DC  20001

For the Defendant:        DANIELLE JAHN, AFPD
                       FEDERAL PUBLIC DEFENDER
                       625 Indiana Avenue, NW
                       Washington, DC  20004




Court Reporter:           EDWARD HAWKINS, RMR
                       Official Court Reporter
                       Room 6806, U.S. Courthouse
                       Washington, D.C. 20001
                       (202) 682-2555

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription

1            P R O C E E D I N G S

2            THE COURT:  Good morning, everyone.

3        Good morning, Mr. Casseday.

4            THE DEFENDANT:  Good morning.

5            THE DEPUTY CLERK:  Criminal Case 06-329.  The United

6    States of America versus Randall Casseday.  Patricia Stewart for

7    the government.  Dani Jahn for the defendant.  The defendant is

8    present in the courtroom.

9            THE COURT:  All right.  We're here to discuss an

10   amendment to the plea, which was -- I went through the full

11   Rule 11 inquiry on November 20th of this year, and it was a

12   Rule 11C1(c), which it still is.  It was a preindictment plea.

13       The government had agreed to dismiss Count 1, which

14   attempted enticing a minor which is a federal offense, and

15   Mr. Casseday entered a plea to Count 2, which was also a federal

16   offense, of possession of material constituting or containing

17   child pornography, and Count 3 which was a DC offense, which is

18   enticing a child or a minor.

19       The original agreement was on the federal offense of

20   possession of child pornography, the sentence would be

21   30 months; on the DC offense of enticement of a minor, it would

22   be 60 months; it would be consecutive, for a total of 90 months.

23       When the Probation Office began to prepare the

24   presentence report, particularly around the DC offense, it came

25   to the attention of the parties and the court that a 60-month

1    sentence would not be appropriate on the DC offense, since the

2    statutory maximum was five years and you need to do something

3    less than the full sentence under the statute relating to DC

4    offenses.

5        So we had a discussion about the possibility of leaving

6    the total sentence as the 90 months, which had been agreed to by

7    all the parties, including Mr. Casseday, but to basically flip

8    the sentencing sentence that would be agreed to by both

9    Mr. Casseday, the parties and the court.

10        So that the possession of child pornography would now

11    be the 60 months, which is within the statutory maximum of

12    10 years, would involve a variance of the sentencing guidelines,

13    since the sentencing guideline range that was discussed on the

14    record as part of the original plea was that the guidelines

15    would be -- let me be exact here -- would be offense level 19,

16    Category 1, of 30 to 37 months.  So agreeing to 60 months would

17    be a variance of it.

18        The 30 months for the DC offense would not be a

19    problem, since it's less than the full statutory maximum, and

20    would be I believe within the range of what it appears to be the

21    category that eventually will be associated with the DC offense,

22    which would be Category 8, which is -- actually, that one also

23    will involve a variance because it's 6 to 24 months.

24        So in both cases there would be a variance to come up

25    with the 60 on the federal, 30 on the DC one, which would reach

1    a total of 90 since they are consecutive.

2        My understanding -- and we needed to put this on the

3    record -- as to the advantage to Mr. Casseday and why the

4    government was making this particular order -- this plea, to

5    indicate, since for both the federal offense and the DC offense,

6    the sentence that Mr. Casseday would be agreeing to as well as

7    the court would be a variance from the sentencing guidelines,

8    keeping in mind that they are advisory and, therefore, the court

9    is not obliged to accept them.  They are below the statutory

10   maximum.  The court cannot go above the statutory maximum.

11       But I think in our last plea colloquy we really didn't

12   get into the advantages of the plea, as I understand it, to

13   Mr. Casseday and the motivation for the government to make this

14   offer.  So I think we should put that on the record first before

15   I go through this.

16       And I believe I've stated it correctly in terms of it

17   would be a variance both for the federal in terms of the

18   advisory sentencing guidelines, as well as for the district in

19   terms of it being -- and also in the advisory sentencing

20   guidelines.

21       MS. STEWART:  That's correct, Your Honor.  That's our

22   understanding.

23       Your Honor, in this case the defendant was initially

24   charged by complaint with the offense of enticement of a minor

25   in violation of 18 United States Code 2422(b).  That statute, up

1    until July, carried a maximum penalty of 30 years and a

2    mandatory minimum of five years.

3            On July 27th Congress changed, in the Adam Walsh Child

4    Safety and Protection Act, increased the mandatory minimum

5    sentence for that offense to 10 years and the maximum sentence

6    to life imprisonment.  There's been no equivalent adjustment of

7    the guidelines.

8            And in looking at it, the result to Mr. Casseday was

9    that if he went to trial and were convicted of the federal

10   offense of enticement, he would be looking at an approximate

11   guideline range to 63 to 78 months -- that's our rough

12   adjustment -- and if he pled guilty he would be looking at an

13   approximate guideline sentence of 45 to 57 months.

14           In both cases the court would be compelled to impose a

15   sentence more severe because of the new mandatory minimum

16   sentence.

17           The government's position was that this was a serious

18   offense, that the conduct required a substantial period of

19   incarceration; at the same time, there should be some incentive

20   to a defendant who, like Mr. Casseday through his attorney,

21   indicated early in this case that he was willing to accept

22   responsibility.

23           There was nothing the government could do in terms of

24   recommending the low end of the guidelines, moving for a 3-point

25   reduction, that would provide any incentive for him to enter a

1    guilty plea.

2          And it was for that reason, in order to provide some

3    incentive not only to conserve resources but because a defendant

4    who had admits responsibility in our view is more likely to be

5    rehabilitated, that we fashioned this plea which will result in

6    a sentence of approximately seven and a half years.

7          Had Mr. Casseday gone to trial and been convicted he

8    would face not only a mandatory minimum sentence on the federal

9    enticement of 10 years, he would face an approximate guideline

10   sentence of four and a half years on the child pornography

11   count.

12         Had a court run those sentences consecutively he would

13   be looking at between 14 and 15 years imprisonment.  This plea

14   will give him the opportunity to have a sentence of

15   approximately half of that.

16         THE COURT:  All right.  If I could just ask one

17   question.

18         In terms of the federal offense in terms of the

19   guideline range for enticement prior to the change in the

20   statute, what did you say it was?  I missed it.  Approximately.

21         MS. STEWART:  Approximately, for a defendant who went

22   to trial who had no prior criminal history, my rough

23   calculations were, depending on whether a computer was used,

24   wasn't used, and other factors, would be approximately 63 to

25   78 months if the defendant had no criminal history.

1    So there was some incentive to plead to a five-year

2    statutory maximum.  For some defendants with a more extensive

3    criminal history there was even more of an incentive.  But since

4    the guidelines haven't been adjusted, there really is no reason

5    to plead now to that offense.

6        THE COURT:  Ms. Jahn, if I could just ask whether you

7    agree with that and whether there's anything else that we need

8    to put on the record.

9        MS. JAHN:  I agree with the entire first part of the

10   presentation as to why the plea was made as such and why

11   Mr. Casseday is accepting their offer.

12       I would note, though -- and if the court recalls --

13   that Mr. Casseday has been troubled with the severity of the

14   penalties with regard to the statutory max and then also the

15   guidelines.

16       There's been a lot of discussion with Ms. Stewart and

17   myself about different cases and the guidelines.  But I would

18   just note that prior to July and the enforcement of the Adam

19   Walsh Act, it is my understanding that the guidelines would have

20   somewhere been in the range of 46 to 57 months based on a

21   criminal history category of 1.

22       THE COURT:  Are you talking about the federal offense

23   for enticement?

24       MS. JAHN:  Correct, Your Honor.

25       THE COURT:  So you have a different view than she does

71

1    about it?

2         MS. JAHN:  I do, Your Honor, but I may be factoring in

3    acceptance of responsibility with regard to that.  I don't know

4    if that takes care of that issue.

5         If he had not received acceptance of responsibility the

6    range would have been 63 to 78 months.  However, I don't think

7    that there's any suggestion that Mr. Casseday wouldn't have

8    maintained acceptance of responsibility prior to July, and if

9    that had occurred, then his range would have been 46 to

10   57 months.

11        THE COURT:  Okay.

12        MS. STEWART:  I think we're in agreement.

13        I was trying to point out the discrepancy between the

14   guideline range and the statute.

15        And Ms. Jahn is correct.  Defendants with no criminal

16   history who pled early, accepted responsibility, would be facing

17   a 46- to 57-month range.  Had they gone to trial it would be the

18   higher one.

19        I think we're in agreement on the guideline

20   calculations, Your Honor.

21        THE COURT:  All right.  So at this point, once the

22   statute came in, it obviously made a difference in terms of what

23   Mr. Casseday would be facing.  As I understand it, the change in

24   the statute was the July of 2006.

25        MS. JAHN:  Yes, Your Honor, pursuant to the Adam Walsh

1    Act.

2          THE COURT:  So the offenses, though, occurred

3    afterwards.  Am I correct?

4          MS. JAHN:  That's correct, Your Honor.

5          THE COURT:  All right.  So from his perspective,

6    because the offenses occurred after they changed the statute so

7    that there's now the mandatory minimum of 10 years on the

8    federal enticement charge, so that even though there's a major

9    discrepancy between that, obviously, and what the sentencing

10   guideline range would be, and the court obviously would be

11   required to impose the mandatory sentence and not the sentencing

12   guidelines.  The sentencing guidelines are advisory, but the

13   statute would not be.

14         MS. JAHN:  Correct.

15         THE COURT:  So I wouldn't have any choice except to

16   give him the 10 years, even if he pled; is that correct?

17         MS. JAHN:  Yes.

18         THE COURT:  Is this something that you discussed with

19   Mr. Casseday?

20         MS. JAHN:  Oh, yes, at length, Your Honor.

21         THE COURT:  All right.  Then let me bring Mr. Casseday

22   up.  If we could swear him in again.

23         THE DEPUTY CLERK:  Would you raise your right hand,

24   please, sir?

25

1    RANDALL CASSEDAY, Defendant, SWORN

2    BY THE COURT:

3    Q.  Mr. Casseday, remember what I had said to you before.  I'm

4    not going to go through the whole plea, but I do want to just

5    talk about the penalties or the charges that you are pleading

6    to, what the penalty was for the one that's going to be

7    dismissed about it, and the change in, not the total sentence

8    that you agreed to back in November for the Rule 11C1(c), but

9    its allocation.  But if you have any other questions, please

10   bring them up.

11        What I wanted to do this morning, before we got into

12   the colloquy, is to make sure we put on the record the

13   government's reason for making this offer and your reason, in

14   terms of an advantage, since -- in terms of not only because

15   you're accepting responsibility, which obviously is viewed in a

16   different way than somebody who does not accept responsibility,

17   but also in terms of the advantage to you in terms of this plea,

18   if there was any.  So that's the reason for discussing it.

19        Do you understand?

20   A.  Yes, Your Honor.

21   Q.  Okay.  And the reason is that in terms of the advisory

22   sentencing guidelines, both in the federal offense that you pled

23   to as well as the DC offense that you pled to, those sentencing

24   guidelines would be less than what you're actually agreeing to.

25   So, in other words, the court would be making a ruling that a

1    variance was appropriate in this particular case in order to

2    accept it.

3            The whole purpose of this would be to achieve a

4    sentence that the government viewed was fair, you would view as

5    an advantage to you because they were going to be dismissing the

6    federal enticement charge, which is based on the exact same

7    factual predicate for the DC enticement charge, but there's

8    obviously, even with the variance, it still is less than what

9    you would be facing if you were convicted and/or pled to the

10    federal enticement charge.

11            Do you follow me so far?

12    A.  I do, Your Honor.

13    Q.  So from your perspective -- and I'll get through the full

14    colloquy -- but on the federal offense for the possession of

15    child pornography, the advisory sentencing guidelines are 30 to

16    37 months, you would be agreeing to 60 months, which is still

17    within the statutory maximum which is 10 years, so the court is

18    certainly in a position to do that.

19            On the DC offense, my understanding it's probably going

20    to be Category 8 -- they have not made a final decision, but

21    that's what they appear to be doing -- which would be 6 to

22    24 months, and you're agreeing to a 30-month sentence, which is

23    also a variance.  These are also advisory.  It would be

24    consecutive, for a total of 90 months.

25            And the advantage to you is to get dismissed the

1    federal enticement charge, because that one, even though the

2    sentencing guidelines -- whether or not you accepted

3    responsibility -- would be less than -- quite a bit less than

4    the 10 years which you're now facing.

5         The change in the statute was made in the summer, in

6    July.  Your offense conduct occurred in September.  So, as a

7    practical matter, it would apply to you.

8         This isn't something that the penalty changed between

9    the offense and your plea.  It has nothing to do with it.  Your

10   offense was later and, therefore, there would be no question

11   that the statute would apply to you.

12        So as I understand it, the major advantage to you would

13   be that for the two charges that you're pleading to, which would

14   be the 90 months, that you're getting dismissed a case that

15   would be 10 years mandatory minimum, and then if you had -- that

16   doesn't take into account the possession of child pornography or

17   anything else which would be on top of that.

18        So from a total sentence you would have an advantage --

19   you would get an advantage to pleading guilty to these two

20   charges, even with a variance from the advisory sentencing

21   guidelines when you look at what you would face, whether you

22   pled or went to trial on the federal offense of enticement and

23   whatever additional information would be provided.  In addition

24   to the fact that since you were willing to accept responsibility

25   for your conduct, this gives you an opportunity to actually do

Randall Casseday - Court                              76

1    so with some advantage to you as opposed to being left with the

2    10-year mandatory minimum.

3           Does that comport with your understanding of why you're

4    doing this?

5    A.  Yes, Your Honor.

6    Q.  Do you have any questions, anything you want to ask at least

7    at this point before I get into it?

8    A.  Not at the present time, Your Honor.

9    Q.  So you do understand that this will be a variance from the

10   sentencing guidelines, but the idea is to come up with a

11   reasonable and appropriate sentence, taking into account the two

12   charges which have slightly different factual predicates, and

13   then the dismissal of the federal enticement charge when you

14   look at the complete picture.

15          Do you understand?

16   A.  Yes, Your Honor.

17   Q.  Okay.  So what I'm going to do is, there is the

18   December 19th letter, which I understand that you have signed.

19   Let me just go through it.

20          I'm not going to go through the whole plea colloquy.

21   Basically, I will be accepting the responses that you made to

22   the charges that you pled to and I'll go through that again.

23   The background information I believe remains the same.

24          I did have a discussion with you about your waiver of

25   constitutional rights.  Do you still understand those, and are

1    you still waiving them, without my having to go through each one

2    of them; in other words, based on our last discussion?

3    A.  Yes, Your Honor, I understand.

4    Q.  Okay.  And we have the written -- the proffer on facts and

5    the court went through that carefully with you.  And are you

6    adopting that discussion and your admissions?

7    A.  Yes, Your Honor.

8    Q.  And the last part is in terms of whether you're making this

9    decision voluntarily in terms of the change which I'm about to

10   go over?

11   A.  Yes, Your Honor.

12   Q.  In general, I'm going to be adopting everything except for

13   this modification that I'm going to be discussing now.  Do you

14   understand?

15   A.  Yes, Your Honor.

16   Q.  If you have it in front of you.  We're talking about

17   paragraph one -- and I'm just going to ask -- sets out what

18   you're agreeing to, which is the same as before, but let me go

19   through it.

20        You're agreeing to plead guilty to Counts 2 and 3 of

21   the criminal information.  Count 2 is the possession of child

22   pornography, which is a federal offense, and Count 3 is

23   attempted enticement of a minor, which is the DC offense.

24        And you're agreeing that the offense of possession of

25   child pornography -- in terms of the statute -- carries a

1    penalty up to 10 years imprisonment -- in other words, I

2    couldn't sentence you to more than that -- a fine up to $250,000

3    or both, and a term of supervised release of any term up to

4    life.

5            And I explained to you what supervised release was.  If

6    you're given a period of jail time, you can then be given a

7    period that you're supervised in the community with certain

8    conditions that you need to follow.

9    A.  Yes.

10   Q.  Do you understand and are you agreeing to that?

11   A.  Yes.  Yes, Your Honor.

12   Q.  Then the offense of enticement, which is a DC offense, has a

13   maximum statutory penalty of five years imprisonment, three

14   years of which may be imposed at the time of sentencing.

15           In other words, I could not give you a five-year

16   sentence, I could only give you a three-year sentence, with two

17   years remaining, so if at some point the court revoked the

18   sentence you could be sentenced to the additional two years.

19           Do you understand?

20   A.  Yes, Your Honor.

21   Q.  And the DC offense of enticement carries a penalty of a fine

22   up to $50,000 and a term of supervised release of not less than

23   three but no more than 10 years.

24           Do you understand and agree?

25   A.  Yes, Your Honor.

Randall Casseday - Court                                79

1    Q.   Now, in terms of -- make sure that you understand, that the

2    supervised release imposed for the offense of enticement, if

3    that is ever revoked -- and that's the DC offense -- then you

4    would be subject to the term of two years.   Remember, I

5    explained to you that earlier.

6         In other words, the statutory maximum is five years.

7    If I sentence you, I couldn't sentence you to more than three.

8    And if it was ever revoked, then I could sentence you up to two

9    years, the remaining two years on the offense.

10        Do you understand and agree?

11   A.   Yes, Your Honor.

12   Q.   Now, the length of the term of imprisonment on the

13   revocation of supervised release would be determined by the

14   parole commission, the U.S. parole commission, and would be

15   independent of, and could be imposed in addition to any

16   penalties imposed by the court on revocation of supervised

17   release for the federal offense of possession of child

18   pornography.   Do you understand?

19        In other words, if I revoked it for both -- on both

20   charges, then I could impose whatever I thought were appropriate

21   penalties for revocation of the federal offense.   And the parole

22   commission would be the ones who would be making any

23   determination --

24        THE COURT:   Are they making a determination on both of

25   them or just the DC one?

1           MS. JAHN:  Just the DC code, Your Honor.

2           THE COURT:  Okay.

3   BY THE COURT:

4   Q.  So, in other words, on the DC -- let me backtrack.

5           If you were on -- did your jail time, put out in this

6   community on supervised release with certain conditions, if you

7   didn't meet them, either with new offenses or you didn't follow

8   through with the conditions that were set, and the court revoked

9   it, then on the DC offense, it's the parole commission, U.S.

10  parole commission, that would decide what sentence you should

11  get.  There would be two years that they would have that they

12  could impose because that would be up to the statutory maximum.

13          Do you understand so far?

14  A.  Yes, Your Honor.

15  Q.  On the federal offense, the court would make the decision.

16  If I revoked it -- again, either because you were involved in

17  new conduct, criminal conduct, and/or didn't follow through with

18  the conditions of supervised release, then I could impose

19  penalties that were appropriate for the possession of child

20  pornography which would -- you should keep in mind that you

21  would not get credit for the time that you had already served on

22  that federal offense.

23          Do you understand?

24  A.  Yes, Your Honor.

25  Q.  If you don't, just speak up.

1   A.   That's the first I heard that.  Would you explain that

2   further?

3   Q.   Sure.  In the penalties for -- on supervised release for

4   federal offenses, if you -- if there's a revocation -- and it

5   depends and why it's revoked.

6        If it's revoked for new offenses, then there's certain

7   penalties that are allocated.  If it's revoked for -- because

8   you technically violated because you haven't met the conditions,

9   and there are different range of penalties that are available.

10  And these penalties -- the penalties are set out in terms of

11  what the court could impose depending on what the violation was.

12  And I'd have to find first that there was a violation.

13       But they are not reduced by the time you've already

14  served.  In other words, they don't -- if there's a range of 18

15  to 24 months, just hypothetically, it's not reduced by the

16  amount of time you've already spent.  In other words, these are

17  new penalties.  That's what I meant.

18  A.   Okay.  I understand.

19  Q.   And it's the court that makes that decision, it would not be

20  the U.S. parole commission which would make the decision about

21  any penalties after revocation on the DC offense.  On the

22  federal one the court makes the decision.

23  A.   That, I understand.  Yes.

24  Q.   And, as I said, the penalties are set out depending on what

25  the basis for the revocation, and they generally are a range.

Randall Casseday - Court                    82

1    And I just want to make sure that you understand they are not

2    going to get reduced by the time you've already served.

3    A.  I understand.

4           MS. JAHN:  Your Honor, may I just add something --

5           THE COURT:  Sure.

6           MS. JAHN:  -- to maybe clarify because we've had

7    discussions about this very issue.

8           THE COURT:  Okay.

9           MS. JAHN:  Is that both this court and the parole

10   commission have separate interests if, in fact, he violates any

11   term of supervised release.  And it's very likely that the

12   conditions of supervised release will be very similar, if not

13   identical.

14          So, if in fact there is an alleged violation, it is

15   very likely that he would appear before this court and also the

16   parole commission.

17          THE COURT:  I think that's correct.  There would be no

18   reason, frankly, for me to set -- since I'll be doing the

19   sentence -- for me to set different conditions of supervised

20   release in one charge versus the other.  They would be the same.

21   BY THE COURT:

22   Q.  So if you committed a criminal, a new criminal offense,

23   whatever it would be, the likelihood is it would be a revocation

24   of the DC parole commission and a revocation before me on the

25   federal offense.

1        If there are certain conditions I would set, there

2   would be no reason for me, and I think it would be simply

3   confusing, frankly, to set a series of different ones.  They

4   would be the same.  You're the same person in the community.

5   The charges relate to the same kind of conduct.  I would set the

6   same conditions in all likelihood.  And, therefore, if you

7   didn't follow through with one of the conditions, it's likely it

8   would be for both terms of supervised release and, therefore,

9   the revocation would be in front of the parole commission on the

10  DC offense and in front of me on the federal offense.

11       Do you understand?

12  A.  Yeah, I understand.  So that means I could end up being

13  revoked twice and serving --

14  Q.  Two sets of sentences.  Yes.

15  A.  I understand.

16  Q.  And then in terms of the addendum here, we're still talking

17  about the special assessment of a hundred dollars that goes to

18  the district court on the federal offense, and the hundred

19  dollars -- a hundred to $5,000, the range, which goes to the

20  Victims of Crime Fund for the DC offense, and we haven't gotten

21  there yet in terms of what I would assess.

22       The court cannot waive those.  You have to pay them at

23  some point, either during your period of incarceration and/or

24  while you're in the community.  But you should just be aware

25  that those assessments still apply.

1           Under the sentencing guidelines, again, which are

2    advisory, the court can, although I'm not obliged to even under

3    the guidelines, that I could impose a fine that's sufficient to

4    pay the federal government the costs of imprisonment, term of

5    supervised release or period of probation.  You should just be

6    aware of that.

7           Now, the important part, probably, is paragraph 3 of

8    this new addendum because this is a major change.  The agreed

9    sentence is that on the possession of child pornography, which

10   is the federal offense, you would be agreeing, and the court

11   would be agreeing, to a sentence of 60 months -- which, as I've

12   indicated, would be a variance of the advisory sentencing

13   guidelines, but is within the statutory maximum sentence so the

14   court can impose this -- and a sentence of 30 months or two and

15   a half years on the enticement charge which is the federal one.

16   Again, this is a variance from the DC advisory voluntary

17   sentencing guideline range.  And the 60 months and 30 months

18   would be served consecutively, one sentence after the other, so

19   that it would result in an aggregate or total sentence of

20   90 months.

21           Do you understand?

22   A.  I do, Your Honor.

23   Q.  And we've discussed earlier the advantage to you in terms of

24   what you would be facing, although it's in a variance from the

25   advisory sentencing guidelines in both federal and DC, and the

1    variance is higher than the guidelines, the advantage to you

2    still is to get rid of the -- and have dismissed the charge that

3    you would be facing with the mandatory minimum.

4              Do you understand?

5    A.   Yes, Your Honor.

6    Q.   Okay.  And then the agreement is the term of at least

7    10 years supervised release on the possession of child

8    pornography and a term of three years supervised release on the

9    enticement charge to be served concurrently.  So the concurrent,

10   they run at the same time.

11             All right.  And the agreement, with respect to the

12   sentence, is limited to the length of terms of imprisonment and

13   the supervised release.  So, on the federal one it's at least

14   10 years; under the statute, it can go up to life.  And on the

15   DC one, you've agreed to a specific 3-year sentence of

16   supervised release; is that correct?

17   A.   That's correct, Your Honor.

18   Q.   And this is the only amendment to the agreement as you

19   understand it.  Is that correct?

20   A.   That's correct, Your Honor.

21   Q.   Anything else that you think is part of this, or do you have

22   any questions?

23   A.   No.  No questions at this time.

24   Q.   All right.  And are you agreeing to this amendment to the

25   plea of November 20th?  Are you entering this amendment

Randall Casseday - Court                                    86

1    voluntarily of your own free will?

2    A.  Yes, Your Honor.

3    Q.  And are you adopting the full discussion we had back on

4    November 20th in terms of the answers that you gave to the

5    court's questions?

6    A.  Yes, Your Honor.

7              THE COURT:  I don't think there's anything else.

8              Is there?

9              MS. JAHN:  I don't believe so, Your Honor.

10             THE COURT:  All right.  Then I would like to see the --

11   I'm inclined to agree to this, but I would like to see the

12   presentence report ultimately in terms of making a final

13   decision.  We have set out --

14             You can go ahead and sit down, Mr. Casseday.

15             We have set out a presentence report in February,

16   memorandum-in-aid of sentencing, the defendant's response and a

17   sentencing date in February.

18             The one thing that I wanted to bring up, since the

19   supervised release is somewhat of an open question in the sense

20   of how, on the federal one, of how long it's going to be.  My

21   understanding is that there can be psychosexual evaluations, and

22   that might be useful to, frankly, do that.  That would be of

23   assistance, both to everyone in terms of making some decisions,

24   particularly on the supervised release.

25             I mean, the sentence, if the court agrees to it, is

1  set.  But on the federal offense it will be at least 10 years,

2  and the question is how much beyond that, it might be of use,

3  frankly, to get one.

4      MS. JAHN:  I understand the court's inquiry, but I'm

5  just wondering what authority the court is relying upon for that

6  sort of...

7      THE COURT:  I think you can do it.  As I understood it,

8  in the context of asking... in terms of as part of the sentence.

9  It would be in the context of deciding on the sentence, and it

10  would be -- I'm raising it with you, because I was frankly going

11  to ask the Probation office unless you wished to do something

12  yourself.

13      I think the Probation Office just as they can request a

14  mental health examination or whatever to assist them in coming

15  up with the presentence report, the question I would have is to

16  whether this would assist, frankly, in the presentence report in

17  terms of the court making a decision.

18      In this case it wouldn't be about the sentence because

19  I would have agreed to it, but it would be around the issue of

20  what would be an appropriate supervised release issue.

21      I'm raising it with you because I know with some

22  judges, frankly defense counsel had gone and done their own, had

23  their own evaluation.  I don't know whether the government has

24  done it.  And in other instances Probation has actually done it.

25      I was frankly going to ask Probation to indicate to me

1  whether they thought it was appropriate, since they would had

2  some contact with Mr. Casseday, and mine has been more limited,

3  and they would certainly know more about it.  They would have to

4  obviously propose it, and I would have to agree to it, and I

5  would give you an opportunity to respond.  But I'm giving you an

6  opportunity if you want to ask for it in terms of doing it

7  yourself.

8        MS. JAHN:  I do not want to ask for it at this time,

9  Your Honor.  I will note -- and I know Mr. Penders is not

10 here -- but we've already had the presentence interview by

11 Mr. Penders with Mr. Casseday, and during that interview there

12 was no indication or discussion about any mental health or

13 mental illness-related issues, even relating to his family.

14        So I would just be asking that if Probation is going to

15 be requesting that, that they put forth a basis as to why so I

16 can confer with Mr. Casseday and then we may either oppose or

17 agree to it at that time.

18        But as it stands right now we would object to that

19 without hearing a basis for it and what authority the court

20 and/or Probation is relying upon.

21        THE COURT:  I think I would ask, frankly -- I don't

22 know.  It's something new in the sense -- I mean, these

23 evaluations have been around a long time.

24        I think that in these cases where we're starting to get

25 them and where there's so many issues and the penalties,

1    frankly, are fairly long -- put it that way -- and that the

2    court would have an option on the supervised release to go up to

3    life, which is unusual for most of these cases.

4         And there also is certainly -- Congress has added a

5    whole series of different conditions.  For instance, in terms of

6    if you don't register, evidently that's a basis for revocation.

7    There's a whole series of different things that have now been

8    placed into it.  So I'm not sure in terms of moving towards it.

9         It would be in the context of a valuation to determine

10   the risk of recidivism, dangerousness, any necessary treatment.

11   It would be in that context.  So it's not what I would consider

12   the necessary -- a mental health evaluation in the typical

13   sense.

14        I gave it as an example that Probation, in instances

15   where they want to make decisions about treatment, or they want

16   to indicate recommendations about supervised release, can ask

17   for, for instance, mental health evaluations even though there's

18   no issue of competency.  It would fall in the category of an

19   evaluation to determine the risk of recidivism, dangerousness,

20   and what kind of treatment would be appropriate, since there's

21   evidently a variety of them.  So I would raise it in that.

22        I'm letting you know so this is not a surprise.  I was

23   frankly going to talk to Mr. Penders about it to see whether he

24   thought it was appropriate.  He's had more contact with

25   Mr. Casseday than I have.  So I would raise it as an issue.

90

1          If it would be of assistance, it seems to me it's

2     useful, since I'm obviously going have to be making a decision

3     about the length of the supervised release.

4          I don't know whether Probation has an issue.  Can you

5     come up for a minute?  Or has something that you can provide us

6     with some additional information.

7          MS. EPSON:  Typically, Your Honor, the Probation

8     Department does not have evaluations prior to the sentence being

9     imposed because we just don't have jurisdiction.

10          If the court imposes a term of supervised release and

11     the probation officer, supervising the defendant or the

12     probationer, wants to assess if that person needs some treatment

13     it would be done at that time, and the order of judgment can be

14     amended to include some sort of evaluation.  However, the court

15     prior to sentencing needs to do an order for any kind of

16     treatment recommendation or psychoanalysis.

17          THE COURT:  No, I would do an order.  I'm raising the

18     issue so that there's not a big surprise here.  I haven't made a

19     decision.  I'm going to raise the issue with Mr. Penders.

20          As I understand it, Probation in other cases has

21     decided it's appropriate.  So, if they make a recommendation, I

22     would want to see what the recommendation is, I would enter an

23     order to do it.  Counsel for the defense and the government

24     would have an opportunity to weigh in.

25          I'm just raising it as an issue to give others an

1    opportunity to indicate, one, their position, and two, whether

2    they -- in some instances, people have gone and done it on their

3    own, and then either provided the information to the court or

4    not.

5          MS. EPSON:  From experience on these cases with the

6    10-year to life mandatory, or advisory supervised release range,

7    10 years to life, typically the judges in this district are

8    imposing the 10 years because that is pretty much in line with

9    how long the defendant has to register as a sex offender.

10          MS. STEWART:  Your Honor, if I might briefly address

11    the court.

12          THE COURT:  Okay.

13          MS. STEWART:  I would have to take issue with the

14    probation officer's statement about the length of supervised

15    release that's typically been imposed on the federal side.  And,

16    frankly, we've only had three cases to be sentenced on these

17    exploitation offenses, these online offenses.  And I know Judge

18    Walton has imposed a 30-year term of supervised release, other

19    judges have imposed less.  So I don't think we have a typical

20    pattern here at all.

21          The government's position is simply that if the court

22    believes it's useful to have an evaluation under 18 U.S. Code

23    3552 a presentence study and report, either by the Bureau of

24    Prisons or by psychiatric or psychological examiners, the court

25    clearly can order it if it would assist the court.

1          Under these circumstances where the defendant is
2    incarcerated, I think it would be impractical for it to be done
3    in the community, and it would be done by the Bureau of Prisons.
4          At this time we're not taking a position.  However, we
5    would -- just to alert the court and counsel, should counsel be
6    inclined to submit, as many defense counsel have been in these
7    cases, an evaluation by a social worker or psychologist or
8    something, a report at the time of sentencing, the government is
9    going to ask in advance that not be considered unless the
10   government has an opportunity to have the defendant examined by
11   the Bureau of Prisons.
12         In other words, if there's going to be a defense study
13   done we would like the opportunity to have a study done also.
14         I don't know what the bed space is at Butner at this
15   time.  I do know that Butner is the facility that is usually
16   used, because to my knowledge it's the only Bureau of Prisons'
17   facility that is conducting psychological evaluations in cases
18   of sex offenses.
19         THE COURT:  Okay.  As I said, I haven't come to any
20   conclusions one way or the other about it.  I, frankly, was
21   going to discuss it with Mr. Penders since he's the one who has
22   put it together as a contact with Mr. Casseday.  And I view it
23   strictly as an issue of assistance in terms of coming up with a
24   sentence.  If he doesn't think it's necessary, then I probably
25   would certainly not be inclined to override what his view is.

1   But I did want to discuss it with him, and I didn't want to have

2   this discussion and not let you know it.  But if I did it I'm

3   not going to do it without filing -- you know, he has to file

4   something.  You'll get to look at it and I'll make a decision

5   about it with input.

6          MS. JAHN:  Your Honor, I would just ask that we have a

7   short turnaround with regard to this.

8          If, in fact, it's determined Probation does want him

9   evaluated, there may be additional evaluations by either

10  government counsel or Mr. Casseday to contest or -- there could

11  be multiple issues that arise.

12         And the sentencing is set for February.  I think

13  everyone, including Mr. Casseday, wants to proceed as quickly as

14  possible to get out of this jurisdiction, at least closer to his

15  family in New York.

16         And I would just note that the case where Judge Walton

17  imposed a 30-year term of supervised release is currently on

18  appeal.  So this is an ongoing issue.  And in fact, Judge Leon

19  is imposing sentence in another case today, which I intend on

20  watching to determine what in fact that court does.  So we can

21  at least advise the court what other judges are doing in terms

22  of supervised release, if the court is inclined to hear about

23  that.

24         THE COURT:  Okay.  I'm going to do it quickly.

25  Mr. Penders had another appointment which we knew when I set

1    this, except that I wanted to do a quick turnaround about this

2    so that we could proceed in terms of the amendment.  I will try

3    and speak to him, either today or tomorrow, and just see where

4    he is on this.  As I said, since he's had more contact with

5    Mr. Casseday, if he doesn't think it's really necessary, then I

6    probably would be inclined not to do it.

7         Let me put it this way.  I have assignments on another

8    court, so I'm not in the building most of the day.  You will

9    hear from me or my secretary if we're going to do something,

10   just so you get a heads-up.  If you don't hear anything from me

11   today or tomorrow, then assume it's not going to get done.

12   We're not doing it.

13        That way, in terms of trying to keep track of who I

14   tell people about things.  So you will get a heads-up before we

15   proceed.  I'll have a discussion with him because he's around

16   today.  He'll be back in the building later this morning, and I

17   will leave a message for him because I need to leave right after

18   this.

19        MS. JAHN:  Yes, Your Honor, thank you.

20        THE COURT:  All right.  So at this point we're still,

21   you know, moving on the track that we've got.  I haven't changed

22   anything.

23        As soon as I get the report, if I've left it that --

24   again, if you don't hear from me once I get it, assume that I've

25   accepted it and we're moving forward.  I'd only bring you back

1    if, for some reason, I didn't accept the plea.  Okay.

2            All right.  Take care.

3            MS. JAHN:  Thank you, Your Honor.

4            THE COURT:  You will put something in writing at some

5    point by the time of the sentencing about the justification for

6    the Rule 11C1(c).  I think it's helpful to have it on the record

7    and written and not just, you know, orally.

8            MS. STEWART:  Very well.

9            THE COURT:  From the government's perspective, that's

10   all you need to do.

11           MS. STEWART:  Very well.  Thank you.

12       **(Proceedings concluded at 9:57 a.m.)**

13

14                        CERTIFICATE

15       I, EDWARD N. HAWKINS, Official Court Reporter, certify

16   that the foregoing pages are a correct transcript from the

17   record of proceedings in the above-entitled matter.

18

19                    _____

20                    Edward N. Hawkins, RMR

21

22

23

24

25

**Exhibit D**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CR No. 06-329 |
| | : | December 21, 2006 |
| Plaintiff, | : | |
| | : | 9:10 a.m. |
| v. | : | |
| | : | Washington, DC |
| RANDALL G. CASSEDAY, | : | |
| | : | |
| Defendant. | : | |

..........................:

DAY TWO of TWO
TRANSCRIPT OF GUILTY PLEA
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:        PATRICIA STEWART, AUSA
                         U.S. ATTORNEY'S OFFICE
                         555 Fourth Street
                         Washington, DC  20001

For the Defendant:       DANIELLE JAHN, AFPD
                         FEDERAL PUBLIC DEFENDER
                         625 Indiana Avenue, NW
                         Washington, DC  20004




Court Reporter:          EDWARD HAWKINS, RMR
                         Official Court Reporter
                         Room 6806, U.S. Courthouse
                         Washington, D.C. 20001
                         (202) 682-2555


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription

1                       P R O C E E D I N G S

2            THE COURT:  Good morning, everyone.

3        Good morning, Mr. Casseday.

4            THE DEFENDANT:  Good morning.

5            THE DEPUTY CLERK:  Criminal Case 06-329.  The United

6    States of America versus Randall Casseday.  Patricia Stewart for

7    the government.  Dani Jahn for the defendant.  The defendant is

8    present in the courtroom.

9            THE COURT:  All right.  We're here to discuss an

10   amendment to the plea, which was -- I went through the full

11   Rule 11 inquiry on November 20th of this year, and it was a

12   Rule 11C1(c), which it still is.  It was a preindictment plea.

13       The government had agreed to dismiss Count 1, which

14   attempted enticing a minor which is a federal offense, and

15   Mr. Casseday entered a plea to Count 2, which was also a federal

16   offense, of possession of material constituting or containing

17   child pornography, and Count 3 which was a DC offense, which is

18   enticing a child or a minor.

19       The original agreement was on the federal offense of

20   possession of child pornography, the sentence would be

21   30 months; on the DC offense of enticement of a minor, it would

22   be 60 months; it would be consecutive, for a total of 90 months.

23       When the Probation Office began to prepare the

24   presentence report, particularly around the DC offense, it came

25   to the attention of the parties and the court that a 60-month

1    sentence would not be appropriate on the DC offense, since the

2    statutory maximum was five years and you need to do something

3    less than the full sentence under the statute relating to DC

4    offenses.

5         So we had a discussion about the possibility of leaving

6    the total sentence as the 90 months, which had been agreed to by

7    all the parties, including Mr. Casseday, but to basically flip

8    the sentencing sentence that would be agreed to by both

9    Mr. Casseday, the parties and the court.

10        So that the possession of child pornography would now

11   be the 60 months, which is within the statutory maximum of

12   10 years, would involve a variance of the sentencing guidelines,

13   since the sentencing guideline range that was discussed on the

14   record as part of the original plea was that the guidelines

15   would be -- let me be exact here -- would be offense level 19,

16   Category 1, of 30 to 37 months.  So agreeing to 60 months would

17   be a variance of it.

18        The 30 months for the DC offense would not be a

19   problem, since it's less than the full statutory maximum, and

20   would be I believe within the range of what it appears to be the

21   category that eventually will be associated with the DC offense,

22   which would be Category 8, which is -- actually, that one also

23   will involve a variance because it's 6 to 24 months.

24        So in both cases there would be a variance to come up

25   with the 60 on the federal, 30 on the DC one, which would reach

1    a total of 90 since they are consecutive.

2            My understanding -- and we needed to put this on the

3    record -- as to the advantage to Mr. Casseday and why the

4    government was making this particular order -- this plea, to

5    indicate, since for both the federal offense and the DC offense,

6    the sentence that Mr. Casseday would be agreeing to as well as

7    the court would be a variance from the sentencing guidelines,

8    keeping in mind that they are advisory and, therefore, the court

9    is not obliged to accept them.  They are below the statutory

10   maximum.  The court cannot go above the statutory maximum.

11           But I think in our last plea colloquy we really didn't

12   get into the advantages of the plea, as I understand it, to

13   Mr. Casseday and the motivation for the government to make this

14   offer.  So I think we should put that on the record first before

15   I go through this.

16           And I believe I've stated it correctly in terms of it

17   would be a variance both for the federal in terms of the

18   advisory sentencing guidelines, as well as for the district in

19   terms of it being -- and also in the advisory sentencing

20   guidelines.

21           MS. STEWART:  That's correct, Your Honor.  That's our

22   understanding.

23           Your Honor, in this case the defendant was initially

24   charged by complaint with the offense of enticement of a minor

25   in violation of 18 United States Code 2422(b). That statute, up

1    until July, carried a maximum penalty of 30 years and a

2    mandatory minimum of five years.

3        On July 27th Congress changed, in the Adam Walsh Child

4    Safety and Protection Act, increased the mandatory minimum

5    sentence for that offense to 10 years and the maximum sentence

6    to life imprisonment.  There's been no equivalent adjustment of

7    the guidelines.

8        And in looking at it, the result to Mr. Casseday was

9    that if he went to trial and were convicted of the federal

10    offense of enticement, he would be looking at an approximate

11    guideline range to 63 to 78 months -- that's our rough

12    adjustment -- and if he pled guilty he would be looking at an

13    approximate guideline sentence of 45 to 57 months.

14        In both cases the court would be compelled to impose a

15    sentence more severe because of the new mandatory minimum

16    sentence.

17        The government's position was that this was a serious

18    offense, that the conduct required a substantial period of

19    incarceration; at the same time, there should be some incentive

20    to a defendant who, like Mr. Casseday through his attorney,

21    indicated early in this case that he was willing to accept

22    responsibility.

23        There was nothing the government could do in terms of

24    recommending the low end of the guidelines, moving for a 3-point

25    reduction, that would provide any incentive for him to enter a

1  guilty plea.

2       And it was for that reason, in order to provide some

3  incentive not only to conserve resources but because a defendant

4  who had admits responsibility in our view is more likely to be

5  rehabilitated, that we fashioned this plea which will result in

6  a sentence of approximately seven and a half years.

7       Had Mr. Casseday gone to trial and been convicted he

8  would face not only a mandatory minimum sentence on the federal

9  enticement of 10 years, he would face an approximate guideline

10 sentence of four and a half years on the child pornography

11 count.

12      Had a court run those sentences consecutively he would

13 be looking at between 14 and 15 years imprisonment.  This plea

14 will give him the opportunity to have a sentence of

15 approximately half of that.

16      THE COURT:  All right.  If I could just ask one

17 question.

18      In terms of the federal offense in terms of the

19 guideline range for enticement prior to the change in the

20 statute, what did you say it was?  I missed it.  Approximately.

21      MS. STEWART:  Approximately, for a defendant who went

22 to trial who had no prior criminal history, my rough

23 calculations were, depending on whether a computer was used,

24 wasn't used, and other factors, would be approximately 63 to

25 78 months if the defendant had no criminal history.

1    So there was some incentive to plead to a five-year

2    statutory maximum.  For some defendants with a more extensive

3    criminal history there was even more of an incentive.  But since

4    the guidelines haven't been adjusted, there really is no reason

5    to plead now to that offense.

6    THE COURT:  Ms. Jahn, if I could just ask whether you

7    agree with that and whether there's anything else that we need

8    to put on the record.

9    MS. JAHN:  I agree with the entire first part of the

10   presentation as to why the plea was made as such and why

11   Mr. Casseday is accepting their offer.

12   I would note, though -- and if the court recalls --

13   that Mr. Casseday has been troubled with the severity of the

14   penalties with regard to the statutory max and then also the

15   guidelines.

16   There's been a lot of discussion with Ms. Stewart and

17   myself about different cases and the guidelines.  But I would

18   just note that prior to July and the enforcement of the Adam

19   Walsh Act, it is my understanding that the guidelines would have

20   somewhere been in the range of 46 to 57 months based on a

21   criminal history category of 1.

22   THE COURT:  Are you talking about the federal offense

23   for enticement?

24   MS. JAHN:  Correct, Your Honor.

25   THE COURT:  So you have a different view than she does

1    about it?

2    MS. JAHN:  I do, Your Honor, but I may be factoring in

3    acceptance of responsibility with regard to that.  I don't know

4    if that takes care of that issue.

5    If he had not received acceptance of responsibility the

6    range would have been 63 to 78 months.  However, I don't think

7    that there's any suggestion that Mr. Casseday wouldn't have

8    maintained acceptance of responsibility prior to July, and if

9    that had occurred, then his range would have been 46 to

10    57 months.

11    THE COURT:  Okay.

12    MS. STEWART:  I think we're in agreement.

13    I was trying to point out the discrepancy between the

14    guideline range and the statute.

15    And Ms. Jahn is correct.  Defendants with no criminal

16    history who pled early, accepted responsibility, would be facing

17    a 46- to 57-month range.  Had they gone to trial it would be the

18    higher one.

19    I think we're in agreement on the guideline

20    calculations, Your Honor.

21    THE COURT:  All right.  So at this point, once the

22    statute came in, it obviously made a difference in terms of what

23    Mr. Casseday would be facing.  As I understand it, the change in

24    the statute was the July of 2006.

25    MS. JAHN:  Yes, Your Honor, pursuant to the Adam Walsh

1    Act.

2              THE COURT:  So the offenses, though, occurred

3    afterwards.  Am I correct?

4              MS. JAHN:  That's correct, Your Honor.

5              THE COURT:  All right.  So from his perspective,

6    because the offenses occurred after they changed the statute so

7    that there's now the mandatory minimum of 10 years on the

8    federal enticement charge, so that even though there's a major

9    discrepancy between that, obviously, and what the sentencing

10   guideline range would be, and the court obviously would be

11   required to impose the mandatory sentence and not the sentencing

12   guidelines.  The sentencing guidelines are advisory, but the

13   statute would not be.

14             MS. JAHN:  Correct.

15             THE COURT:  So I wouldn't have any choice except to

16   give him the 10 years, even if he pled; is that correct?

17             MS. JAHN:  Yes.

18             THE COURT:  Is this something that you discussed with

19   Mr. Casseday?

20             MS. JAHN:  Oh, yes, at length, Your Honor.

21             THE COURT:  All right.  Then let me bring Mr. Casseday

22   up.  If we could swear him in again.

23             THE DEPUTY CLERK:  Would you raise your right hand,

24   please, sir?

25

Randall Casseday - Court                        73

1    RANDALL CASSEDAY, Defendant, SWORN

2    BY THE COURT:

3    Q.  Mr. Casseday, remember what I had said to you before.  I'm

4    not going to go through the whole plea, but I do want to just

5    talk about the penalties for the charges that you are pleading

6    to, what the penalty was for the one that's going to be

7    dismissed about it, and the change in, not the total sentence

8    that you agreed to back in November for the Rule 11C1(c), but

9    its allocation.  But if you have any other questions, please

10   bring them up.

11          What I wanted to do this morning, before we got into

12   the colloquy, is to make sure we put on the record the

13   government's reason for making this offer and your reason, in

14   terms of an advantage, since -- in terms of not only because

15   you're accepting responsibility, which obviously is viewed in a

16   different way than somebody who does not accept responsibility,

17   but also in terms of the advantage to you in terms of this plea,

18   if there was any.  So that's the reason for discussing it.

19          Do you understand?

20   A.  Yes, Your Honor.

21   Q.  Okay.  And the reason is that in terms of the advisory

22   sentencing guidelines, both in the federal offense that you pled

23   to as well as the DC offense that you pled to, those sentencing

24   guidelines would be less than what you're actually agreeing to.

25   So, in other words, the court would be making a ruling that a

Randall Casseday - Court                                      74

1    variance was appropriate in this particular case in order to

2    accept it.

3          The whole purpose of this would be to achieve a

4    sentence that the government viewed was fair, you would view as

5    an advantage to you because they were going to be dismissing the

6    federal enticement charge, which is based on the exact same

7    factual predicate for the DC enticement charge, but there's

8    obviously, even with the variance, it still is less than what

9    you would be facing if you were convicted and/or pled to the

10   federal enticement charge.

11         Do you follow me so far?

12   A.   I do, Your Honor.

13   Q.   So from your perspective -- and I'll get through the full

14   colloquy -- but on the federal offense for the possession of

15   child pornography, the advisory sentencing guidelines are 30 to

16   37 months, you would be agreeing to 60 months, which is still

17   within the statutory maximum which is 10 years, so the court is

18   certainly in a position to do that.

19         On the DC offense, my understanding it's probably going

20   to be Category 8 -- they have not made a final decision, but

21   that's what they appear to be doing -- which would be 6 to

22   24 months, and you're agreeing to a 30-month sentence, which is

23   also a variance.  These are also advisory.  It would be

24   consecutive, for a total of 90 months.

25         And the advantage to you is to get dismissed the

1  federal enticement charge, because that one, even though the

2  sentencing guidelines -- whether or not you accepted

3  responsibility -- would be less than -- quite a bit less than

4  the 10 years which you're now facing.

5          The change in the statute was made in the summer, in

6  July.  Your offense conduct occurred in September.  So, as a

7  practical matter, it would apply to you.

8          This isn't something that the penalty changed between

9  the offense and your plea.  It has nothing to do with it.  Your

10 offense was later and, therefore, there would be no question

11 that the statute would apply to you.

12         So as I understand it, the major advantage to you would

13 be that for the two charges that you're pleading to, which would

14 be the 90 months, that you're getting dismissed a case that

15 would be 10 years mandatory minimum, and then if you had -- that

16 doesn't take into account the possession of child pornography or

17 anything else which would be on top of that.

18         So from a total sentence you would have an advantage --

19 you would get an advantage to pleading guilty to these two

20 charges, even with a variance from the advisory sentencing

21 guidelines when you look at what you would face, whether you

22 pled or went to trial on the federal offense of enticement and

23 whatever additional information would be provided.  In addition

24 to the fact that since you were willing to accept responsibility

25 for your conduct, this gives you an opportunity to actually do

Randall Casseday - Court                    76

1    so with some advantage to you as opposed to being left with the

2    10-year mandatory minimum.

3            Does that comport with your understanding of why you're

4    doing this?

5    A.  Yes, Your Honor.

6    Q.  Do you have any questions, anything you want to ask at least

7    at this point before I get into it?

8    A.  Not at the present time, Your Honor.

9    Q.  So you do understand that this will be a variance from the

10   sentencing guidelines, but the idea is to come up with a

11   reasonable and appropriate sentence, taking into account the two

12   charges which have slightly different factual predicates, and

13   then the dismissal of the federal enticement charge when you

14   look at the complete picture.

15           Do you understand?

16   A.  Yes, Your Honor.

17   Q.  Okay.  So what I'm going to do is, there is the

18   December 19th letter, which I understand that you have signed.

19   Let me just go through it.

20           I'm not going to go through the whole plea colloquy.

21   Basically, I will be accepting the responses that you made to

22   the charges that you pled to and I'll go through that again.

23   The background information I believe remains the same.

24           I did have a discussion with you about your waiver of

25   constitutional rights.  Do you still understand those, and are

1  you still waiving them, without my having to go through each one

2  of them; in other words, based on our last discussion?

3  A.  Yes, Your Honor, I understand.

4  Q.  Okay.  And we have the written -- the proffer on facts and

5  the court went through that carefully with you.  And are you

6  adopting that discussion and your admissions?

7  A.  Yes, Your Honor.

8  Q.  And the last part is in terms of whether you're making this

9  decision voluntarily in terms of the change which I'm about to

10  go over?

11  A.  Yes, Your Honor.

12  Q.  In general, I'm going to be adopting everything except for

13  this modification that I'm going to be discussing now.  Do you

14  understand?

15  A.  Yes, Your Honor.

16  Q.  If you have it in front of you.  We're talking about

17  paragraph one -- and I'm just going to ask -- sets out what

18  you're agreeing to, which is the same as before, but let me go

19  through it.

20       You're agreeing to plead guilty to Counts 2 and 3 of

21  the criminal information.  Count 2 is the possession of child

22  pornography, which is a federal offense, and Count 3 is

23  attempted enticement of a minor, which is the DC offense.

24       And you're agreeing that the offense of possession of

25  child pornography -- in terms of the statute -- carries a

1    penalty up to 10 years imprisonment -- in other words, I

2    couldn't sentence you to more than that -- a fine up to $250,000

3    or both, and a term of supervised release of any term up to

·4    life.

5            And I explained to you what supervised release was.  If

6    you're given a period of jail time, you can then be given a

7    period that you're supervised in the community with certain

8    conditions that you need to follow.

9    A.  Yes.

10    Q.  Do you understand and are you agreeing to that?

11    A.  Yes.  Yes, Your Honor.

12    Q.  Then the offense of enticement, which is a DC offense, has a

13    maximum statutory penalty of five years imprisonment, three

14    years of which may be imposed at the time of sentencing.

15            In other words, I could not give you a five-year

16    sentence, I could only give you a three-year sentence, with two

17    years remaining, so if at some point the court revoked the

18    sentence you could be sentenced to the additional two years.

19            Do you understand?

20    A.  Yes, Your Honor.

21    Q.  And the DC offense of enticement carries a penalty of a fine

22    up to $50,000 and a term of supervised release of not less than

23    three but no more than 10 years.

24            Do you understand and agree?

25    A.  Yes, Your Honor.

Randall Casseday - Court                                79

1    Q.   Now, in terms of -- make sure that you understand, that the

2    supervised release imposed for the offense of enticement, if

3    that is ever revoked -- and that's the DC offense -- then you

4    would be subject to the term of two years.   Remember, I

5    explained to you that earlier.

6         In other words, the statutory maximum is five years.

7    If I sentence you, I couldn't sentence you to more than three.

8    And if it was ever revoked, then I could sentence you up to two

9    years, the remaining two years on the offense.

10        Do you understand and agree?

11   A.   Yes, Your Honor.

12   Q.   Now, the length of the term of imprisonment on the

13   revocation of supervised release would be determined by the

14   parole commission, the U.S. parole commission, and would be

15   independent of, and could be imposed in addition to any

16   penalties imposed by the court on revocation of supervised

17   release for the federal offense of possession of child

18   pornography.   Do you understand?

19        In other words, if I revoked it for both -- on both

20   charges, then I could impose whatever I thought were appropriate

21   penalties for revocation of the federal offense.   And the parole

22   commission would be the ones who would be making any

23   determination --

24        THE COURT:   Are they making a determination on both of

25   them or just the DC one?

1          MS. JAHN:  Just the DC code, Your Honor.

2          THE COURT:  Okay.

3    BY THE COURT:

4    Q.  So, in other words, on the DC -- let me backtrack.

5          If you were on -- did your jail time, put out in this

6    community on supervised release with certain conditions, if you

7    didn't meet them, either with new offenses or you didn't follow

8    through with the conditions that were set, and the court revoked

9    it, then on the DC offense, it's the parole commission, U.S.

10   parole commission, that would decide what sentence you should

11   get.  There would be two years that they would have that they

12   could impose because that would be up to the statutory maximum.

13         Do you understand so far?

14   A.  Yes, Your Honor.

15   Q.  On the federal offense, the court would make the decision.

16   If I revoked it -- again, either because you were involved in

17   new conduct, criminal conduct, and/or didn't follow through with

18   the conditions of supervised release, then I could impose

19   penalties that were appropriate for the possession of child

20   pornography which would -- you should keep in mind that you

21   would not get credit for the time that you had already served on

22   that federal offense.

23         Do you understand?

24   A.  Yes, Your Honor.

25   Q.  If you don't, just speak up.

1    A.   That's the first I heard that.  Would you explain that

2    further?

3    Q.   Sure.  In the penalties for -- on supervised release for

4    federal offenses, if you -- if there's a revocation -- and it

5    depends and why it's revoked.

6         If it's revoked for new offenses, then there's certain

7    penalties that are allocated.  If it's revoked for -- because

8    you technically violated because you haven't met the conditions,

9    and there are different range of penalties that are available.

10   And these penalties -- the penalties are set out in terms of

11   what the court could impose depending on what the violation was.

12   And I'd have to find first that there was a violation.

13        But they are not reduced by the time you've already

14   served.  In other words, they don't -- if there's a range of 18

15   to 24 months, just hypothetically, it's not reduced by the

16   amount of time you've already spent.  In other words, these are

17   new penalties.  That's what I meant.

18   A.   Okay.  I understand.

19   Q.   And it's the court that makes that decision, it would not be

20   the U.S. parole commission which would make the decision about

21   any penalties after revocation on the DC offense.  On the

22   federal one the court makes the decision.

23   A.   That, I understand.  Yes.

24   Q.   And, as I said, the penalties are set out depending on what

25   the basis for the revocation, and they generally are a range.

1    And I just want to make sure that you understand they are not

2    going to get reduced by the time you've already served.

3    A.   I understand.

4              MS. JAHN:   Your Honor, may I just add something --

5              THE COURT:   Sure.

6              MS. JAHN:   -- to maybe clarify because we've had

7    discussions about this very issue.

8              THE COURT:   Okay.

9              MS. JAHN:   Is that both this court and the parole

10   commission have separate interests if, in fact, he violates any

11   term of supervised release.   And it's very likely that the

12   conditions of supervised release will be very similar, if not

13   identical.

14             So, if in fact there is an alleged violation, it is

15   very likely that he would appear before this court and also the

16   parole commission.

17             THE COURT:   I think that's correct.   There would be no

18   reason, frankly, for me to set -- since I'll be doing the

19   sentence -- for me to set different conditions of supervised

20   release in one charge versus the other.   They would be the same.

21   BY THE COURT:

22   Q.   So if you committed a criminal, a new criminal offense,

23   whatever it would be, the likelihood is it would be a revocation

24   of the DC parole commission and a revocation before me on the

25   federal offense.

1          If there are certain conditions I would set, there

2    would be no reason for me, and I think it would be simply

3    confusing, frankly, to set a series of different ones.  They

4    would be the same.  You're the same person in the community.

5    The charges relate to the same kind of conduct.  I would set the

6    same conditions in all likelihood.  And, therefore, if you

7    didn't follow through with one of the conditions, it's likely it

8    would be for both terms of supervised release and, therefore,

9    the revocation would be in front of the parole commission on the

10   DC offense and in front of me on the federal offense.

11         Do you understand?

12   A.  Yeah, I understand.  So that means I could end up being

13   revoked twice and serving --

14   Q.  Two sets of sentences.  Yes.

15   A.  I understand.

16   Q.  And then in terms of the addendum here, we're still talking

17   about the special assessment of a hundred dollars that goes to

18   the district court on the federal offense, and the hundred

19   dollars -- a hundred to $5,000, the range, which goes to the

20   Victims of Crime Fund for the DC offense, and we haven't gotten

21   there yet in terms of what I would assess.

22         The court cannot waive those.  You have to pay them at

23   some point, either during your period of incarceration and/or

24   while you're in the community.  But you should just be aware

25   that those assessments still apply.

1          Under the sentencing guidelines, again, which are

2    advisory, the court can, although I'm not obliged to even under

3    the guidelines, that I could impose a fine that's sufficient to

4    pay the federal government the costs of imprisonment, term of

5    supervised release or period of probation.  You should just be

6    aware of that.

7          Now, the important part, probably, is paragraph 3 of

8    this new addendum because this is a major change.  The agreed

9    sentence is that on the possession of child pornography, which

10   is the federal offense, you would be agreeing, and the court

11   would be agreeing, to a sentence of 60 months -- which, as I've

12   indicated, would be a variance of the advisory sentencing

13   guidelines, but is within the statutory maximum sentence so the

14   court can impose this -- and a sentence of 30 months or two and

15   a half years on the enticement charge which is the federal one.

16   Again, this is a variance from the DC advisory voluntary

17   sentencing guideline range.  And the 60 months and 30 months

18   would be served consecutively, one sentence after the other, so

19   that it would result in an aggregate or total sentence of

20   90 months.

21          Do you understand?

22   A.  I do, Your Honor.

23   Q.  And we've discussed earlier the advantage to you in terms of

24   what you would be facing, although it's in a variance from the

25   advisory sentencing guidelines in both federal and DC, and the

1   variance is higher than the guidelines, the advantage to you

2   still is to get rid of the -- and have dismissed the charge that

3   you would be facing with the mandatory minimum.

4        Do you understand?

5   A.  Yes, Your Honor.

6   Q.  Okay.  And then the agreement is the term of at least

7   10 years supervised release on the possession of child

8   pornography and a term of three years supervised release on the

9   enticement charge to be served concurrently.  So the concurrent,

10  they run at the same time.

11       All right.  And the agreement, with respect to the

12  sentence, is limited to the length of terms of imprisonment and

13  the supervised release.  So, on the federal one it's at least

14  10 years; under the statute, it can go up to life.  And on the

15  DC one, you've agreed to a specific 3-year sentence of

16  supervised release; is that correct?

17  A.  That's correct, Your Honor.

18  Q.  And this is the only amendment to the agreement as you

19  understand it.  Is that correct?

20  A.  That's correct, Your Honor.

21  Q.  Anything else that you think is part of this, or do you have

22  any questions?

23  A.  No.  No questions at this time.

24  Q.  All right.  And are you agreeing to this amendment to the

25  plea of November 20th?  Are you entering this amendment

Randall Casseday - Court                    86

1   voluntarily of your own free will?

2   A.   Yes, Your Honor.

3   Q.   And are you adopting the full discussion we had back on

4   November 20th in terms of the answers that you gave to the

5   court's questions?

6   A.   Yes, Your Honor.

7            THE COURT:   I don't think there's anything else.

8            Is there?

9            MS. JAHN:   I don't believe so, Your Honor.

10           THE COURT:   All right.   Then I would like to see the --

11  I'm inclined to agree to this, but I would like to see the

12  presentence report ultimately in terms of making a final

13  decision.   We have set out --

14           You can go ahead and sit down, Mr. Casseday.

15           We have set out a presentence report in February,

16  memorandum-in-aid of sentencing, the defendant's response and a

17  sentencing date in February.

18           The one thing that I wanted to bring up, since the

19  supervised release is somewhat of an open question in the sense

20  of how, on the federal one, of how long it's going to be.   My

21  understanding is that there can be psychosexual evaluations, and

22  that might be useful to, frankly, do that.   That would be of

23  assistance, both to everyone in terms of making some decisions,

24  particularly on the supervised release.

25           I mean, the sentence, if the court agrees to it, is

1     set.   But on the federal offense it will be at least 10 years,

2     and the question is how much beyond that, it might be of use,

3     frankly, to get one.

4          MS. JAHN:   I understand the court's inquiry, but I'm

5     just wondering what authority the court is relying upon for that

6     sort of...

7          THE COURT:   I think you can do it.   As I understood it,

8     in the context of asking... in terms of as part of the sentence.

9     It would be in the context of deciding on the sentence, and it

10    would be -- I'm raising it with you, because I was frankly going

11    to ask the Probation office unless you wished to do something

12    yourself.

13         I think the Probation Office just as they can request a

14    mental health examination or whatever to assist them in coming

15    up with the presentence report, the question I would have is to

16    whether this would assist, frankly, in the presentence report in

17    terms of the court making a decision.

18         In this case it wouldn't be about the sentence because

19    I would have agreed to it, but it would be around the issue of

20    what would be an appropriate supervised release issue.

21         I'm raising it with you because I know with some

22    judges, frankly defense counsel had gone and done their own, had

23    their own evaluation.   I don't know whether the government has

24    done it.   And in other instances Probation has actually done it.

25         I was frankly going to ask Probation to indicate to me

1    whether they thought it was appropriate, since they would had

2    some contact with Mr. Casseday, and mine has been more limited,

3    and they would certainly know more about it.  They would have to

4    obviously propose it, and I would have to agree to it, and I

5    would give you an opportunity to respond.  But I'm giving you an

6    opportunity if you want to ask for it in terms of doing it

7    yourself.

8         MS. JAHN:  I do not want to ask for it at this time,

9    Your Honor.  I will note -- and I know Mr. Penders is not

10   here -- but we've already had the presentence interview by

11   Mr. Penders with Mr. Casseday, and during that interview there

12   was no indication or discussion about any mental health or

13   mental illness-related issues, even relating to his family.

14        So I would just be asking that if Probation is going to

15   be requesting that, that they put forth a basis as to why so I

16   can confer with Mr. Casseday and then we may either oppose or

17   agree to it at that time.

18        But as it stands right now we would object to that

19   without hearing a basis for it and what authority the court

20   and/or Probation is relying upon.

21        THE COURT:  I think I would ask, frankly -- I don't

22   know.  It's something new in the sense -- I mean, these

23   evaluations have been around a long time.

24        I think that in these cases where we're starting to get

25   them and where there's so many issues and the penalties,

1    frankly, are fairly long -- put it that way -- and that the

2    court would have an option on the supervised release to go up to

3    life, which is unusual for most of these cases.

4         And there also is certainly -- Congress has added a

5    whole series of different conditions.  For instance, in terms of

6    if you don't register, evidently that's a basis for revocation.

7    There's a whole series of different things that have now been

8    placed into it.  So I'm not sure in terms of moving towards it.

9         It would be in the context of a valuation to determine

10   the risk of recidivism, dangerousness, any necessary treatment.

11   It would be in that context.  So it's not what I would consider

12   the necessary -- a mental health evaluation in the typical

13   sense.

14        I gave it as an example that Probation, in instances

15   where they want to make decisions about treatment, or they want

16   to indicate recommendations about supervised release, can ask

17   for, for instance, mental health evaluations even though there's

18   no issue of competency.  It would fall in the category of an

19   evaluation to determine the risk of recidivism, dangerousness,

20   and what kind of treatment would be appropriate, since there's

21   evidently a variety of them.  So I would raise it in that.

22        I'm letting you know so this is not a surprise.  I was

23   frankly going to talk to Mr. Penders about it to see whether he

24   thought it was appropriate.  He's had more contact with

25   Mr. Casseday than I have.  So I would raise it as an issue.

1    If it would be of assistance, it seems to me it's

2    useful, since I'm obviously going have to be making a decision

3    about the length of the supervised release.

4    I don't know whether Probation has an issue.  Can you

5    come up for a minute?  Or has something that you can provide us

6    with some additional information.

7    MS. EPSON:  Typically, Your Honor, the Probation

8    Department does not have evaluations prior to the sentence being

9    imposed because we just don't have jurisdiction.

10    If the court imposes a term of supervised release and

11    the probation officer, supervising the defendant or the

12    probationer, wants to assess if that person needs some treatment

13    it would be done at that time, and the order of judgment can be

14    amended to include some sort of evaluation.  However, the court

15    prior to sentencing needs to do an order for any kind of

16    treatment recommendation or psychoanalysis.

17    THE COURT:  No, I would do an order.  I'm raising the

18    issue so that there's not a big surprise here.  I haven't made a

19    decision.  I'm going to raise the issue with Mr. Penders.

20    As I understand it, Probation in other cases has

21    decided it's appropriate.  So, if they make a recommendation, I

22    would want to see what the recommendation is, I would enter an

23    order to do it.  Counsel for the defense and the government

24    would have an opportunity to weigh in.

25    I'm just raising it as an issue to give others an

1    opportunity to indicate, one, their position, and two, whether

2    they -- in some instances, people have gone and done it on their

3    own, and then either provided the information to the court or

4    not.

5         MS. EPSON:  From experience on these cases with the

6    10-year to life mandatory, or advisory supervised release range,

7    10 years to life, typically the judges in this district are

8    imposing the 10 years because that is pretty much in line with

9    how long the defendant has to register as a sex offender.

10        MS. STEWART:  Your Honor, if I might briefly address

11   the court.

12        THE COURT:  Okay.

13        MS. STEWART:  I would have to take issue with the

14   probation officer's statement about the length of supervised

15   release that's typically been imposed on the federal side.  And,

16   frankly, we've only had three cases to be sentenced on these

17   exploitation offenses, these online offenses.  And I know Judge

18   Walton has imposed a 30-year term of supervised release, other

19   judges have imposed less.  So I don't think we have a typical

20   pattern here at all.

21        The government's position is simply that if the court

22   believes it's useful to have an evaluation under 18 U.S. Code

23   3552 a presentence study and report, either by the Bureau of

24   Prisons or by psychiatric or psychological examiners, the court

25   clearly can order it if it would assist the court.

1          Under these circumstances where the defendant is

2     incarcerated, I think it would be impractical for it to be done

3     in the community, and it would be done by the Bureau of Prisons.

4          At this time we're not taking a position. However, we

5     would -- just to alert the court and counsel, should counsel be

6     inclined to submit, as many defense counsel have been in these

7     cases, an evaluation by a social worker or psychologist or

8     something, a report at the time of sentencing, the government is

9     going to ask in advance that not be considered unless the

10    government has an opportunity to have the defendant examined by

11    the Bureau of Prisons.

12         In other words, if there's going to be a defense study

13    done we would like the opportunity to have a study done also.

14         I don't know what the bed space is at Butner at this

15    time.  I do know that Butner is the facility that is usually

16    used, because to my knowledge it's the only Bureau of Prisons'

17    facility that is conducting psychological evaluations in cases

18    of sex offenses.

19         THE COURT:  Okay.  As I said, I haven't come to any

20    conclusions one way or the other about it.  I, frankly, was

21    going to discuss it with Mr. Penders since he's the one who has

22    put it together as a contact with Mr. Casseday.  And I view it

23    strictly as an issue of assistance in terms of coming up with a

24    sentence.  If he doesn't think it's necessary, then I probably

25    would certainly not be inclined to override what his view is.

1    But I did want to discuss it with him, and I didn't want to have

2    this discussion and not let you know it.  But if I did it I'm

3    not going to do it without filing -- you know, he has to file

4    something.  You'll get to look at it and I'll make a decision

5    about it with input.

6        MS. JAHN:  Your Honor, I would just ask that we have a

7    short turnaround with regard to this.

8        If, in fact, it's determined Probation does want him

9    evaluated, there may be additional evaluations by either

10   government counsel or Mr. Casseday to contest or -- there could

11   be multiple issues that arise.

12       And the sentencing is set for February.  I think

13   everyone, including Mr. Casseday, wants to proceed as quickly as

14   possible to get out of this jurisdiction, at least closer to his

15   family in New York.

16       And I would just note that the case where Judge Walton

17   imposed a 30-year term of supervised release is currently on

18   appeal.  So this is an ongoing issue.  And in fact, Judge Leon

19   is imposing sentence in another case today, which I intend on

20   watching to determine what in fact that court does.  So we can

21   at least advise the court what other judges are doing in terms

22   of supervised release, if the court is inclined to hear about

23   that.

24       THE COURT:  Okay.  I'm going to do it quickly.

25   Mr. Penders had another appointment which we knew when I set

94

1   this, except that I wanted to do a quick turnaround about this

2   so that we could proceed in terms of the amendment.  I will try

3   and speak to him, either today or tomorrow, and just see where

4   he is on this.  As I said, since he's had more contact with

5   Mr. Casseday, if he doesn't think it's really necessary, then I

6   probably would be inclined not to do it.

7          Let me put it this way.  I have assignments on another

8   court, so I'm not in the building most of the day.  You will

9   hear from me or my secretary if we're going to do something,

10  just so you get a heads-up.  If you don't hear anything from me

11  today or tomorrow, then assume it's not going to get done.

12  We're not doing it.

13         That way, in terms of trying to keep track of who I

14  tell people about things.  So you will get a heads-up before we

15  proceed.  I'll have a discussion with him because he's around

16  today.  He'll be back in the building later this morning, and I

17  will leave a message for him because I need to leave right after

18  this.

19         MS. JAHN:  Yes, Your Honor, thank you.

20         THE COURT:  All right.  So at this point we're still,

21  you know, moving on the track that we've got.  I haven't changed

22  anything.

23         As soon as I get the report, if I've left it that --

24  again, if you don't hear from me once I get it, assume that I've

25  accepted it and we're moving forward.  I'd only bring you back

1    if, for some reason, I didn't accept the plea.  Okay.

2             All right.  Take care.

3             MS. JAHN:  Thank you, Your Honor.

4             THE COURT:  You will put something in writing at some

5    point by the time of the sentencing about the justification for

6    the Rule 11C1(c).  I think it's helpful to have it on the record

7    and written and not just, you know, orally.

8             MS. STEWART:  Very well.

9             THE COURT:  From the government's perspective, that's

10   all you need to do.

11            MS. STEWART:  Very well.  Thank you.

12            **(Proceedings concluded at 9:57 a.m.)**

13

14                         CERTIFICATE

15            I, EDWARD N. HAWKINS, Official Court Reporter, certify

16   that the foregoing pages are a correct transcript from the

17   record of proceedings in the above-entitled matter.

18

19            _____

20                         Edward N. Hawkins, RMR

21

22

23

24

25

**Exhibit E**

U.S. Department of Justice



Jeffrey A. Taylor
United States Attorney

*District of Columbia*

---

Judiciary Center
555 Fourth St., N.W.
Washington, D.C. 20530

**FILED**

DEC 2 1 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

December 19, 2006

Danielle Jahn, Esquire
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Washington, D.C. 2004

*United States v. Randall Casseday*
*Criminal Case No. 06-329(CKK)*

Dear Ms. Jahn:

This letter confirms the agreement between your client, Randall Casseday, and the Office of the United States Attorney for the District of Columbia ("the Government", "this Office") with respect to modifications to the October 31, 2006 plea agreement between your client and the Government that was executed by the parties and submitted to the Court for its consideration on November 20, 2006. In accordance with paragraph 16 of that agreement, the agreed upon alterations to the agreement set forth herein are made in a writing signed by the parties. There are no other changes, alterations, additions or modifications to the October 31, 2006 agreement executed by the parties other than those set forth in this addendum to that agreement.

1. Your client, Randall Casseday agrees to admit guilt and enter a plea of guilty to Counts Two and Three of a criminal Information, a copy of which is attached, in violation of 18 U.S.C. §2252(a)(4)(B) (Possession of Child Pornography) and of Section 216(d) of the District of Columbia Omnibus Public Safety Congressional Review Emergency Act of 2006, Act 16-445, amending 22 D.C. Code § 3010 (Attempted Enticement of a Minor (herein after "Enticement"). Your client understands that pursuant to 18 U.S.C. §§2252(1)(4)(B), 3571(b) and 3583(k), the offense of Possession of Child Pornography carries a penalty of up to ten years imprisonment, a fine of up to $250,000, and a term of supervised release of any term of years up to life. The offense of Enticement is punishable pursuant to 22 D.C. Code §3010 by up to five years imprisonment, up to three years of which may be imposed at the time of sentencing. In addition, the offense carries a penalty of a fine up to $50,000 and a term of supervised release of no less than three and no more than ten years. 22 D.C. Code § 3010, 24 D.C. Code §403.01(b)(2)(B), (4)(A), 22 D.C. Code §§4001(8)(B), 4002(a). Your client further understands that should the supervised release imposed for the offense of Enticement be revoked, he would be subject to a term of imprisonment of up to two years. 24 D.C. Code §403.01(b)(7))C). Moreover, the length of any such term of imprisonment upon revocation

of supervised release would be determined by the United States Parole Commission and would be independent of, and could be imposed in addition to, any penalties imposed by the Court upon revocation of supervised release for the federal offense of Possession of Child Pornography. In addition, your client agrees to pay a special assessment of $100 to the Clerk of the United States District Court for the District of Columbia and a payment of no less than $100 and no more than $5,000 as determined by the Court to the Superior Court Victims of Violent Crime Compensation Fund at the time of sentencing. Pursuant to U.S.C. Section 3571 and Section 5E1.2 of the Sentencing Guidelines, the Court may also impose a fine that is sufficient to pay the federal government the costs of any imprisonment, term of supervised release and period of probation.

3. Your client and the Government agree that a sentence of 60 months on the Possession of Child Pornography Charge, and a sentence of two and a half years (30 months) on the Enticement charge, to be served consecutively, resulting in an aggregate sentence of 90 months, and a term of at least ten years supervised release on the Possession of Child Pornography Charge, and a term of three years supervised release on the Enticement charge to be served concurrently, is the appropriate sentence for the offenses to which your client is pleading guilty. The parties agreement with respect to the appropriate sentence in this case is limited to the length of terms of imprisonment and supervised release to be imposed.

This letter sets forth the entire agreement between the parties with respect to modifications to the October 31, 2006 plea agreement between the your client and the Government. There are no other agreements, promises, understandings or undertakings between your client and this Office with respect to that agreement.

Sincerely yours,

JEFFREY A. TAYLOR
United States Attorney

PATRICIA STEWART
Assistant United States Attorney

## DEFENDANT'S ACCEPTANCE

I have read this agreement and have discussed it with my attorney, Danielle Jahn, Esquire. I fully understand this agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this agreement fully.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to agree to the modifications to the plea agreement previously entered into between the United States Attorney's Office for the District of Columbia and myself except those set forth in this agreement. I am satisfied with the legal services provided by my attorney in connection with this agreement to modifications to of the plea agreement into which I previously entered.

Date: 12/21/06

RANDALL CASSEDAY
Defendant


## ATTORNEY'S ACKNOWLEDGMENT

I have read each of the pages setting forth modifications to the plea agreement previously entered into between my client, Randall Cassedy and the Office of the United States Attorney for the District of Columbia, reviewed them with my client, and discussed the modifications to the agreement with my client, fully. These pages accurately and completely set forth the entire agreement between the parties with respect to modifications to the plea agreement previously entered into by the parties.

Date: 12/21/06

DANIELLE JAHN, Esquire
Attorney for the Defendant

**Exhibit F**

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA   :   CR No. 06-329
                           :   February 15, 2007
          Plaintiff,   :
                           :   9:13 a.m.
v.                       :
                           :   Washington, DC
RANDALL CASSEDAY,        :
                           :
          Defendant.   :
. . . . . . . . . . . . . . . . . . . . . . . . . . :

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:      PATRICIA Z. STEWART, AUSA
                       OFFICE OF U.S. ATTORNEY
                       555 4th Street, NW
                       Washington, DC  20001
                       (202) 514-7064

For the Defendant:      DANIELLE C. JAHN, AFPD
                       FEDERAL PUBLIC DEFENDER
                       625 Indiana Avenue, NW
                       Suite 550
                       Washington, DC  20004
                       (202) 208-7500

Court Reporter:         EDWARD HAWKINS, RMR
                       Official Court Reporter
                       Room 6806, U.S. Courthouse
                       Washington, D.C. 20001
                       (202) 354-3245

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription

1                          *P R O C E E D I N G S*

2              THE COURT:  Good morning, everyone.

3              MS. STEWART:  Good morning, Your Honor.

4              MS. JAHN:  Good morning, Your Honor.

5         (Defendant entered the courtroom.)

6              THE COURT:  Good morning, Mr. Casseday.

7              THE DEFENDANT:  Good morning, Your Honor.

8              THE DEPUTY CLERK:  Criminal Case 06-329.  The United

9    States of America versus Randall G. Casseday.

10             Ms. Stewart for the government.  Ms. Jahn for the

11   defendant.  The defendant is present in the courtroom.

12             THE COURT:  All right.  We are here for a sentencing of

13   Mr. Casseday.

14             This was a Rule 11C(1)(c) plea in which the parties had

15   agreed to, in essence, an upward departure to the advisory

16   sentencing guidelines, but within the statutory maximum of

17   60 months on Count 2, which is the federal offense, and

18   30 months on Count 3 consecutive, which would have been a total

19   of 90 months.

20             Mr. Casseday pled to Count 2, which is possession of

21   material containing or constituting child pornography, which is

22   a statutory maximum of 10 years in jail and/or a fine of

23   $250,000, and Count 3 is a DC offense.  It's enticing a child,

24   which has a maximum statutory five years and/or $50,000 fine.

25             The agreement also under Rule 11C(1)(c) was at least

3

1    10 years supervised release on Count 2 and three years on the DC

2    count.

3         I have a presentence report.  I think they had revised

4    it again on February 12th.  There were a few minor mistakes that

5    had been made that I pointed out, but the key part I think

6    remains the same.

7         Page 19 with the objections, there was a mistake on the

8    cite and the paragraph number was changed to match up with what

9    we actually have here.  So there's nothing that's changed that's

10   of any substance.

11        I have a victim impact statement, the government's

12   sentencing memorandum, and the defendant's sentencing

13   memorandum, which also has an exhibit with 16 letters supporting

14   Mr. Casseday.

15        Is it Cassa-DAY or Cassa-DE?

16        THE DEFENDANT:  Cassa-DAY.

17        THE COURT:  Cassa-DAY.  In terms of objections, the

18   government's objections were all resolved.

19        In terms of the defendant, paragraph 72, which

20   addresses Count 1, which is one he did not plead to, whether it

21   correctly reflects that a 10-year mandatory minimum sentence to

22   life is a statutory sentence.

23        I would agree with the probation officer that under

24   5G1.1(b), that if the mandatory minimum is higher than the

25   guideline range, then the court imposes the mandatory minimum

4

1    sentence.  I don't think it makes any difference because it's

2    not what he actually pled to.

3         In terms of the advisory sentencing guideline range,

4    the offense level calculation.  The base offense is 18.  Because

5    the images contained at least two children under the age of 12,

6    there's an additional 2 points.  The images were on a computer,

7    another 2 points.  And there were at least 10 images which adds

8    an additional 2 points, which makes it 24, minus 3 for

9    acceptance of responsibility, is a total offense level 21.

10        In terms of criminal history, both the federal and the

11   District, operating a car under the influence of either drugs or

12   alcohol:  Under the federal, it's 1 point; under the District,

13   it's a quarter point, which places him in criminal history

14   Category 1 under the federal and category A under the District.

15        In terms of the federal advisory sentencing guideline

16   range -- is he one or two?  Let me just look at this.

17        PROBATION:  Criminal history Category 1, Your Honor.

18        THE COURT:  Okay.

19        I don't know why he put two.  Hold on.

20        So it's 37 to 46 months for custody.  Probation not

21   eligible.  Supervised release would be three years up to life.

22   I think that that's actually wrong.  I thought it's 10 years

23   under the new statute.

24        Am I correct?

25        MS. STEWART:  No, Your Honor.  I believe the statute

1    provides that for any offense in Chapter 109 involving a child,

2    it's up to life.

3              THE COURT:  Up to life.  Okay.

4              So, although the advisory sentencing guidelines talk

5    about three years, the statute would trump it, so it would be up

6    to life.

7              The fine would be 7,500 to 75,000.  Restitution is not

8    applicable.  It's $100 on Count 2 and it would be $100 on

9    Count 3 as either the special assessment or a payment into the

10   Victims of Crime Fund for the DC offense.

11             Let me make sure the changes were made.  Yes.

12             Paragraph 43 -- this was the other change that was

13   made.  Originally, it had Mr. Casseday as being married in 1992,

14   and they've corrected it in the new presentence report.  It's

15   1982, which is the correct one.  The only other one, as I said,

16   and the objections.

17             So those two things have been corrected in addition to

18   the advisory sentencing, because it had 21 and two instead of

19   the 21 and one.

20             In terms of the Rule 11C(1)(c) sentence agreement, I'll

21   find that there are justifiable reasons, and the government has

22   set them out, which the court would adopt, such that it would be

23   an upward departure under the federal one but still within the

24   statutory maximum of 60 months for Count 2, and 30 months on

25   Count 3 which is the DC offense, and then the agreement of at

1    least 10 years supervised release on Count 2 and three years --

2    and these were concurrent, if I'm not mistaken -- and three

3    years on Count 3.

4        So, if there's nothing else, I will go ahead and adopt

5    the presentence report as written, indicate that I've accepted

6    the Rule 11C1(c). And if there isn't anything else, then I'll

7    hear from the government, defense counsel, and the defendant.

8        MS. STEWART: Your Honor, the court is correct that the

9    agreement entered into by the parties and submitted to the court

10   called for a term of supervised release. However, it was a

11   minimum term of supervised release.

12       The parties were free to allocute for an additional

13   length of term and with respect to what conditions of supervised

14   release be imposed. I'm not going to dwell on them. We've set

15   them forth in our sentencing memorandum.

16       The government is asking for a 20-year term of

17   supervised release. We feel it's justified because, even on the

18   pornography count, the maximum is life, we're not asking for

19   that, but the danger that is presented, even by looking at these

20   pictures I think is set forth very eloquently in the victim

21   impact statement. And apart from that, the mere possession of

22   child pornography drives the production of the pornography.

23       Mr. Casseday has demonstrated he has at this time in

24   his life a sexual interest in young girls. How long it will

25   last, none of us know, but we do feel it presents a significant

7

1    enough danger, that the term of supervised release with the

2    conditions we've requested -- which are not onerous.  We're not

3    asking no computer use, no contact with minors.  They don't even

4    include all of the conditions that the Probation Office set

5    forth in the presentence report that are available to the court.

6    We would submit they are actually quite moderate.

7            For the reasons that are in the report, unless the

8    court has any questions, we would urge the court to impose a

9    long enough term of supervised release that would allow

10   supervision of his use of computers.  That would do as much as

11   possible to prevent him from accessing child pornography on

12   line.

13           THE COURT:  One thing.  I had spoken to Mr. Penders

14   about proposing in the sentencing format what the government had

15   set out and then I wanted to hear from defense counsel as to

16   what your views were, not only about the time, but also about

17   the conditions, since they seem to be slightly different than

18   what had been set out.  I just got it this morning, so I don't

19   know what they reflect.  Do you?  Because I haven't had a chance

20   to take a look to see whether he's incorporated what is usually

21   done from Probation or he's put what I had asked, which is to

22   put what the government had.

23           PROBATION OFFICER:  I have not yet gotten to actually

24   review that.  I can do that.  The parties do not receive that

25   section of the report.

1      THE COURT:  No, I understand.  But in terms of my

2  proceeding with it, that's what I had asked, is that it

3  include -- it doesn't look like -- looking at it, frankly -- no,

4  it does, actually.  Never mind.  Okay.  I think it actually

5  does.

6      Well, when we go through this, but let me hear from

7  defense counsel, both in the context of the length of time,

8  which I believe the government is asking for 20 years.  Is that

9  correct?

10      MS. STEWART:  That's correct, Your Honor.

11      THE COURT:  And they had roughly 10 conditions, as to

12  what your position is on that, and whatever else you want to

13  bring to my attention.  It seems to me that's the only issue

14  that's sort of out there, since we have a Rule 11C(1)(c)

15  sentence.

16      MS. JAHN:  Yes, Your Honor.

17      With regard to the term of supervised release, as

18  stated in my memorandum, we are asking that the court impose a

19  term of 10 years.

20      As the court is aware, Mr. Casseday is currently

21  53 years old.  At the time he will be released from

22  incarceration he will be approximately 60 years old.

23      Consistent with the plea agreement he would be

24  supervised for a period of 10 years, taking him to the age of

25  70, and here the government is asking for a continued monitoring

1    of Mr. Casseday from the ages of 70 to 80.

2         It should be noted that Mr. Casseday is required to

3    register as a sex offender for 25 years, and there's no dispute

4    among the parties with regard to that.

5         There may be a possibility of some disputes with regard

6    to the special conditions of supervised release.  At this time,

7    as articulated in numbers 1 through 10 pursuant to the

8    government's memorandum on ages 6 and 7, we have no objection to

9    any of those specific conditions at this time.  However, in the

10   presentence report there are voluminous conditions --

11        THE COURT:  In terms of treatment?

12        MS. JAHN:  Correct, Your Honor.  And we would

13   absolutely be objecting to specific parts of that.

14        THE COURT:  Then tell me what they are because we might

15   as well hear them now.

16        My understanding was that the one thing that they do

17   include is, in terms of the treatment, I assume you're talking

18   about the sex offender treatment.  Is that the only one you have

19   an issue with?

20        MS. JAHN:  Related to that Your Honor, yes.

21        THE COURT:  Okay.

22        MS. JAHN:  I don't per se have an objection to sex

23   offender treatment.  However, there are different components

24   within that treatment, such as the Abel screen polygraphs, and I

25   mispronounce it all the time, but it is called a plethysmograph.

1    THE COURT:  P-l-e-t-h-y-s-m-o-g-r-a-p-h.

2    MS. JAHN:  Correct, Your Honor.

3    There are also some -- I know at one point there was

4    something about -- yes, in paragraph N, number 83 in the

5    presentence report -- talking about that the client cannot

6    utilize adult telephone numbers.

7    Anything related to adults, we would be objecting to

8    because the conditions of supervised release need to be

9    reasonably related to the offense and the characteristics of

10   Mr. Casseday.  This offense does not involve adults, this

11   involves children, those under the age of 18.

12   We would have no objection to any imposition -- I'll

13   come back to it -- of any imposition with regard to contact with

14   minors, with the exception of children.

15   There is identified in here that he shall be restricted

16   from any contact with children, and I would note that

17   Mr. Casseday currently has three children of his own ranging in

18   age that, at the time that he is released from custody, may in

19   fact have their own children.  And, as I read this, Mr. Casseday

20   would be precluded from having any contact with grandchildren --

21   THE COURT:  I think what it is --

22   MS. JAHN:  -- and we would object to that.

23   THE COURT:  Generally speaking, I think that -- not

24   reside, limited to -- you not reside with child or children

25   under the age of 18 without the express written approval of

1    whoever the guardian is.  So that would the parent.  If the

2    parents have no problem, then there's no issue.

3         All of these things require -- you know, it would be

4    under the age of 18, and it would be -- in terms of his own

5    family, if they don't have a problem, there's no issue.

6         MS. JAHN:  I understand.

7         THE COURT:  In terms of the sex offender treatment,

8    which I did look and I did find out what some of these things

9    are in terms of bringing it up, these are options that they can

10   have.  And my understanding is that -- that's why we should

11   discuss it now.  I would not preclude it.

12        It seems to me if they decide that this is something

13   that is necessary, then there can be some debate about it since

14   it would be...

15        But I think that it's not done -- as I understand it,

16   it's not done routinely.  If they decide that there seems to be

17   some concern about his being truthful in terms of what he's

18   doing, that this is one thing that can be -- that is done.  And

19   my understanding is that it's fairly standard.

20        MS. JAHN:  Your Honor, in fact, it's not standard.

21        Only two judges from this court have imposed those

22   conditions, and that is Judge Friedman and Judge Walton.  Judge

23   Walton's imposition of those conditions are being appealed right

24   now.  Judge Friedman's case, it has been undetermined whether or

25   not the defendant in that case is going to be appealing.

1         THE COURT:  Let me ask you a question, though.  Not

2    that you can't appeal it.

3         The question is, is that in terms of whether the

4    programs themselves, sex offender programs, whether or not they

5    have this as an option.  It's not something that they would

6    routinely do.  But this is sort of like, you know, drug

7    treatment.  We always put in detox, residential, if it's

8    appropriate.  It would only be done if it's clinically

9    appropriate.  And I would be happy to put that in.

10         I don't think it's something that should be done -- I

11    mean, the Probation Office has to approve it, but it has to be

12    something they've decided clinically, as part of his sex

13    offender treatment program, that it's appropriate so you have a

14    professional making this decision.

15         And I think under those circumstances, unless you want

16    to tell me that these sex offender programs don't include that

17    or that there's some other issue with it, that I certainly would

18    be happy to hear.  And if you want to have -- you know, we can

19    get experts in.

20         I asked you at the beginning of this case as to whether

21    people wanted experts around the issue of the treatment because

22    there is -- in terms of what they would need.

23         I have no sense of whether Mr. Casseday, you know, when

24    he gets released, is going to be a problem or not.  We don't

25    have a lot of history for him, other than a personal history.

13

1       But certainly in terms of what he -- you know, the two

2   issues in terms of the images and certainly the enticing of what

3   turned out to be a police officer but could have been a

4   13-year-old.

5       So since I don't have enough information about it, if

6   you want to debate this, I have no problem and I'll hold off on

7   the treatment portion of it, and we'll get experts in to tell me

8   if it's an appropriate part of a sex offender treatment program.

9   I, frankly, am not certain.

10      I would also put in that it must be a clinical decision

11  that this is appropriate for them to determine as to what, if

12  there are issues about -- sort of like drug testing, if you

13  think somebody -- you're in a drug program and you think

14  somebody is taking drugs, they begin to initiate drug testing.

15      I view these as a way of -- not something that's done

16  routinely or considered as an approved part of sex offender

17  treatment program, then I would agree with you, I would not put

18  it in without their coming back to the court.

19      If it is part, generally, of the approved sex offender

20  treatment that they have, and this is one of the, you know,

21  tools that they have to be able to treat people and keep track

22  of whether there's a problem, then I have a different view.

23      So, let's forget the appeal.  You can always appeal

24  something.  Let me just ask.  Do you know whether this is

25  something that is used as part of sex offender treatment

1    programs, if appropriate?

2         MS. JAHN:  It can be, Your Honor.  And if I could just

3    respond to the first part of the court's inquiry.

4         The reason why I did not discuss this fully in my

5    memorandum is because I agreed with all of the conditions that

6    the government was asking this court to impose as conditions of

7    supervised release.

8         When the presentence report came out I conferred with

9    Mr. Penders as to why all of this information was in the report.

10   Was he telling the court to impose all of these things?  Why was

11   it in there?

12        And he said, The only reason it's in there is because

13   the court may impose these conditions.  And so I waited until

14   the government filed --

15        THE COURT:  And I'm not faulting you for it.

16        I mean, in terms of -- I mean, I told him that -- it

17   seems to me that if you're going to order treatment and it has

18   some aspects to it that's very specific, that the order should

19   have it in there.  It shouldn't be, We just do sex offender

20   treatment.  It has a paragraph earlier about what it would be

21   and you don't get to contest it.

22        So I told him, if this is what the Probation Office

23   considers sex offender treatment, then it should be in the order

24   so we can discuss it.

25        It's not fair to everybody to have it sitting in

1    paragraph 83, and if Probation assumes, that when I approve a

2    sex offender treatment program, that this is going to be

3    implicit in it, that that not be laid out.  And I think that it

4    should be set out.

5         So I'm not faulting you.  I'm just saying to you that

6    in terms of needing an expert about it, if there's a dispute

7    about using it and it's not something that's done, then I'd be

8    happy to hear from some professionals as to whether it should be

9    something that's considered as part of an approved program or

10   not.

11        If it's not considered part of an approved program,

12   then I won't put it in and I'd leave it for them to come back to

13   the court to ask to do it.  If it is, then I might be more

14   inclined, frankly, to do it, but I don't know the answer to it.

15        So that's why I asked you, Probation -- Mr. Penders is

16   not here, and I asked actually for the person that they have in

17   Probation, who may not have been available unless you're the

18   person, who deals with the sex offender treatment programs.

19        Are you?

20        PROBATION:  No, Judge.  That would be Kurt Panzer or --

21   I can't remember.

22        THE COURT:  I asked Mr. Penders to go back and talk to

23   them about what Probation views as part of their sexual offender

24   treatment program and to tell me whether -- and he's put it in

25   the order, so my assumption -- and what he said to me is that

1   this is what -- you know, is something that can be done.  It is

2   part of an approved, you know, protocol.  It's only used -- for

3   that particular examination -- is only used if there's some

4   suspicion that the defendant is not being truthful about, you

5   know, what they are doing.

6          And a lot of this has to do -- it's not easy to pick up

7   on these things if there has been a violation at a later point.

8   So that was the explanation that they got.  So that's why I told

9   them *put it in so we can talk about it*, because if they are

10  thinking of doing it, then we should litigate it if there's an

11  objection to it.

12         So if there's an objection to it -- and I guess the

13  question is, what is the objection? -- then maybe I can go

14  forward but hold off on the specifics of the offender program,

15  and I'll hear from the government as well, and get some expert

16  to come in and tell us whether this is something that should be

17  included or not.

18         MS. JAHN:  Your Honor, just two things.

19         One is Mr. Casseday needs to be aware of every specific

20  condition that would be imposed and he should object to it at

21  the time or it's waived.

22         THE COURT:  I don't view it that way.  My feeling is

23  that -- I'm not considering it waived.

24         I told him to put it in the order, because if it's

25  sitting in the paragraph and it's not in the order and we're

1    just ordering sex offender treatment, and this is part of the

2    sex offender treatment, that you all should have notice.  So,

3    you can object to it.  I want to know what the objection is,

4    though.

5         MS. JAHN:  The objection is that the conditions are

6    unconstitutional, they are invasive, they violate his Fifth

7    Amendment.  I'm actually very prepared to talk specifically

8    about the Abel assessment and the argument --

9         THE COURT:  Then I'll tell you what.  You file

10   something on this because I'm not going to do this orally.  And

11   I'll hear from the government in terms of doing this.

12        Because from my perspective, this is a very serious

13   offense, and I'm going to be responsible if he goes out and does

14   something and I have not put in all that's required for this

15   treatment program.  So, I'm not going to order something that is

16   not appropriate.

17        On the other hand, I'm not going to leave it out if

18   it's an approved protocol for sex offender treatment.  If it's

19   an approved protocol, I'm happy to listen to the legal arguments

20   and the rest, but I'd like to start with the first part and

21   that's frankly, clinically, is this an approved protocol?

22   Because if it's not and it's something that should be brought up

23   only in a particular instance, then I'll handle it that way.

24        If it's an approved protocol, then we'll start

25   clinically from it and we can move to the legal arguments.  But

1    I think the first question is, is this an approved protocol?

2    Unless we can agree it is.

3        MS. JAHN:  Yes, Your Honor, I believe the Bureau of

4    Prisons believes that it is an approved protocol.  And, pursuant

5    to the Adam Walsh Act, people are being involuntarily committed

6    in light of some of these assessments that are made.

7        And there's ongoing litigation now.  It's becoming a

8    very hot topic among the federal defender's offices across the

9    country, that now we need to be objecting and raising these

10   issues beforehand rather than waiting until a client is on

11   supervised release, to then raise them, and there seems to be a

12   battle of the experts.

13       And I know that neither the government nor myself

14   wanted to endeavor down that road, but if that's what the court

15   is asking for --

16       THE COURT:  Let me put it this way.  I'll hear from

17   what the government has.  What I don't want to do is to do a sex

18   offender program that is useless.  Okay?

19       So, I don't know enough about the sex offender

20   programs.  The last time I had something to do with these is a

21   long time ago.  So, from my perspective, I would want to see

22   what's here.

23       I don't want to impose something on him that's not

24   appropriate.  On the other hand -- or that's not used

25   appropriately.  On the other hand, I'm not going to gut a

1    program if that's what they should have.

2        So, I'll hear for a moment in terms of what the --

3    government, you've had more dealings with Mr. Casseday than I

4    have, what's your view?

5        MS. STEWART:  Your Honor, I think if the court is going

6    to, as the court will, impose a term of supervised release

7    however long after this incarceration, I don't know that any of

8    us can sit here today and say what the sex offender program will

9    be 10 years from now, 15 years from now, or 18 years from now.

10        THE COURT:  Do you want to then not put what's in

11    there?

12        MS. STEWART:  No.

13        What we would ask is that the defendant participate --

14    I think what we used in our memorandum was in mental health

15    programs targeted at sex offender treatment, and I would ask the

16    court to put *as appropriate or as recommended by the Probation*

17    *Department.*

18        I think it would be, frankly, a waste of time to sit

19    here and litigate what in 2007 is considered the appropriate

20    treatment when that may not be what's at issue for Mr. Casseday

21    10 or 15 years from now.

22        THE COURT:  So your view is that we would make it more

23    generalized, and if they proposed something for him that he

24    objects to, that it's litigated at that point?

25        MS. STEWART:  I think that's right.  I think that is

1   the one way we can be sure.

2         We don't know where Mr. Casseday is going to be

3   15 years from now and we don't know what the treatment protocols

4   would be.  The one thing we do know is that they do change with

5   time.

6         THE COURT:  And that's definitely true.

7         Certainly, you know, what I'm familiar with is a long

8   time ago, and the programs have changed quite a bit since that

9   period.

10        I don't have a problem of changing it that way in terms

11  of making it a more generalized sex offender treatment program,

12  with the understanding that Mr. Casseday, if they are proposing

13  something that he objects to, that he can come into the court

14  and litigate it at that point.  If the government feels that's

15  the better way to do it, then I'm willing to go along with it.

16        My concern, frankly, was putting something in there

17  that doesn't put everybody on notice on what they are thinking

18  of doing.  So it seemed to me that you were better off putting

19  in there.

20        But it is correct that it's going to be a number of

21  years before he faces that, and at that point they may be doing

22  something different.  Your litigation may have completed it one

23  way or another, and we may have a better idea at that point.

24        I don't know how long the individuals would have

25  been -- how long are the others locked up, the ones that

1    Friedman and Walton had?

2        MS. JAHN:  If I could have one moment, Your Honor.

3    (Pause)

4        Judge Friedman's case was *United States v Larry Pool.*

5    Docket Number 06-282.  He was sentenced to 66 months with five

6    years of supervised release.  He pled guilty to enticement,

7    which was a 5-year mandatory minimum at the time, and possession

8    of child pornography.  Very similar to this case.

9        THE COURT:  Okay.

10       MS. JAHN:  In the case -- there are two cases by Judge

11   Walton.  One is *United States vs Mark Russell.*  Case Number

12   06-176.  Pled guilty to interstate transportation with intent to

13   engage in sex with a minor.  Sentenced to 52 months with

14   30 years of supervised release.  The supervised release is being

15   appealed.

16       The additional Walton case is *U.S. vs Roger Arntt.*

17   A-r-n-t-t.  Docket Number 06-160.  Pled guilty -- I'm sorry --

18   jury finding of guilt to enticement.  Sentenced to 97 months

19   with lifetime supervised release.  And the entire sentence is

20   being appealed.

21       THE COURT:  Okay.

22       MS. JAHN:  I can give the other cases of the other

23   judges if you are interested as to what they --

24       THE COURT:  No, that's okay.  I was trying to get a

25   sentence in terms of whether the bottom sentence was different

1    in terms of how long before they actually got out, which it is

2    true that this is an area that I think there has been some

3    attention, and the treatment for sex offenders has varied over

4    the years and they've come up with new things.

5         I will, then, on this one leave it as *participate in*

6    *mental health program related to sexual offender therapy as*

7    *approved by the Probation Office.*

8         And then with the understanding, Mr. Casseday, that if

9    you object to a particular part of the program as approved by

10   the Probation Office and clinically mandated, because my feeling

11   is that this should be something that professionals make the

12   decision initially, Probation agrees with it, and then if you

13   object to something, it can be litigated specifically, and we'll

14   see where you are at that point.

15        Is there anything else besides the years?

16        MS. JAHN:  Your Honor, placement at Otisville, which is

17   in Otisville, New York, is one of the closest facilities to

18   where his family resides.  And I think it's evidenced by all of

19   the letters in support of Mr. Casseday, that the family is very

20   dependent upon him, and his presence at least closer to home

21   would alleviate some of their concerns, and we would ask that he

22   be placed there.  I have some specific information as to the

23   psychiatric unit there that would be appropriate for him.

24        THE COURT:  I must admit I have not heard of it.  How

25   do you spell it?  Is it two Ts or one?

1        MS. JAHN:  One.  O-t-i-s-v-i-l-l-e.  It's about

2    70 miles northwest of New York City.  There is both --

3        THE COURT:  The question I have is whether they have an

4    appropriate -- hopefully, there would be some mental health

5    discussions with him while he's serving this period of time so

6    that at the point that he gets out some work would have been

7    done in terms of his understanding why he engaged in this

8    conduct.

9        MS. JAHN:  Your Honor, if I could, according to the

10   Bureau of Prisons, that institution is staffed by two to three

11   full-time psychologists, and there is an additional psychologist

12   available at any time to assist with mental health issues.  And

13   I'm reading directly from language that gives the background as

14   to what this facility entails.

15       There's also a UNICOR program there.  There also is

16   additional vocational and apprenticeships there that

17   Mr. Casseday may endeavor to participate in.

18       THE COURT:  What's the government -- I thought that

19   there were programs that were specifically geared towards --

20       MS. STEWART:  Your Honor, the government --

21       THE COURT:  -- sex offenders.

22       MS. STEWART:  -- has no objection to the court

23   recommending placement close to Mr. Casseday's family.  We

24   certainly would agree with the recommendation that he be placed

25   close to his family for their sake as well as his.

1         With respect to the treatment program, the information

2    I have now, it's generally been done at Butner and one other

3    facility in Massachusetts, and I cannot -- Danvers I want to

4    say.

5         With the passage of the Adam Walsh Act, there actually

6    has been funding for the Bureau of Prisons to increase sex

7    offender treatment within the Bureau of Prisons' system, and

8    they are going to be instituting programs in various facilities

9    around the country.  When that's going to happen and when the

10   money is going to start flowing for that, I don't know.

11        But there are more prisoners that are being sentenced

12   for these offenses than they have programs for.  So the goal is

13   to increase them, and I simply don't know what facilities they

14   are going to be located at.

15        THE COURT:  All right.  Well, I will go ahead and make

16   this recommendation.  I assume that they will take a look at

17   what is an appropriate program, but I think --

18        MS. JAHN:  Your Honor, if I may.

19        THE COURT:  Hopefully, they'll be geared towards -- I

20   mean, the issue is for him to understand, you know, why he did

21   this and how to work on not having it repeated.

22        MS. JAHN:  Your Honor, if I may.

23        There is an issue ongoing right now with these

24   programs.  Currently, the main sex offender treatment occurs at

25   Butner, North Carolina, and, unfortunately, that program will

1    not allow new participants until they are almost at the end of

2    their sentence.    They have to be at 18 months or less of their

3    pending sentence before they can participate in any sex offender

4    treatment.

5        So a part of the problem, I think the government would

6    concur, is that no one is getting treatment for five, six, 10

7    plus years until the very end.  And I think the Bureau of

8    Prisons is endeavoring to fix that and create more programs.

9    And Mr. Casseday may be eligible to participate in something

10   sooner over the next few years.

11       THE COURT:  Well, I'll be happy to make the

12   recommendation.  I don't have a problem with that.  They usually

13   make an effort to send them there, but it won't hurt to do an

14   additional recommendation.

15       Let me just add something here.

16       Mr. Casseday, you have a right to address the court as

17   well if you wish.  You don't have to, but if you wish to, I'd be

18   happy to hear from you.

19       Why don't you come up so we can get a record of what

20   you're saying, in terms of doing it, into the microphone.

21       THE DEFENDANT:  Your Honor, I'll be brief.

22       I just want to say that throughout this entire

23   nightmare I've -- I have not ducked my responsibility from this

24   and I have taken full responsibility from the very beginning.

25       And I would like to say that I've been continuing to

1 take responsibility.  So even after this is all finished, you

2 know, I'm not looking to be untruthful to anybody about anything

3 regarding my behavior or anything like that.  And I think you'll

4 find that that will be consistent with what I've been doing so

5 far.

6   I'm very sorry for all that's happened.  It's caused a

7 lot of difficulty for myself as well as my family.  You can tell

8 in the letters that they've been totally distressed.  But I

9 would say that I'd probably be the one more distressed than

10 anybody.

11   And I would like to get through this as soon as

12 possible and try to resume whatever is left of a normal life

13 that I would have.

14   And in regards to again the request to be placed near

15 my family, you can see why.  Even though my children are of

16 college age, they still depend on me for guidance.  Now, you

17 know, the main source of income is lost.  So I need to be able

18 to offer some kind of guidance to my wife and my children.

19   And I have a lot of close friends in the Hudson Valley.

20 It's where I'm from.  So in that regards I hope you would

21 understand that I'm a family man.  This is an aberration from

22 that and it's not going to happen again.

23   What I've been doing for the last almost five months

24 has been returning to my religious roots, which I had before

25 this all happened, and a renewing of my faith in order to

1    resolve these sort of things in my mind and make sure I don't do

2    this again.  And this will be continuing.

3            I've been religious for most of my life, so I can't

4    side step that issue.  So I would like to be able to continue in

5    a religious lifestyle which I think would be very helpful in the

6    prevention of anything that could happen in the future.

7            So, that's all I'd like to say at this time.  I'm very

8    sorry for all this.

9            THE COURT:  All right.  You can go ahead and sit down.

10           All right.  The court considers the following factors,

11   among others, in determining what is an appropriate and

12   reasonable sentence pursuant to 18 USC 3553(a), which the

13   court -- the government set out reasons for the Rule 11C(1)(c)

14   in terms of the new statutes and the different choices that

15   would be made in order to bring about a plea and a resolution of

16   a case for someone who was willing to plead guilty at an early

17   stage.

18           So I think in terms of the choices that were made about

19   the counts and the reasons that the government is proceeding

20   with it, and obviously the defendant has an advantage in doing

21   this as well, but the court in also looking through the

22   information that was provided to me in the presentence report, I

23   feel that it's a reasonable and appropriate sentence.

24           Mr. Casseday is 53 years old.  He has only one

25   conviction:  Operating a vehicle under the influence, it appears

1   of alcohol, at the age of 48, and he spent three days in jail.

2         In terms of an education, he's a high school graduate.

3   It looks like in terms of the college graduation, although I

4   looked at the -- that he got his degree over a period of time in

5   media studies.  He has a paralegal certificate, other marketable

6   skills, including in the Human Resources' field, and evidently

7   has an interest in cars.

8         In terms of job history.  His most recent employment

9   was with Washington Times as the HR director from October of '04

10  to September of '06 in the District of Columbia.

11        And then from 1998 to October of '04 he was employed

12  at -- and this is the acronym -- SEEICO Enterprises in New York;

13  evidently a parent company of Kahn Arms, a gun manufacturer.  It

14  was founded by Reverend Moon's son.  Mr. Casseday provided legal

15  services and public relations.  He was ultimately, in October,

16  replaced by an attorney at which time he came to work for the

17  Washington Times.

18        From '95 to '98 he worked for a car dealership in Ohio.

19        From '74 to '95 he was employed in various capacities

20  with the Unification Church.

21        In other words, of finances, although he has a

22  residence and some assets, he has outstanding loan payments, and

23  I'm going to find he has no financial ability to pay a fine,

24  particularly in light of the sentence that's been agreed to.

25        In terms of health, there appear to be no issues at

1    present.  In terms of mental health, there doesn't appear to be

2    any past history.

3            Substance abuse.  In the 1970s experimented with

4    marijuana.  Does not report an alcohol problem, although I would

5    just note that the one conviction seems to have involved alcohol

6    use.

7            On a personal basis, he was born into an intact union.

8    Parents are retired school teachers.  Has four siblings, all

9    involved in education in some way.

10           In January of 1974 he left college and became involved

11   with the Unification Church, although his involvement was more

12   limited at the point of the offense.

13           In 1982, he got married, was arranged through the

14   church.  His wife came to the United States in 1980 from South

15   Korea.  She resides in New York.  She's a Registered Nurse at a

16   psychiatric hospital.  They have three children, ages 19, 20,

17   and 23.

18           From 1977 to '95 the defendant and then later he and

19   his wife and presumably his children resided in New York at a

20   property maintained by the Unification Church, and then they

21   moved to Ohio and then back to New York where his wife and

22   children have remained.  Although they are in college, so I'm

23   not sure that they are in college in New York.  And then more

24   recently the defendant has been in the District while his wife

25   has remained in New York.

1          In terms of the offense conduct in very similar form.

2   On September 26th of '06 the defendant was using a laptop

3   computer in the District of Columbia, entered an Internet chat

4   room, began a chat with -- he didn't know, but it was a police

5   officer representing herself as a 13-year-old girl called

6   *Amanda*, so I'll use Amanda as the name here.  Amanda represented

7   herself as living in the District of Columbia with her mother.

8          The defendant sent a photo of his face to Amanda,

9   13-year-old Amanda, and some personal facts; that he was

10  53 years old, he was staying in Bowie, Maryland, that his family

11  lived in another state.

12         Amanda sent a photo of herself, indicated that she had

13  been sexually abused by her father, although no sexual

14  intercourse had occurred.

15         The defendant sent photos of his mail genitalia

16  suggesting that they have intercourse.  Amanda agreed to meet

17  him, gave an address.  The defendant went there and was

18  arrested.

19         All the photos the defendant sent to Amanda and the

20  photos that she sent him, as well as photos of teens urinating

21  on each other, which he evidently indicated to Amanda that he

22  liked, ten images of child pornography, two images of children

23  previously identified by the National Center for Missing and

24  Exploited Children under the age 12.  The government states that

25  one was either 6 or 7 years old when abused and photographed.

1    There are a list of about a hundred people on his buddy list.

2             The victim impact statement was from the mother of the

3    child of either a six or 7-year-old who was one of the images

4    that had been found on his computer.

5             In terms of the sentence.  Mr. Casseday did enter an

6    early plea.  He has been consistently remorseful and has not

7    minimized his culpability, to his credit.  Although Amanda

8    turned out to be a police officer, certainly Mr. Casseday didn't

9    know that, which means that you were taking advantage of what

10   you thought was a 13-year-old who already had described herself

11   as having been sexually abused, which would certainly make her a

12   more vulnerable victim, enticing her to meet you clearly with

13   the intent to have intercourse with her and perhaps engage in

14   other sexual activities of prurient interest to you and can only

15   be described as a sexual predator.

16            As the victim impact statement describes, sexually-

17   abused children are damaged emotionally.  They may never learn

18   to trust or have normal relationships for the rest of their

19   life.  It depends on the children, but certainly they are

20   damaged.  Some recover more easily than others.

21            Having child pornography on a computer is not a

22   victimless crime.  You may not have taken the photographs, but

23   as long as there's a market for this, as long as people are

24   willing to have these photographs and look at them and share

25   them, individuals will continue to exploit and photograph

1    children in this way.  If people stopped doing it, there would

2    be no reason to have this done.

3          The sharing of the child pornography with

4    others perpetuates the abuse and the exploitation of the

5    children.

6          Something that the mother of the child, who is

7    evidently one of the images, brought up that I hadn't really

8    focused on myself.  I'm certainly aware of it as being not a

9    victimless crime because these are real children, but the idea

10   that as this is constantly viewed by other people, it's not just

11   once, but more than that, that it continues to perpetuate the

12   abuse and the exploitation of the particular child.

13          And children should be protected by society in general,

14   and adults are supposed to be the protectors, not the abusers.

15   We're supposed to be the ones who nurture them and treat them as

16   if they have value in their life and they are valuable to our

17   society.

18          If you exploit them, then the lesson they learn is that

19   they don't have value, and that is something that's very

20   damaging to children -- to anybody, but certainly to children

21   because it's hard for them to overcome it.  And children tend to

22   trust adults until they find out they can't.  And in terms of

23   all this, it's basically to gratify sexual desires of an adult.

24          As I said, the victim impact statement I thought was

25   particularly powerful in terms of describing really the effect

1    on the child, the family, and is something to be considered in

2    terms of doing this.

3         In terms of your own family, which you're obviously

4    very concerned about, both your wife and your children and the

5    financial impact as well as just the impact in general on them.

6    There are obviously going to be hardships and consequences of

7    your act.

8         Unfortunately, in all criminal cases, or most, the

9    defendant's family becomes the victim as well to the extent that

10   their lives are impacted negatively, and they are, both in terms

11   of sometimes the nature of the crime, sometimes the fact that

12   they are not going to have companionship, the support, whether

13   it's financial or emotional, and that is going to be true of

14   your own family, having read the letters.

15        I will certainly recommend that you be nearby.  I think

16   it's both important for them, but frankly for you as well.  I

17   think people do better when they are released if they've had

18   contact with the family, if they have support from family and

19   friends, and you obviously do.  People have not abandoned you,

20   both in terms of your family and your friends who are aware of

21   the charges.  So these are not people who wrote not knowing what

22   you had been charged with.

23        Now, you've agreed to the period of incarceration that

24   has been set out.  I'll recommend placement, as I've indicated,

25   near your wife, your children, your friends to provide you with

1  support.

2        I'll also recommend that you work through UNICOR which

3  is their work program.  It makes you productive, number one, but

4  it also provides you with some income, some of which you can,

5  once you pay your special assessments, you can keep and some you

6  can make available to your family.

7        The other issue is the supervised release in terms of

8  the length of time.  The agreement is at least 10 years.  In

9  terms of looking at it, the government has recommended 20 years,

10  which would place you -- you're 53 -- which would place you well

11  into your seventies and eighties.

12        At this time and age, frankly where people are living

13  older and where I think what in the past would have been viewed

14  as an old age is no longer, I think that -- you know, I can't

15  come to a conclusion that -- since they've decided that even

16  25 years to be registered as a sexual offender is an appropriate

17  time frame -- that it's too long a period.

18        I frankly don't know enough about you to be able to

19  tell whether this is truly an aberration or whether this is

20  something that is going to be a major problem for you in terms

21  of once you're released.

22        You strike me as having the intent to try and not

23  engage in this again.  I don't know how deep seated these

24  problems and issues are.  I don't think this is an area that

25  people understand very well, and I can't claim that I do, so I

1    would rely on the professionals to make this decision.

2         As with all supervised release, if it turns out, and if

3    Probation recommends that people be terminated early because

4    they appear to not require any more supervision, I go ahead and

5    terminate people.

6         If they feel in dealing with them that somebody doesn't

7    need their services any more, doesn't need this in the

8    community, then I have no problem with it.

9         I would be inclined to do the 20 years instead of

10   leaving it at the 10.  If it turns out that ultimately that's

11   too long a period and you don't need it, Probation will come

12   back, and I certainly will consider shortening it.

13        But I think at this point in terms of figuring out --

14   you know, these are serious offenses both in terms of both the

15   pornography and the enticement, and I want to make sure that we

16   figure out what happened, how to prevent it from the future, and

17   how much assistance you'll need, and whether this is something

18   you'll need for the rest of your life, in which case the

19   supervised release is the way to do it.

20        It may turn out that you don't, in which case we can

21   deal with it.  But it may be something where you do need

22   assistance for the rest of your life and the supervised release

23   would be the way to do it.

24        And I obviously have a role and responsibility to

25   ensure, the best I can, that this doesn't happen again and to

1    give you and me the means to bring that about.

2         So I'm going to leave it at the 20 years.  As I said,

3    if it turns out that ultimately that is not required by the time

4    you're released we'll have a much better idea when you get

5    released and you're assessed as to, frankly, what you need at

6    that point.

7         I can always revisit this issue, but at least looking

8    forward, I would want to make sure that you at all times have

9    the necessary services and attention and support.  You can

10   obviously seek it on your own, but I'd much prefer to make sure

11   that it's there and that we insure it in terms of the

12   responsibilities that I have to it.

13        And although it is an imposition, to the extent that it

14   requires you to do certain things, it also is a means of

15   insuring that you will not engage in this conduct again and to

16   provide you with the services to make sure that this doesn't

17   happen.  So I will leave it at the 20 years.

18        So in terms of the sentence -- and I will go through

19   what I think are appropriate based on what the government has

20   come up with and what we've talked about.

21        In terms of the treatment program I will await to see

22   what they propose at the point, and you as well at the point

23   that you're actually released and they are looking wherever you

24   are, where you're residing, which I assume probably will be back

25   up in New York, to figure out what programs are appropriate.

1          If it turns out that they are proposing something that

2     you have an objection to, that can be litigated at that point.

3     You need a program.  Now the components of it by the time you're

4     released may change.  So I won't, as has been requested, both by

5     your counsel and agreed to by the government, I won't specify

6     what is part of it, and leave it to the professionals to come up

7     with something at the time, which would be clinical.  And I will

8     put that in, because I think it's the clinical people who need

9     to decide and propose initially, at least, what is an

10    appropriate program for you, and I think these are tailored to

11    the individual.

12         So, it's the judgment of the court that you, Randall

13    Casseday, are hereby committed to the custody of the Bureau of

14    Prisons for a term of 60 months on Count 2 and 30 months on

15    Count 3 to run consecutive to each other.

16         You are further sentenced to serve 240 months term of

17    supervised release on Count 2 and a concurrent supervised term

18    of 36 months on Count 3.

19         You are ordered to pay a hundred dollars special

20    assessment on Count 2 and a hundred on Count 3.  I cannot waive

21    those, so those have to be paid over time.

22         I will recommend that you be in the Bureau of Prisons'

23    facility in Otisville, New York, for mental health treatment,

24    and I'll recommend that you participate in the UNICOR program.

25         The special assessments are immediately payable to the

1    Clerk of the Court for the U.S. District Court in the District

2    of Columbia.

3         Within 30 days of any change of address, you will

4    notify the Clerk of the Court of the change until such time as

5    the financial obligation is paid in full.  You can either pay it

6    through in addition with the UNICOR program while you're in the

7    Bureau of Prisons or while on supervised release.

8         I'll find that you don't have the ability to pay a fine

9    and, therefore, waive imposition of a fine in this case.

10         Within 72 hours of release from custody, you will

11   report in person to the Probation Office in the district to

12   which you're released.

13         While on supervision you shall not possess a firearm or

14   other dangerous weapon.

15         Now, I understand that you at some point did have

16   licenses because of the job that you had.  I believe I indicated

17   to you as part of the plea that even though you may have had

18   licenses at one point, now that you're considered a convicted

19   felon, that even if somehow you could get a license under some

20   state provision, that under the federal statutes, unless they

21   change them, you will not be able to have a weapon.  And I don't

22   know what's happened with your licenses, but hopefully they've

23   lapsed, and you understand that you cannot exercise them.

24         You shall also not use or possess an illegal controlled

25   substance nor commit another federal, state, or local crime.

1        You shall also abide by the general conditions of

2    supervision adopted by the U.S. Probation Office as well as the

3    following special conditions.

4        Pursuant to the statute, you will submit to the

5    collection of DNA identification information which will either

6    be done in the Bureau of Prisons or at the direction of the

7    Probation Office once you are released.

8        You will submit to periodic unannounced examinations of

9    your computer by the Probation Office and/or authorized

10    probation service representative, which can include retrieval

11    and copying of all data from the computer, any internal or

12    external peripherals, to ensure compliance with the condition

13    and/or removal of such equipment for the purpose of conducting a

14    more thorough inspection.  Obviously, they would give them back.

15        You will allow installation of any hardware or software

16    system to monitor your computer use and pay for the cost of such

17    monitoring equipment if you are financially able.  And,

18    obviously, it will depend on whether you can get employment, et

19    cetera.

20        You will not possess or use any data encryption

21    technique or program and shall refrain from accessing via

22    computer any material that relates to the activity in which you

23    were engaged when committing the instant offenses.

24        You shall maintain a daily log of all addresses

25    accessed by way of any computer other than those authorized for

1    employment, and you will make the log available to the Probation

2    Office for review.

3         You will consent to third-party disclosure to any

4    employer or potential employer concerning any computer-related

5    restrictions that may be imposed upon you.  And that will depend

6    on the type of employment that you have.

7         You will cooperatively participate in a mental health

8    program specifically related to sexual offender therapy as

9    clinically approved and as approved by the Probation Office.

10        You shall not possess or use a computer that has access

11   to any, quote, online computer services, unquote, at any

12   location, including your place of employment, without the prior

13   written approval of the Probation Office.

14        Online computer services include, but is not limited

15   to, any Internet service provider, bulletin board systems, or

16   any other public or private computer network.

17        You shall have no direct or indirect contact with

18   children under the age of 18 or younger -- under the age of 18.

19   And you shall refrain from loitering in any place where children

20   congregate, including, but not limited to, residences, arcades,

21   parks, playgrounds, schools.

22        You shall not reside with a child or children under the

23   age of 18 without the express and written approval of the

24   minor's legal guardian.

25        You shall not engage in employment consulting or

1   associate in any way with children as a profession for the
2   duration of your supervision.
3           You shall not be employed in any capacity or
4   participate in any volunteer activity that involves contact with
5   minors under the age of 18; again, except under circumstances
6   approved in advance and in writing by the court.
7           You shall comply with the sex offender registration
8   requirements for convicted sex offenders in any state or
9   jurisdiction where you reside or are employed, carry on a
10  vocation, or you are a student.  You will registered as a sex
11  offender for 25 years pursuant to the statutory requirements.
12          The Probation Office shall release the presentence
13  investigation report to all appropriate agencies.  In order to
14  execute the sentence of the court, treatment agencies shall
15  return the presentence report to the Probation Office when you
16  complete or are terminated from treatment.
17          Let me just check one thing.
18          You have a right to appeal the sentence imposed by the
19  court.  If you choose to appeal, you must do so within 10 days
20  after the court has entered judgment in this case.
21          If you're unable to afford the costs of an appeal, you
22  may request permission from the court to file an appeal without
23  cost to you.  If you're going to appeal, you should talk to your
24  counsel about it.  They file a notice.  You don't need to do
25  briefs, etc., immediately.  That occurs at a later point.  Okay?

1          MS. JAHN:  Your Honor, can I gain one clarification

2     with regard to, I believe, the condition as enumerated in

3     section I of paragraph 83 where I believe the court instructed

4     Mr. Casseday have no direct contact with anyone under the age of

5     18.  And then it goes on to read, and with regard to my

6     objection to that.  I don't know if there's any exception.  If

7     you could say, *with the approval of the guardian or whomever.*

8          For example, if he has a grandchild and wants to take

9     his grandchild to the movies, the way I read that it's entirely

10    too broad, and that could be a violation.

11         THE COURT:  Okay.  It's the contact restriction.  Let

12    me read it because I don't know whether it's like paragraph 13

13    because I changed it.

14         I have, You shall have no direct or indirect contact

15    with children under the age of 18, and you shall refrain from

16    loitering in any place where children congregate, including, but

17    not limited to, residence, arcades, parks, playgrounds, and

18    schools.  And then we have the residence, without the express

19    written approval.

20         What's the government's position?  Do you have a

21    problem if we put something in, in terms of the contact?  Again

22    putting in *unless with the express or written approval of the*

23    *legal guardian.*  I might put in there, *and the court.*

24         MS. STEWART:  No, Your Honor, we wouldn't object.

25         And I do appreciate the position, that there may be

1    family instances, such as attending a birthday party for a

2    grandchild or something of that nature, which would probably be

3    beneficial and shouldn't be prohibited if we can find a way of

4    simply documenting that it's approved by the family, the child's

5    guardian.

6    THE COURT:  I'll add, then, *without the express and*

7    *written approval of the minor's legal guardian.*

8    So, it's whoever is in charge of the children.

9    MS. JAHN:  So the guardian of the child --

10   THE COURT:  Well, we put *guardian*, but I mean, if the

11   guardian is the parent, it's the parent.

12   Basically in some instances it's a broader term, so if

13   a child has a guardian as opposed to a parent, obviously legal

14   guardians are inclusive of parents, but legal guardian is a

15   little broader, which I think is why they use that language, but

16   it means parents.

17   MS. JAHN:  So as long as there is an approval letter

18   from the Probation Office, from that parent or guardian to take

19   child X to wherever, it would not be a violation; is that

20   correct?

21   THE COURT:  That's correct.

22   MS. JAHN:  Thank you.

23   THE COURT:  Let me just put this in.

24   I'll just add that language in so I have it done.  All

25   right, I think that's it, then.  Is there anything else?

1          MS. STEWART:  Just two housekeeping matters, Your

2     Honor.

3          I did indicate to the court and counsel that I would

4     make available, if the court wishes, an unredacted copy of the

5     victim impact statement.

6          THE COURT:  Yes.  I think that may be helpful.

7          MS. STEWART:  I would ask only that it --

8          THE COURT:  I will keep it in chambers' file and not

9     any other place.

10          MS. STEWART:  Thank you.

11          And also pursuant to the plea agreement, Your Honor, we

12     would move to dismiss Count 1 of the information.

13          THE COURT:  Okay.  In terms of the impact statement,

14     was that, the redacted one, was that made available to

15     Mr. Casseday?

16          MS. STEWART:  Yes, Your Honor, I faxed it to his

17     counsel.

18          THE COURT:  I don't know whether you've looked at it,

19     Mr. Casseday, but you should because --

20          THE DEFENDANT:  I have.

21          THE COURT:  -- because I think it makes it as clear as

22     possible.  You obviously have children of your own and there may

23     be other children in your family.  I think this gives you some

24     sense of why it's as serious as it is.

25          Parties are excused.

1          Good luck, Mr. Casseday.  Hopefully, I'm not going to

2   see you back here.

3          **(Proceedings concluded at 10:19 a.m.)**

4

5

6

7                           CERTIFICATE

8          I, EDWARD N. HAWKINS, Official Court Reporter, certify

9   that the foregoing pages are a correct transcript from the

10  record of proceedings in the above-entitled matter.

11

12          _____

13              Edward N. Hawkins, RMR

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit G**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA     :
         :
    v.                  :       Cr. No. 06-329 (CKK)
         :
RANDALL CASSEDAY,          :
         :
      Defendant.         :

---

### DECLARATION OF DANIELLE C. JAHN, ESQ.

Pursuant to 28 U.S.C. § 1746, Danielle C. Jahn declares as follows:

1.     I graduated from University of Baltimore School of Law in May 2002. I am licensed to appear before the District Court for the District of Columbia and I am a member of the bar of the State of Maryland. I have been employed by the Office of the Federal Public Defender since July 2000, first as a paralegal and then, after I graduated from law school, as a Research and Writing attorney and since 2005, as an Assistant Federal Public Defender.

2.     On October 3, 2006, I was appointed to represent Mr. Randall Casseday. Mr. Casseday entered into a plea agreement to two charges and an agreed-upon sentence of 90 months' imprisonment pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. On February 15, 2007, the Court accepted the plea agreement and imposed the agreed-upon sentence.

3.     When the sentencing hearing was over, I stepped back with Mr. Casseday and spoke with him in the cell block. I recall discussing with him at that time that since the agreed upon sentence was imposed there was no basis for an appeal. I do not recall how this discussion came up. I am sure, however, that Mr. Casseday did not ask me, or suggest to me, at that time that I should file a notice of appeal in this case.

4.    The next communication that I recall with Mr. Casseday was when I received a letter from him dated March 29, 2007. In this letter, Mr. Casseday expressed his unhappiness with many aspects of the case and stated that he was considering filing a Rule 35 motion to correct an illegal sentence or a motion for reconsideration of sentence. He did not direct or suggest in this letter that I should file a notice of appeal for him. A copy of this letter is included as Attachment 1.

5.    I responded to Mr. Casseday's March 29, 2007 letter in a letter dated April 3, 2007. In my letter, I explained that the sentence that he received was legal (including the term of supervised release) and that the plea bargain allowed him to avoid the ten year mandatory minimum sentence that would have been imposed if he had pled guilty to or been found guilty of the federal charge of enticement. A copy of my April 3, 2007 letter to Mr. Casseday is included as Attachment 2.

6.    I next heard from Mr. Casseday in a letter dated June 1, 2007. This was a lengthy letter in which he again expressed his unhappiness with many aspects of his case. Mr. Casseday did not direct or suggest that I file a notice of appeal on his behalf in this letter. I did not respond to this letter, a copy of which is included as Attachment 3.

7.    Mr. Casseday wrote me again on or about April 3, 2008. This is the last letter that I have received from him. In that letter, he requested that I send him a copy of my case file. He did not direct or suggest that I file a notice of appeal for him. A copy of this letter is included as Attachment 4.

8.    I responded to Mr. Casseday's April 3, 2008 letter in a letter dated April 23, 2008. Along with my letter, I sent him a copy of his case file. A copy of my April 23, 2008 letter is included as Attachment 5.

9.    Other than the letters from Mr. Casseday described above, I do not recall receiving any other letters from him after he was sentenced. I also do not recall any other type of communications with him or from him after he was sentenced.

10.    It is my firm belief that Mr. Casseday never asked me to file a notice of appeal in this matter.

I declare under penalty of perjury that the foregoing is true and correct.

September 3rd, 2008

_Danielle C. Jahn_
Danielle C. Jahn

3

**<u>Attachment 1</u>**

March 29, 2007

Dani Jahn, Esq.
625 Indiana Ave NW
Suite 550
Washington D C 20004

Dear Ms. Jahn,

This letter is to inform you that I would like to explore filing of a Rule 35a (or 35b) – correction of illegal sentence – based on the Blockburger test in regards to my sentencing. I am, and have been – upset about the severity of the punishment that I had no choice but to agree to in order to avoid a Draconian 10 year sentence on the enticement charge. I am very unhappy with several aspects of the way my case was handled from all the way back to October at the Bond hearing and am dissatisfied with the characterization that the AUSA Taylor and the Prosecutor Stewart portrayed me. It is too late to bring any challenges, motions, arguments, etc. for the manifest injustice bar has been set very high to overcome the agreement and gamble on a better sentence through a plea withdrawal. I recognize the jeopardy I face in pulling back my plea, although I still feels that there should have been challenges placed in front of AUSA Taylor on my arrest, detention, and the probable cause of the traffic stop. I raised these issues with Carey Feldman and have mentioned

these to you as well. No motions were ever filed to try to suppress evidence nor any challenges based on 4th Amendment placed in court. I waived the probable cause hearing because I did not want those pictures being passed around in court, yet they were anyway at the Bond hearing in front of Magistrate Robinson, which is exactly what I did not want to happen. As a result, I was forced to sit in jail since last September, and was humiliated in court and the media. There were no challenges presented to suppress evidence (even if they would have been unsuccessful) nor was there a cross examination of the detective on the stand at the bond hearing.

I feel as though I have been a punching bag with my hands tied. The two biggest blows to me were the consecutive sentences and the 20 year supervised release which came as a total surprise to me. I was led to believe I would do 10 years based on the agreement with a chance at ending that early, but as usual the government did not play fair with the supervised release, even though the agreement said "at least" 10 years. I believe you were also suckered by both Taylor and Stewart, and I am now a victim of their injustice. To say the least I am angry.

I have been researching the law in the US Criminal Code (as you know I work at the law Library)

and the Sentencing Guidelines and cannot find any statute mandating consecutive sentences for my two charges. I have several cases to defeat DC code 23-112 requiring consecutive sentences, but in reality I believe I am being sentenced under Federal guidelines, not DC code. So, unless the two charges cannot be connected to the same crime, and unless Judge Kollar-Kotelly would be incensed to make me serve more time, which I believe she cannot based on the agreement and based on a new case from California that bars a Judge from increasing a sentence without a jury, I don't see a reason why a motion for a Rule 35a reconsideration for concurrent sentences and a 2255 motion should not be filed. I know that by law I do not need counsel to file. I am prepared to do so if need be unless there is a compelling reason why I shouldn't. I have cooperated fully all along and am frankly tired of being run over and tired of the games being played by DOJ and the Correctional System. I do not want to roll over without a fight. Will I prevail? maybe not, but an argument should be made to make a point, and these decisions are appealable. Don't know if you don't try, right? Additionally, I don't believe I need be there in court for these motions, according to materials I have read. Actually, is not it the duty of defense counsel to use every legal tool available to protect the client? Even if the client is

wrong or disagreeable?

I tried to call you but the phone is blocked again, and I asked for a meeting by voicemail. I know you were here on March 28 visiting other inmates. If you are unable to do this or at least advise, can you send your boss? Or am I now out of your system as far as billable hours to the government because I am sentenced? This I don't know....

I would appreciate your opinion on this as I am prepared to solicit other opinions as well if need be, I don't want to mess up my case or accidentally prejudice myself but a Rule 35 motion does not preclude my Constitutional rights under cruel and unusual punishment. Look up Alston v US, App DC 590 A2d 511 (1991) regarding the 120 day limit to correct a sentence to run concurrently. I have read Blockburger, Byrd, Simpson, Whalen, and a host of other cases to support concurrent sentencing instead of consecutive under certain conditions. Shouldn't the argument be made?

Please advise. I am still in D.C.

Regards

Randall Casseday.

**<u>Attachment 2</u>**

April 3, 2007

Randall Casseday
DCDC# 312072
C.T.F.
1901 E Street, S.E.
Washington, DC 20003

Dear Mr. Casseday:

I received your letter dated March 29, 2007, whereby you indicated your concern about the "illegality" of your sentence. To begin, your sentence was legal. The plea offer in your case was to have the terms of incarceration on each of your charges to run consecutively to one another; that is, to have you serve 60 months on the federal charge of possessing child pornography and then to serve 30 months on the D.C. Code offense of enticement. There is nothing in the law that precludes the government from making this type of offer. This offer was made to you, in part, due to the Adam Walsh Act that became law in July 2006, which established mandatory minimum charges for enticing minors over the internet. If you had been convicted or plea guilty to the federal charge of enticement, a ten year mandatory minimum would apply, notwithstanding any other charges. Your plea offer was pursuant to Fed. R. Crim. Pro. 11(c)(1)(C), which required to the judge to impose the specific sentence agreed upon by both the government and you.

In addition, your plea also stated that you would agree to at least a ten year term of supervised release. However, the statute says that the judge may impose supervised release for life. At your sentencing I argued that a ten year term of supervised release would be sufficient; however, Judge Kollar-Kotelly felt otherwise and imposed a term of twenty years. She had the discretion to impose a lifetime term of supervised release. As you may recall from the sentencing, Judge Kollar-Kotelly indicated that after you have successfully completed at least ten years on supervised release, she may be inclined to early terminate the remainder of your supervised release term. This issue can not be raised until you have successfully completed the ten year term of supervised release.

This plea offer was made prior to an indictment being filed in this case and therefore no pretrial motions were filed. However, at the detention hearing in your case, I did cross examine the detective who chatted with you on-line.

If you file a motion pursuant to Rule 35 or a habeas petition pursuant to § 2255, you should be advised that this is in violation of your plea agreement. If you are attempting to withdraw your plea agreement, and you are successful in doing so, you should be aware that it is likely you will face additional charges than to what you pled guilty.

At both plea hearings in your case, Judge Kollar-Kotelly was very thorough in making sure you understood the differences between each of the offenses and the penalties associated with each offense. Therefore, at your sentencing hearing, the only issue for the judge to decide was the term of supervised release to be imposed since the other penalties (an aggregate of 90 months) had already been determined.

I hope this letter answers your questions. As we previously discussed, I will send you a copy of the sentencing hearing transcript and a copy of the judgment once you are placed at a Bureau of Prisons facility.

Sincerely,


Dani Jahn
Assistant Federal Public Defender

**Attachment 3**

June 1, 2007

Dani Jahn, Esq.
Federal Public Defenders Office
633 Indiana Ave. NW
Washington, DC 20001

Dear Ms. Jahn,

I am informing you that I am now in Otisville, NY at the Federal
Correctional Institute. I was transferred from Brooklyn MDC on May 24. I am
trying to get adjusted to a very foreign lifestyle.

I was in receipt of your letter dated at the end of March or beginning
of April but did not respond right away. I had typed two letters to send
before I left DC but I did not mail them after reflecting on the tone of the
letters. I will briefly express a few thoughts to express on my sentence but
I am not at this point asking my plea to be withdrawn, I am quite aware of
the risks of doing so. I am also quite aware that I have a high bar to reach
("manifest injustice") before the court would entertain a plea withdrawal at
this point of my incarceration. I did a lot of study on the issue before
leaving DC regarding the elements of the charges and whether they could have
met the standards to allow for concurrent sentencing, whether it was lawful
to run concurrent sentencing with a DC charge and a Federal charge, the rule
of lenity, I scoured the sentencing guidelines for anything that would have
precluded me from being sentenced concurrently, and found numerous case law
to support an argument of concurrent sentencing on the charges.

I want to impress upon you, irregardless of the charges or what you may
have thought of me in this case, that I am outraged, disappointed, and in a
way disgusted with the way I was sentenced and the arrogance of the US
Attorney. I have stumbled into a dark world here and have heard numerous
stories from others how the US Attorneys have been rather abusive in their
powers, but irregardless of other cases, I was outraged from last November
when the plea agreement was brought forth. Richard Steinbronn heard comments
in the hallway after one of the hearings from Pat Stewart how she was
disappointed I took a plea because she was looking forward to taking this to
trial, and I can only assume she wanted to send me away for the rest of my
life for a stupid chat and for the photos that I feel were private anyway
since I was not trafficking any of them. Of course looking back I do have
regrets over the entire situation, but I have fundamental beliefs in privacy
and First Amendment issues that has been challenged all the way to the

Supreme Court in the past. In my case there were no victims, no matter what the argument was over the photos. I did not know I had photos of someone who had been so severly abused, if I had known I would never have kept anything. One may argue that the detective posing undercover was a v

One may argue that the detective posing undercover was a "victim", but in reality was he? And there is always the matter of mens rea. I had no intent of doing anything illegal that night, no matter what you say. You did not clearly understand what I was doing because you did not interview me in depth on the incident. Your insistence that I answer Judge Kollar-Kotely in the affirmative on the question of intent really disturbs me because I had no intent of committing a crime at that scene. I never stopped on that street and had no intention to. I was curious to see if there was someone real I was chatting with, that's all. The police did not tell the truth in the information sheet attached to the charges in the initial stage of the process. I waived the probable cause hearing thinking that the evidence would not be presented and hoping to keep the evidence out of the courtroom, but pictures of me were waved around the court anyway in the bond hearing. I have been following cases as I could and have watched others receive sentences far less than I did for actually committing rape or for actually having sex with minors. I never even came close to doing that. There is a case in the local NY area near here where two teachers at a school for troubled teens had sex with 16 year old boys and got out on $1000 bail. I keep finding cases where people got 1-3 years for chatting, and in some locales the illegal photos are considered misdemeanors. I still do not have a clue why I received such a harsh sentence, it makes no sense to me. Weren't you incensed when the US Attorney gave you the plea agreement? Didn't you argue for concurrent sentencing considering the elements of the two charges were enough to justify concurrent sentences? How strongly did you argue the point?

Since I was unfamiliar with criminal law at the time, I was relying totally on your advice, but now after studying the laws closely in DC and studying the sentencing guidelines, I feel raped myself. researching the sentencing guidelines, I am more incensed at the harshness of the sentence. I am in with convicts who have committed some very serious crimes and have received lighter sentences than I did. Therefore, considering that case law plays a huge part in motions and trials and sentencing and so forth, my eyes have been opened to something I could almost consider a scam in the Justice

Department, and I am suspicious of all the players involved in all these cases, Public Defenders included. There are serious problems in New York with the quality of representation of defendants by Public Defenders, and I was not terribly excited by what I saw in DC. Now I know better. However, considering the Draconian and mean-spirited attitude of the current US Attorneys, including AG Gonzalez, I shouldn't be so suprised. I really don't think you clearly understand me or my mind or how I feel, and being prosecuted by a female, represented by a female, and having a female Judge left me feeling at a disadvantage. You may not like the tone of this letter, but I have been wanting to express my view at some point for the record and to let you know that I am not rolling over to play dead and go along with everything no matter what. If I just let the US Attorney do whatever they want, I would end up in prison until I die, and with the idiotic rules and attitudes of the US Parole Commission, I could very well end up right back in while on supervised release just because a parole officer doesn't like me or my charges.

I believe I have a right to be outraged.

I am watching the laws being considered in Congress now with hopes that my charges will not preclude me from being able to take advantage of a sooner release. As it is, restrictions will be a part of the rest of my life, I have not much to lose in watching and challenging if necessary. Will I take the plea back and take a chance on the court agreeing to a concurrent sentence? Only if a new plea agreement were drawn up even before taking a plea back. What standards would I use to take the plea back? I will not reveal that to you at this time. How would this be done? I am still researching and am not ruling out any options including new counsel. I don't know yet but am praying and thinking and researching and consulting. To take a new plea would be a political process rather than legal considering that the Judge could have discretion to reject a new plea and that the US Attorney would probably laugh in your face if you presented it to him. And please don't tell me about the Adam Walsh Act anymore. I know what the penalty is under that law, I feel there are Constitutional issues with parts of that law regarding internet crimes if there is no victim under the First and Eighth Amendments. An actual victim of enticement where there was real physical contact made or injury or physical touching or harm may be different, but as far as a chat goes, even if with a minor, and if the chat is dangerously close to entrapment, should not warrant such a cruel and unusual punishment.

Do I support endorse this activity or would I do this again? The answer is
no. That is why I propose that warnings be placed on the internet, which you
did not understand my intent for that either when I proposed that to you.
Not only minors, but adults need to be protected from activities that many
may think is legal or may be struggling with addiction or mental issues on
that need help rather than prison. Don't you agree and would you argue that?

My hope is to be able to leave prison earlier than the sentence I have.
I have been involved in religious activities since being incarcerated and
have come to grips with what I did and how to deal with the mental issues I
was facing before incarceration. The problem for me is that the rest of my
life is ruined and is basically over with. I will not be employable when I
get out, I will be considered a creep and a monster even though I am not, I
have lost a part of my family from this, I have lost my wife emotionally and
spiritually, I have caused anguish to an incredible degree with the rest of
my family, and from all this I would never go down either this road or any
road that has anything to do with illegal activities ever again. I'm sure y
you've heard it before and seen it before with all the people you have
represented through your job, but you need to be incarcerated to know what it
is like and to experience the depression and darkness. That experience would
fire up your emotions and would enable you to see the law from this side and
how arrogant and vicious not only Prosecutors are but also Judges. I am
disgusted, and have been since 2001, about the number of people incarcerated
in the United States, a country that is supposed to value indiviuality and
freedom. I hear so many stories of people going to prison for a cell phone
call or being in the wrong place at the wrong time having nothing to do with
a crime being committed. I was a conservative politically before all this,
but have lost respect for the process and the system and don't trust anyone
involved in Justice. Therefore I have to research on my own to find out what
my rights and choices are that will benefit me and protect me. I feel I lost
something somewhere along the lines.

I will continue to be in prison 5 years from now, please don't forget me
in the year 2012. Is this fair or justice to send me to prison at my age
with no criminal history for this length of time? You know the answer. How
hard did you fight? I should have challenged you earlier, but there is
always a "should have" or a "could have", isn't there? I can say I have
found my faith again, but is it really necessary to send someone like me to
prison  for 7 1/2 years for a crime with no victim, no money lost, no

threats, no violence, no injury or perjury? Please think about it. Instead of getting angry at me for this letter, next time please turn your anger to the US Attorneys for their arrogance and disrespect for law. If you have a problem with this letter, please share it with your supervisor. I have a lot of issues with the way my case was handled on both sides. I have a right to be incensed, I am the one paying for this with my life, my blood, my family, and my safety. Please remember what happens to people who are caught up in the mess of the legal system years after. It should make your blood circulate faster, for if it doesn't then not only I but others have just become another number and another chance for the Bureau of Prisons to make money off unsuspecting inmates.

Like I said, my eyes have been opened, I just wish the public knew more about what is going on behind the scenes and the numbers of people in prison. Some of the sentences could have been handled differently and there could be more programs at reform rather than the basic attitude of punishment. Don't you think? As I said, you and other attorneys and prosecutors should come to jail and to prison to see what is going on.

I would like to present some questions to you for answer.

1. I know I was not charged with possession of ammunition. Why not, and what is the statute of limitations on bringing charges? I know the plea agreement said they would stop investigating me but it did not say they would not charge me later with ammunition. Will they use this against me later?

2. I do not want to return to DC anymore in the future for any proceeding in this case. I read the statute on a Rule 20 change of venue. It did not give any specific guidelines as to why. I am considering a Rule 20 Motion that would need to be agreed to by both attorneys. I prefer to stay in NY which would be the SDNY. Have you done a Rule 20 before? What are the rule of thumb considerations to have the case transferred after incarceration? I am not going to do anything now but am thinking down the line. Please advise. If there are any complaints from my supervised release where would any proceedings be heard, if I am in NY at the time of my supervised release?

3. Will my charges preclude me from any future relief if the laws change, especially for inmates over the age of 45 or if the 85% law changes to 65%?

Or am I screwed for life with these charges?

If I have any more questions or thoughts you will hear from me. I would like you to share this letter with your supervisor and with the head of your

Public Defenders office.   Like I said, I am disturbed deeply inside and actually feel I am a victim instead of the other way around.   I am outraged at the attitude, arrogance, maliciousness, insensitivity, and abuse of power being used by the US Attorney.   They never spoke to me about anything.   I never had intent, it was a dumb thing I did, but I never had intent.   To make me plea guilty to a crime with no intent could be manifest injustice, but I have to research more and think about this.   I am disturbed deeply by the entire process, more disturbed by the process than about the crime.   I told you in court I had no intent, you can't deny that.   And again please don't write me anymore about the Adam Walsh Act.   I know about it.   Therefore, I want to know what other underhanded dirty tricks the AG will pull on me in the future.   I don't see why they would, they got their conviction and they got another source of profit off me and my family.   Consider how dirty the AG is if there is no consideration of my legal issues.

I hope that even though your caseload is ridiculous and overly burdensome, just making plea agreement after plea agreement does not a good lawyer make.

I should have researched the issues last year but I depended on you to present all information to me.   I will now find out on my own using my own research skills and other outside sources including other attorneys to check my options and understand more how I was railroaded by this sentence.

I want you to feel and understand my anger and despair.   You will be angry reading this letter but as I said I want you to share it with your bosses and turn this anger towards the government for some of THEIR tricks.   Please.

I will close now, you may write me at the address on the envelope.   I am still in touch with Richard Steinbronn although now not by visits but by correspondence.   I am also in touch with Jim Borer, another attorney up here in NY who lives very close to Otisville.   One thing I will say is that God allowed me to be sent here considering the number of inmates trying to get in here; this institution is one of the best in the country in the way they treat inmates (with a greater degree of respect than other places), the number of religious and educational programs available, and the opportunities I have to be busy.   My family and friends are very close by, I just hope I am not sent out of here after 2 years.   My custody level according to what I was told at intake is "low", and the officer wondered why I was in a "medium-high medium" facility.   I would rather be in a camp with no fence and no controlled movement, but I need to be close to my family.   Anywhere else

would make it very difficult to receive visits. I am familiar with all the surrounding areas and communities, can hear news of my hometown on the radio, and can watch news of NYC which I missed terribly in DC. There are lots of white and hispanic inmates, and Asians, especially Chinese. I can have reasonable intelligent conversations with people, and spend a lot of time involved in religious activities as well as walking the track to get fresh air, sunshine, and exercise. I have lost 25 lbs. since incarcerated and when I look at my face I have aged a lot under the stress. I have been in a lot of despair and depression but am dealing with it through prayer and religion. I am a very religious person, at heart, which makes my actions all the more puzzling not only to others but to me as well. But I have resolved those issues and am not enticed anymore by temptation of the internet or otherwise, I have had a very profound religious re-awakening that I had years ago as a younger man. That is why all of this hurts so much, it defies logic what happened to me. I don't have a mental problem and am not obsessed with what got me into trouble in the first place. I can say it was curiosity more than anything, even though I spent too much time online I got stories from all kinds of people I found unbelievable, so I wanted to check it out for myself. Problem is I went overboard in my fantasies, and began having hangups with my wife. Now that I have been separated not only from her but from society I can see clearly what was going on inside my head, which was nothing more than fetishes planted there by others online. I never had any proclivity to this ever and will never in the future because I recognize it for what it is: a fantasy and a fetish and a trap created in the minds of others who planted seeds of enticement in MY head that I acted out in response to my own temptations. After reading some books on psychlogical issues and listening to certain radio programs, I learned how destructive these things are to children AND adults. It scared me actually, so I cannot go back down that path again. Nor any path leading to destruction from sexual activities or alcohol, drugs or anything. I am guilty of allowing myself to go too far and not keeping life under control, I have never touched a minor ever and never will. I have discovered how widespread this problem is, especially incest, and feel that any research to discover ways to help people prevent it before it starts is good, but I don't necessarily think straight up prison is the best answer. I would participate in research if the opportunity came up but only if done with no penalities or liabilities to myself only because I don't trust the government now.

I willl end this letter here but you may be hearing from me again in the future, or near future.  I may have more questions about the discussions you had with the US Attorney as I believe I am entitled to know.  I may have restrictions receiving some of the documents from you including transcripts, the PSR, charging docs, etc. as there are problems with theft and invasion of privacy by other inmates looking for snitches.

I look forward to your responses to my questions, and as I said I may have more.  In the meantime try to have a pleasant summer with the good weather now and try to manage your caseload to where you can spend more quality time with inmates and their legal problems.

Sincerely,

Randall Casseday
28791-016
FCI Otisville, NY

**<u>Attachment 4</u>**

April 3, 2008

Ms. Danielle Jahn, Esq.
Public Federal Defenders
625 Indiana Ave. NW Suite 550
Washington, DC  20004

    In re: United States of America v Randall Casseday, 06-329(CKK)

Dear Ms. Jahn,

    I am writing to request a copy of the entire case file your
office is maintaining on my case.  It will be needed to examine
various aspects of the case, including but not limited to the
crime and the charges, the evidence used against me, the arrest,
the search warrant(s), probable cause issues, subsequent litigation,
court proceedings, and transcripts.

    It is critical that I preserve everything possible, as there
are issues that may be unresolved legally.

    In addition, any and all relevant discussions with law enforcement
officials as well as the US Attorneys that you are able to divulge
are necessary to allow me to independently and intelligently make
informed decisions regarding whether to further pursue relief.
I understand that you would neither do anything to further damage
my (Constitutional) rights nor cause any further pursuit of justice
against me, not that there is anything further to pursue.

    Again, I request a copy of your case file, including copies
of warrants, notes you are able to divulge, transcripts if available,
the chat log or any other computer forensic evidence that was
printed out and/or preserved by law enforcement, and anything
else (except photographs).  Further, if you have available, a
transcript of the "interrogation" at the police station.  I may
need to file motions to secure anything you do not have available
from the prosecution or from the DC PD.

    Thank you very much for your cooperation.

                       Respectfully,

                       Randall Casseday
                       USM 28791-016
                       FCI Loretto
                       P.O. Box 1000
                       Loretto, PA  15940

**<u>Attachment 5</u>**

**FEDERAL PUBLIC DEFENDER**
DISTRICT OF COLUMBIA
SUITE 550
625 INDIANA AVENUE, N.W.
WASHINGTON, DC 20004

A. J. KRAMER
*Federal Public Defender*

Telephone (202) 208-7500
FAX (202) 208-7515

April 23, 2008

Randall Casseday
USM # 28791-016
FCI Loretto
P.O. Box 1000
Loretto, PA 15940

Dear Mr. Casseday:

     Enclosed please find a copy of your case file. The only document not included is your Pre-Sentence Report because the Bureau of Prisons does not allow inmates to keep a copy of their report. In addition, I am unable to send you a copy of the videotaped recording of your discussion with the Metropolitan Police Department because the Bureau of Prisons does not allow videotapes.

Sincerely,

Dani Jahn
Assistant Federal Public Defender